HOLLI  LUNDAHL
P.O. BOX 3109 #11089
HOUSTON, TEXAS
469-522-9725
EMAIL:  hollitlundahl@gmail.com

## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS

## DALLAS DIVISION

| | | |
|---|---|---|
| HOLLI LUNDAHL IN HER PERSONAL CAPACITY AND IN HER ASSIGNEE CAPACITY FOR THE M.D. DIET COMPANIES | : | |
| | : | CIVIL CASE NO.  08-CV-01990 |
| Plaintiffs | : | CORRECTED FIRST AMENDED COMPLAINT (VERIFIED) |
| UNITED STATES OF AMERICA ;  THE FEDERAL DEPT. OF INSURANCE CORP.;  FORBES MAGAZINE; KAI FALKENBERG; OFFICE OF THE FEDERAL PUBLIC DEFENDERS;   ROBERT STEELE;  MARY CORPORON;  BRUCE OLIVER;   VICKY GREGORY;   MICHEAL JOHNSON;  LAW OFFICES OF SNELL AND WILNER;  PAT BARTHOLOMEW;   DONALD RIDGE;  LAW OFFICES OF MORRIS, POLICH AND PURDY; JOHN LECHLEITER;  ELI LILLY AND COMPANY;  RONALD DOLLENS;  GUIDANT CORPORATION;  CHRISTINE DURHAM,  STEPHANIE SEYMOUR,  RICHARD TALLMAN, DEE BENSON IN THEIR OFFICIAL CAPACITIES;   ROBERT GREGG, LESLIE POWERS,  NURSE WHITE,   SUPERVISOR ROERDAN,  CHRISTINE EDWARDS,  IN THEIR PERSONAL AND OFFICIAL CAPACITIES;   PRUDENTIAL INSURANCE (PIMCO); GE; CITIGROUP, INC.;  FIDELITY MUTUAL;   JP MORGAN/CHASE BANK;    WELLS FARGO BANK; GLENNA GOTTFREDSON; WASHINGTON MUTUAL BANK; LILIA CHAVARIN;   ALETA BODELAY,  DOUG CRESSLER, WILLIAM THURMAN,   SONJA SORENSON,   CY CASTLE, LANCE EDWARDS,  GREG ESTES,   FRED TILLMAN AND GEORGE LOPEZ IN THEIR PERSONAL AND OFFICIAL CAPACITIES;   AG ERIC HOLDER IN HIS OFFICIAL CAPACITY CONNIE ELLIANO;   LORI PIVO;   BEVERLY  GILSDORF; US BANK;  CEO RICHARD DAVIS AND DOE EMPLOYEES; WILLIAM DOWNES IN HIS OFFICIAL CAPACITY;  FREDERICK LERNER ,  HOSPITAL CORPORATIONS OF AMERICA;   HCA- CEO RICHARD BRACKEN, KAREN KADYK  AND DOES  1-20 DEFENDANTS | : : : : : : : : : : : : : : : : : : | TO BE CONSIDERED WITH ADDENDUM OF  EXHIBITS FILED UNDER SEPARATE COVER AND REFERRED TO IN THIS CORRECTED FIRST AMENDED COMPLAINT<br><br><br>DEMAND FOR JURY TRIAL |

## I.   SUBJECT MATTER JURISDICTIONAL ALLEGATIONS
### (ALL FEDERAL LAWS WHICH AUTHORIZE THIS SUIT)

This court has subject matter jurisdiction under the Federal Torts Claims Act; Bivens Constitutional Torts and RICO.   This court has supplemental jurisdiction over plaintiffs state law claims for abuse of process,  malicious prosecution,  conversion,  false arrest and imprisonment,   Breach of Implied Covenant of Good Faith and Fair Dealing, and Tortious Interference With Prospective Economic Advantage and Business Relations and Intentional Infliction of Emotional Distress.    Plaintiff also seeks a backwards ACCESS claim within the meaning of  *Christopher v. Harbury,* 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)  1, or in the alternative,   alleges a single continuing conspiracy  wherein  the  last overt act is presently ongoing in the courts present failure to provide LUNDAHL with an impartial tribunal for this action.  2      The Federal laws and Rules regarding this court's subject matter jurisdiction are encompassed herein and are stated as follows:

### 1st COA:   JURISDICTION AND VENUE UNDER THE FTCA

1.   Plaintiff  presently resides in the state of  Texas,  Tarrant County.

2.    Of the claims herein brought,  the First claim is against the United States pursuant to the Federal Tort Claims Act (28 U.S.C. §2671, *et seq*.) and 28 U.S.C. §§1346(b)(1), for money damages as compensation for loss of property and personal injuries that were caused by the negligent and wrongful acts and omissions of employees of the United States Government  while  acting  within  the  scope  of  their  offices  and  employment,      under circumstances where the United States,  if a private person,  would be liable to the Plaintiffs in accordance with the laws of the  States  of  Texas and Utah.

_____

1.   *See Christopher v. Harbury,* 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), The plaintiff may pursue a backward access claim when plaintiff has lost a prior case;   a prior case was inadequately settled;  or plaintiff cannot now obtain relief on the original claim because of some official misconduct which interferred with plaintiff's fair access to the courts.

2.   See WATSON v. Milyard,  09-1006 (10th Cir. 2009) (Equitable tolling of the statute of limitations is permitted in exceptional circumstances",  *Gibson v. Klinger*, 232 F.3d 799, 808 (10th Cir. 2000),      such as "when an adversary's conduct— or other uncontrollable circumstances — prevents a prisoner from  filing a claim." *Id*.

3.     Venue is proper in Texas because  all or a substantial part of the acts and omissions forming the basis of  the underlying  FTCA  claim  occurred in the Northern District of Texas.

4.     The defendants are liable to plaintiff  for the excepted torts of false arrest/ imprisonment;  malicious prosecution;  abuse of process as it pertains to  dismissed criminal action:   U.S. v. Holli Lundahl, case no. 2:06 CR 693 and other actions where access was conclusively denied as a result of the defendants abuse of process. The USA is also liable to plaintiff for Breach of Implied Covenant of Good Faith and Fair Dealing,  Tortious Interference With Prospective Economic Advantage and Intentiional Infliction of Emotional Distress.  3

5.     Plaintiff has fully complied with the provisions of 28 U.S.C. § 2675  of the Federal Tort  Claims Act.

6.     This suit has been timely filed,  in that Plaintiffs timely served notice of  her claims upon the Department of Justice and the BOP in 2008 and again in 2009.     The U.S. Department of Justice assumed responsibility for processing the claims on behalf of all respective agencies.     The DOJ verified receipt of LUNDAHL'S administrative claims by email but has not formally denied LUNDAHL's claims.

7.     The employees committing the torts against plaintiff are and were "investigative or law enforcement officers",  or acting as such,  within the meaning of 28 U.S.C. §2680(h),  and the pursued torts  have been excepted for liability under  28 U.S.C. §2680(b).

## 2nd COA:  JURSIDICTION UNDER BIVENS CONSTITUTIONAL TORTS

8.     The  defendants  are  liable  to  plaintiff  under  Bivens   Constitutional Torts for acts which took place in the states  of  Texas  and Utah.     The defendants while acting under color of law did violate LUNDAHL's  First,  Fourth, Fifth and Sixth Amendment Rights to

_____

3.     See Fort Vancouver Plywood Co. v. US, 747 F.2d 547(9th Cir. 1984)(A claim for Tortious Interference with Prospective Economic Advantage is actionable under the FTCA.); Walsh v. US, 672 F.2d 746 (9th Cir. 1982)(A claim for Breach Of Implied Covenant of Good Faith and Fair Dealing is actionable under FTCA); *Chandler v. United States,* 875 F.Supp. 1250, 1266 (N.D.Tex.1994) (holding that allegations based on bringing charges without probable cause and withholding of material information from prosecutors and grand jury are not barred by FTCA.)

be free from deprivation of life, liberty or property without due process of law;  to a fair trial; to self representation; and to counsel of choice. The defendants caused profound damages to LUNDAHL.  Venue is proper against all defendants under this court's pendent jurisdiction vis-a-via the FTCA and the federal RICO act.

### A.   Defendants Violated LUNDAHL's First Amendment Rights

9.   The defendants violated LUNDAHL's First Amendment rights in the following respects:

(a)   Lundahl's  right of  fair access  to  the  courts, and;  4

(b)   Lundahl's  right  not  to  be  vindictively  prosecuted;  5

### B.   The Defendants Violated Lundahl's Fourth Amendment Right To Be Free From Unreasonable Search And Seizure

10.   The  defendants violated LUNDAHLS rights under the Fourth Amendment to be free from unreasonable search and seizure without probable cause  and for continuation of a criminal case based on false and fabricated evidence to a federal  grand jury which nullified the existence of probable cause.  6

_____

4.   See *Motor Transport Co. v. Trucking  Unlimited*,  404 U.S. 508, 510 (1972) (holding that an individual's right of access to courts is protected by the First Amendment's clause granting an individual's right to petition the government for redress of grievances);

5.   Prosecutorial vindictiveness is shown  by  evidence that the prosecutor's charging decision was an unjustifiable penalty resulting solely from the defendant's exercise of a protected  legal  right." *Id.* (citing *United States v. Goodwin,* 457 U.S. 368, 380-81 (1982) (There is a constitutional right to be free of "bad faith prosecutions.").

6.   See Wilkins v.  DeReyes,  528 F.3d 790 (10th Cir., 2008) citing *Mondragon v. Thompson,*  519 F.3d 1078, 1083 (10th Cir. 2008); and  Wallace v. Kato, -  U.S. -,  127 S.Ct. 1091, 1096, 166 L.Ed.2d 973 (2007)  ("[A]fter [institution of legal process],  unlawful detention forms part of the damages for the ... tort of malicious prosecution,  which remedies detention accompanied not by absence of legal process,  but by *wrongful institution* of legal process."). In this context,  a Fourth Amendment violation exists  when a plaintiff alleges the legal process itself to be wrongful.  In the Fourth Amendment context,  a malicious prosecution claim  deals with *judicial determinations* of probable cause,  either at the warrant application stage or the Grand Jury stage.  "Knowingly arresting a defendant without probable cause,  leading to the defendant's subsequent confinement and prosecution,  violates the Fourth Amendment's

**C.    The Defendants Violated Lundahl's Fifth Amendment Right To
Be From Deprivation of Property Without Due Process Of Law**

11 .    The defendants violated LUNDAHL's Fifth Amendment right to be free from

deprivation of liberty and property without due process of law in the following manner:

(a)    The defendants continued the wrongful criminal prosecution against LUNDAHL

after LUNDAHL submitted mandamus papers to the court asserting that her defenses of

Double Jeopardy Bar, Ex Post Facto Bar, Collateral Estoppel Bar,  Mootness and lack of Corpus

Delicti Bar; and Vindictive Prosecution Bar precluded LUNDAHL's prosecution on the charged

crimes and  stripped the court of subject matter jurisdiction as a matter of law;  7

(b)    The defendants stole LUNDAHL's causes of action that were in line to be refiled

under Utah's savings statute -   by yet again placing LUNDAHL in jail under supermax

classification status to prevent LUNDAHL from refiling these actions;  8

_____

proscription against unreasonable searches and seizures.  *E.g. Meacham,* 82 F.3d at 1561
(citing *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).   See also United
States v. Agurs, 427 U.S. 97, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976) ("Where an officer knows, or
has reason to know, that he has materially misled a magistrate  for a finding of probable cause,
the shield of qualified immunity is lost."   *Golino v. City of New Haven,* 950 F.2d 864, 871 (2d
Cir.1991)   "The grand jury only has the power to accuse,  not to convict."   See Mooney v.
Hollohan, 294 US 103,  55 S Ct 340,  79 L.Ed. 791 ("the Court has consistently held that a
prosecution obtained by the knowing use of perjured testimony and false evidence is
fundamentally unfair and violates the Fourth Amendment proscription against unreasonable
seizures. )

7.    See **Wilkins v. DeReyes, 528 F.3d 790 (10th Cir., 2008)** ("The initial seizure is
governed by the Fourth Amendment, but at some point after arrest,  constitutional analysis
shifts to the Due Process Clause."  *Pierce v. Gilchrist,* 359 F.3d 1279, 1285-86 (10th Cir.2004).
If the defendant has been imprisoned without legal process or based upon false process,   the
defendant has a claim under the Fourth Amendment.   If the defendant has been imprisoned
and continues to be imprisoned pursuant to legal but wrongful process,   the defendant has a
claim under the procedural component of the Fourteenth or  Fifth  Amendments's  Due
Process Clauses analogous to a tort claim for malicious prosecution.

8.    See ***Christopher v. Harbury,*** **536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413
(2002) (** A backwards access claim covers claims not in aid of a class of suits yet to be litigated,
but of specific cases that cannot now be tried (or tried with all material evidence),  no matter

(c)    The defendants conspired to convert and interfere with LUNDAHL's commercial and private income held by the banks and her businesses - to prevent LUNDAHL from funding private counsel of her choice and to render LUNDAHL a pauper once again;  9

(d)    The defendants falsified mental process against LUNDAHL in order to corruptly conceal their improper prosecution of  LUNDAHL and to provide a corrupt defense for this already filed  civil  rights  action;  10

_____

what official action may be in the future.   The official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case, e.g., Foster v. Lake Jackson, 28 F.3d 425, 429 (C.A.5 1994);   Bell v. Milwaukee, 746 F.2d  1205, 1261 (C.A.7 1984)  (`[T]he cover-up and resistance of the investigating police officers rendered hollow [the plaintiff's] right to seek redress'),  the loss of an opportunity to sue, e.g.,  Swekel v. River Rouge, 119 F.3d 1259, 1261 (C.A.6 1997) (police coverup extended throughout `time to file suit ... under ... statute of limitations'),  or the loss of an opportunity to seek some particular order of relief,  as Harbury alleges here.   These cases do not look forward to a class of future litigation,  but backward to a time when specific litigation ended poorly,  or could not have commenced,  or could have  produced  a  remedy subsequently unobtainable.    The ultimate object of these sorts of access claims,  then,  is not the judgment in a further lawsuit,  but simply the judgment in the access claim itself,  in providing relief obtainable in no other suit in the future.

9.    See **US v. Jones, 160 F.3d 641, 649  (10th Cir. 1998)** (due process right not to have assets unrelated to the charges frozen so that defendant could obtain qualified  counsel of choice).  "Right  to  counsel  of  choice  is  violated  when the government wrongfully seizes plaintiffs assets to prevent plaintiff from funding counsel of their choice in their defense.  See U.S. v. Kaley,  579 F.3d 1246 (11th Cir., 2009)  citing to United States v. Bissell, 866 F.2d 1343 (11th Cir.1989 (a defendant whose assets are restrained pursuant to a criminal charge in an indictment,  thus rendering him unable to afford counsel of choice,  is denied his sixth amendment right when the assets seized are not related to the charges.).   Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972);    Bissell, 866 F.2d at 1352 (quoting $8,850, 461 U.S. at 564, 103 S.Ct. 2005).   Indeed, our law is clear and unambiguous that depriving a defendant of the counsel of his choice by wrongfully freezing his assets,  is a serious and significant impediment to his ability to effectively navigate our nation's criminal procedures and protections.    See Gonzalez-Lopez, 548 U.S. at 146, 126 S.Ct. 2557 ("[T]he Sixth Amendment right to counsel of choice  ...  provides that the accused be defended by the counsel he believes to be best.");  Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) ("the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment").

10.    See  **Kitchens  v.  US,   272 F.2d 757   (10th Cir. 1957)**  (When a person is adjudicated to suffer from a mental illness,  the ruling stays until overturned.)

(e)      LUNDAHL was denied the right to an impartial tribunal;   11

**D.      The defendants Violated LUNDAHL's Sixth Amendment Rights**

12.      The defendants violated LUNDAHL's sixth amendment rights by the following:

(a)      Lundahl's right to self representation;   12

(b)      Lundahl's right to counsel of her choice;   13

---

11.      See U.S. v. Cooper, 283 F.Supp.2d 1215 (D. Kan., 2003) (When a judge fails to remove himself sua sponte under § 455(a),  a party may invoke the disqualification statute under 28 USC section 455(b).  *See, e.g., Liteky,* 510 U.S. at 542-43, 114 S.Ct. 1147; *Green v. Branson,* 108 F.3d 1296, 1305 (10th Cir. 1997).   The important policy behind this statute is to promote "public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 858* n. 7, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988).  *Tumey v. Ohio,*  273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (A criminal defendant is entitled to an impartial tribunal under the due process clause);  Holloway v. Ark, 435 US 475, 484-85 (1978)(Court has a duty to avoid conflicts of interest in attorney-client relations in criminal proceedings.); US v. Griffin, 874 F.2d 634 (9th Cir. 1989)(Judge has duty to recuse when a statutory command required disqualification); Cascade Nat. Gas Corp v. El Paso Nat. Gas Co., 386 US 129, 17 L.Ed.2d 814, 87 S Ct. 932 (1980)(Judge showed personal resentment toward the defendant such that his impartiality was reasonably questioned);  Sullivan v.  US Dept. of Navy, 365 F.3d 827 (9th Cir. 2004)(judge expressed his commitment to the facts presented by the government agency such that his impartiality was reasonably questioned).

12.      Persons accused of crime have  a right of self-representation at trial under the 6th amendment.   Faretta v. California, 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

13.      The defendant has the right to counsel of choice.   (People v. Gzikowski, supra, 32 Cal.3d  580, 589, 186 Cal.Rptr. 339, 651 P.2d 1145.)   As stated in the controlling case of Chapman:  "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.... "The right to counsel of choice is such a right.   Just as when a court improperly denies a defendant's motion to represent himself (Faretta v. California (1975) 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562), or to replace counsel because of a conflict of interest (Holloway v. Arkansas (1978) 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426), or when an indigent criminal defendant is denied counsel altogether (Gideon v. Wainwright (1963) 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799);   an indigent criminal's sixth amendment right is violated when the defendant is forced to proceed with a retained attorney whom he has consistently,  and in a timely manner,  sought to discharge in favor of  another or himself.   Chapman v. California (1967) 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705.

(c)      Lundahl's right to effective assistance of counsel, and 14

_____

14.      The US Supreme Court has held the right to effective assistance of counsel is a constitutional right under the 6th amendment and the due process clause.    See **United States v. Cronic,  7. 466 U. S. 648  (104 SC 2039, 80 LE2d 657) (1984)**  (The sixth amendment assures fairness in the adversary criminal process."   United States v. Morrison, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981).   "Unless the accused receives the effective assistance of counsel,  a serious risk of injustice infects the trial itself." Cuyler v. Sullivan, 446 U.S., at 343, 100 S.Ct., at 1715.   "If counsel entirely fails to subject the prosecution's case to meaningful adversarial testing,  then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable because the petitioner has been "denied the right of effective cross-examination" which "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'   Davis v. Alaska, 415 U.S. 308,  318,  94 S.Ct. 1105,  1111,   39 L.Ed.2d 347 (1974)  (citing Smith v. Illinois, 390 U.S. 129, 131, 88 S.Ct. 748, 749, 19 L.Ed.2d 956 (1968), and Brookhart v. Janis, 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966)).   Accord in **Pena v. State, 226 S.W.3d 634 (Tex. App., 2007).**

In a thorough analysis of what constitutes "effective" assistance of counsel,   the colorado Supreme Court in re **People v. Bergerud, Case No. 08SC936 (Colo. 1/11/2010) (Colo., 2010)**  opined the following:

There are three important sources of limitations on a defense attorney's ability to direct the course of a trial.    First,   certain constitutional rights are given directly to the defendant and cannot be wielded by an attorney representative.   See Faretta, 422 U.S. at 820. Decisions such as whether to plead guilty,  whether to testify,  whether to waive a jury trial,  or whether to take an appeal are so fundamental to a defense that they cannot be made by defense counsel,   but rather must be made by the defendant himself.   See Jones v. Barnes, 463 U.S. 745, 751 (1983).    Second,  it is axiomatic that a trial is a truth-seeking endeavor, and so lawyers are restricted from taking actions that would contravene that purpose.   See Schultheis, 638 P.2d at 12.    Attorneys should not labor under conflicts of interest with his client which result in a complete breakdown in communications with their clients and  prevent the client from putting on an adequate defense.    The attorney must obtain the consent of his client to  trial strategies in order that the defendant control his pleading right and right to testify.    "It is a basic principle that a criminal defense attorney cannot admit his client"s  guilt without first obtaining the client"s consent to this strategy."   State v. Wiplinger, 343 N.W.2d 858, 860 (Minn. 1984).   When an attorney does not present the defense chosen by the defendant,   the  result  may  be  a  total  breakdown  in  communication  that  results  in  no representation at all.    Arguello, 772 P.2d at 94.    The third source of limitations on an attorney's actions is that the decisions of trial strategy are not subject to a conflict of interest between the attorney and client.   Mickens v. Taylor, 535 U.S. 162, 166 (2002).   When a court appointed attorney does not perform  the defense sought by the defendant,   the attorney

Footnote 14 continued....

_____

infringes on the defendant's rights to enter a plea and to testify in his own defense.  The Sixth amendment provides the defendant,  not the attorney,  the right to put on a defense.  As previously stated,   these rights  are committed to the defendant's  determination alone and cannot  be usurped by  the  attorneys' strategic decisions.  See Barnes, 463 U.S. at 751.  If the attorney  oversteps  his  authority  and  prevents  the  defendant  from  making  the fundamental choices extended to him by the Constitution, or the attorney  informs the defendant that they have no intention of dutifully following the defendants desires,  the defendant should be entitled to remove the attorney for cause,  replace counsel or proceed pro se rather than being  forced to  chose  between his right to counsel  and other of his trial rights.  See Maurer, 424 F.3d at 313;  Wilks v. Israel, 627 F.2d 32, 35 (7th Cir. 1980).   The Supreme Court has held that where the attorney-client conflict with respect to trial strategies was so great that it resulted in a total lack of communication or otherwise prevented an adequate defense,  that such conflict was structural error requiring reversal.  Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991) (absence of effective counsel  from beginning to end of trial is structural error (citing Gideon v. Wainwright, 372 U.S. 335 (1963))).   Here, Bergerud argued that the conflict with his attorneys concerning whether to pursue a theory of self-defense resulted in a complete breakdown in communications and implied that his attorneys had failed to investigate his desired self-defense theory and the right to plead his innocence.  The right to enter a plea is one of those fundamental choices that must be decided by the defendant alone.  See Barnes, 463 U.S. at 751.   Counsel cannot concede the defendant's guilt to a crime over his express objection,  thereby waiving his privilege against compulsory self-incrimination.   See Boykin v. Page 29 Alabama, 395 U.S. 238, 243 (1969);   see also Brookhart v. Janis, 384 U.S. 1, 4-7 (1966).    In addition,  counsel cannot interfere with the defendant's right to testify in his own behalf as to the defense chosen by the defendant.   When counsel does so,  it is likely that  counsel's examination on the defense is sure to bring about inadequate results.   "The decision whether a defendant should exercise his right to testify [is] one of such compelling importance that it is excluded from the group of constitutionally based rights that defense counsel  can elect to exercise or waive on the behalf of the accused."  People v. Curtis, 681 P.2d 504, 512 (Colo. 1984).  Rock v. Arkansas, 483 U.S. 44, 52-53 (1987) (describing the origins and importance of a defendant's right to testify).   Conflict is shown if the attorney would have wholly undermined the defendants  testimony if offered.  Wood v. Georgia, 450 U.S. 261, 273 (1981).    Last but not least,   "A defendant who cannot communicate with his attorney cannot assist his attorney with preparation of his case" Lott, 310 F.3d at 1250,  and it is very likely that the attorney will  fail in their duty "to make reasonable investigations" and to prepare an adversarial contest.  Strickland, 466 U.S. at 690; see also People v. Herrera, 188 Colo. 403, 405-06, 534 P.2d 1199, 1200-01 (1975) (describing a lawyer's duty to investigate possible defenses.)  Under these circumstances we reverse the judgment and remand for new trial after appointment of another attorney.

        Also see Valencia v. Texas Department of Family and Protective Services, No. 01-08-00345-CV (Tex. App. 12/22/2009) (Tex. App., 2009)  (..."a constructive denial of  counsel

Footnote 14 continued...

_____

occurs when a criminal defendant must navigate the proceedings against him without the aid of an attorney dedicated to the protection of his client's rights under our adversarial system of justice," or when counsel "[abandons] the defense of his client" and "entirely fails to subject the prosecution's case to meaningful adversarial testing"; tantamounting to "no representation at all." Id. at 1229;  Cronic, 466 U.S. at 659, 104 S. Ct. at 2047;  Jackson v. Johnson, 150 F.3d 520, 525 (5th Cir. 1998); see also Gochicoa v. Johnson, 238 F.3d 278, 284-85 (5th Cir. 2000).   Some examples of Constructive denial are when defense counsel sleeps  in trial while evidence is being introduced against the defendant. Burdine v. Johnson, 262 F.3d 336, 338 (5th Cir. 2001);  "when counsel  never investigates the facts,  never discusses the applicable law with [the defendant],  and never advises the defendant of the rights he would surrender by pleading guilty." Childress, 103 F.3d at 1223;  Weaterford v. Burney, 429 US 545, 558 (1977) (when defense counsel joins the tactical strategy pursued by the prosecution.); And,  Fisher v. Gibson, 282 F.3d 1283, 1307 (10th Cir. 2002) (when counsel unprofessionally attacked the defendant's credibility and bolstered the state's case).    In  U.S. v. Lavallee, 439 F.3d 670 (10th Cir., 2006):  the 10th circuit addressed   charges that defense Counsel had participated as a prosecutor on the same matter in a previous case before deciding to become a public defender.   The Gibson Court affirmed that  "[A] fair trial in a fair tribunal is a basic requirement of due process" In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955), and that  "[D]ue process is violated when an attorney represents a client and then participates in the prosecution of that client with respect to the same matter." United States v. Schell, 775 F.2d 559, 566 (4th Cir.1985).    The court concluded that in such instances a defendant has been constructively denied the right to effective counsel  in the placement of a second prosecutor to represent him.    Id. at 661 n. 28, 104 S.Ct. 2039 (quoting Cuyler v. Sullivan, 446 U.S. 335, 350,100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).   A defendant is entitled to the right to effective assistance of  "conflict-free counsel," Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

Moreover,  the right to conflict- free  counsel goes to the trial strategies pursued by counsel  and to avoidance of  a complete breakdown of communication with his client.   See U.S. v. Mendez-Sanchez, 563 F.3d 935,  941 (9th Cir., 2009) (Defendant believed  defense attorneys were  "in cahoots" with the prosecutor,  and expressed that he did not want these court-appointed attorneys representing him.    Mendez-Sanchez centers his argument on the third factor — i.e., the extent of the conflict between Mendez-Sanchez and his attorneys.   To meet this conflict prong,  a defendant must show that there was an "extensive, irreconcilable conflict"  between himself and his appointed counsel.   United States v. Smith, 282 F.3d 758, 763 (9th Cir.2002).   This conflict must have led to "a significant breakdown in communication that substantially interfered with the attorney-client relationship." United States v. Adelzo-Gonzalez, 268 F.3d 772, 779 (9th Cir.2001).   In Adelzo-Gonzalez,  the defendant moved to substitute counsel because of a conflict between himself and his attorney. 268 F.3d at 774.  For example,  Adelzo-Gonzalez's counsel had used bad language,  had threatened to "sink

(d)      Lundahl's right to an unconflicted counsel who followed the professional rules of ethical conduct laid down for attorneys.  15

───────────────────────────────

[Adelzo-Gonzalez] for 105 years" if defendant refused to accept a plea,  had tried to prevent the defendant from filing motions,  and even accused the defendant of being a liar. Id. at 774-75.   Adelzo-Gonzalez also said that he would prefer to represent himself rather than continue with current counsel. Id. at 778.   Under such poor communications,   "All advice, assistance, and guidance provided by the attorney would be fatally suspect,  as would the `willingness' of a defendant to follow the attorney's lead.   The relationship between Adelzo-Gonzalez and the appointed counsel was antagonistic,  lacking in trust,  and quarrelsome.   See Williams, 594 F.2d at 1260 (sufficient conflict where defendant chose to proceed pro se because the "client-attorney relationship had been a stormy one with quarrels, bad language, threats, and counterthreats");   Brown 424 F.2d at 1169 .   The Mandez-Sanchez Court reversed the conviction,  and remanded the action back to the trial court with instructions to remove counsel and proceed with new counsel or allow the defendant to represent himself.).

Likewise in **U.S. v. Lott, 310 F.3d 1231 (10th Cir., 2002)** held: "Even if a defendant's counsel is competent, a serious breakdown in communication can result in an inadequate defense." _United States v. Musa, 220 F.3d 1096, 1102 (9th Cir.2000)_.  A defendant who cannot communicate with his attorney cannot assist his attorney with preparation of his case, including suggesting potential witnesses to call and trial strategies to pursue,  discussing whether the defendant himself should testify,  and helping formulate other bread-and-butter decisions that can constitute the core of a successful defense.   A trial court's failure to appoint new counsel when faced with a total breakdown in communication may thus constitute a denial of counsel in violation of the Sixth Amendment. _Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)._

Also see **Grant v. State, 255 S.W.3d 642 (Tex. App., 2007): (**In _Faretta,_ the Supreme Court held that the Sixth Amendment not only affords an accused facing an adversarial criminal proceeding the right to a defense,  but the Sixth Amendment also "grants to the accused personally the right to make his defense." _Faretta,_ 422 U.S. at 819, 95 S.Ct. 2525.   As the Court noted:  The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.  _Id._ at 819-20, 95 S.Ct. 2525. );   Accord in US v. Mutuc, 349 F.3d 930, 934 (7th Cir. 2003) (6th amendment protects against appointment of counsel whom does not zealously defend his client) and  US v. Freeman, 816 F.2d 558, 564 (10th Cir. 1987)(defendant must allege that appointed counsel is not performing some obligation required by the Code of conduct for attorneys).

15.   Professional Conduct and Ethical Rules prohibit certain conduct by attorneys:

(a) the use of fraudulent,  false,  or perjured testimony or evidence.   A lawyer who knowingly participates in introduction of such testimony or evidence is subject to discipline.

### 3rd COA:     ILLEGAL  CONSPIRACY TO VIOLATE LUNDAHL'S CIVIL RIGHTS PURSUANT TO  BIVENS AND 42 USC SECTIONS  1985(2) AND 1986

13.     The charges in the 2006 indictment show that the defendants have engaged in an ongoing single conspiracy to retaliate against  LUNDAHL for whistleblowing on Eli Lilly in 1991.  The Indictment at ADD. "1" shows that LILLY has accused  LUNDAHL for the 9th time over 16 years of forging 2 orders that were entered in LUNDAHL's favor in 1993 and 1994.  That conspiracy has continued even to today's date with this court refusing to allow LUNDAHL to access an impartial judge in this instant action who does not have a pecuniary interest in LILLY or any other tort defendant's companies herein.    16

_____

(b)   A lawyer should present any admissible evidence his client desires to have presented unless he knows,  or from facts within his knowledge should know,   that such testimony or evidence is false,  fraudulent,  or perjured.

See  **U.S. v. Nichols, 841 F.2d 1485 (C.A.10 (Utah), 1988)**  (A defendant's right to competent counsel  is promised by the sixth amendment  citing United States v. Laura, 607 F.2d 52, 56 (3d Cir.1979).  "A defendant allocates authority to the attorney to present his case. Morris v. Slappy, 461 U.S. 1, 21, 103 S.Ct. 1610, 1621 (1983).   When an attorney does not present the evidence or defenses desired by the defendant,   the attorney violates his code of conduct and the defendant's right to put on a defense. People v. Bingham, 847 N.E.2d 903 (Ill. App., 2006).   *Powell* v. *Alabama,* 287 U.S. 45, 53, 53 S. Ct. 55, 77 L. Ed. 158 (1932) (Held: ..."a primary purpose of the sixth amendment is to grant a criminal defendant effective control over the conduct of his defense.   See *United States* v. *Nichols,* 841 F.2d 1485, 1502 (10th Cir. 1988); *Wilson* v. *Mintzes,* 761 F.2d 275, 279 n.5 (6th  Cir. 1985).   As the United States Supreme Court has stated,  the sixth amendment  "grants to the accused personally the right to make his defense . . . [because] it is the defendant who suffers the consequences if the defense fails." *Faretta* v. *California,* 422 U.S. 806, 819-20, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

16.     LUNDAHL has already filed a challenge to the assigned judge in this case for pecuniary interests in the defendant's companies.   "It is well established that,  where an overt act is required for a conspiracy,  the statute of limitations on a continuing conspiracy does not begin to run until the last overt act in furtherance of the conspiracy is committed." *United States v. Jaynes,* 75 F.3d at 1505 (citations omitted); *see* Fiswick v. United States, 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196 (1946) ("The overt acts averred and proved may thus mark the duration, as well as the scope of the conspiracy."); *USA v. Hauck,* 980 F.2d 611, 613 (10th Cir. 1992); [18 U.S.C. § 371].   Upjohn Co. v. Freeman, 885 S.W.2d 538, 542 (Tex.App.-Dallas 1994, writ denied)(A continuing tort is an ongoing wrong causing a continuing injury that does not

### 4th COA:      THE  DEFENDANTS VIOLATED AND CONSPIRED TO
### VIOLATE THE FEDERAL RACKETEERING ACT

14.    The defendants  violated and conspired to violate the federal racketeering

act.

15.    Furthermore,  the  RICO  conspiracy  herein  alleged  was  a legal and

proximate  cause  of  financial  harms  to plaintiff.     The   purpose  of  the  conspiracy  was to

protect the RICO defendants from "exposure to the public at large"  for their criminal history.

The defendants acchieved  their goals in this open ended conspiracy that continues to todays

date by the following predicate acts:  (1)  mail and wire fraud to defraud beneficiaries,  injured

employees  and  health  care  providers  of  contracted  benefits  under  LILLY's  true  health  and

injury  plans;  17     (2)  Mail  and  wire  fraud  leading  to  obstruction  of  justice  in  numerous

official  proceedings - through an implicit  history of  litigation misconduct;  18    (3)  extortion

_____

accrue until the tortious conduct ceases.  *Id.* at 543 (pill taken daily that caused continuing
injury is basis for continuing tort).  Same in Texas Disposal Systems v. Waste Management, 219
S.W.3d 563 (Tex. App., 2007).   In the case at bar,  the conspiracy to deprive of LUNDAHL of fair
access to the courts continues as long as LUNDAHL is deprived of a judge who does have a
pecuniary interest in any defendant.     See **Texas Department of Criminal Justice v. Guard,
No. 10-06-00065-CV (Tex. App. 4/11/2007) (Tex. App., 2007)** ( as long as there is "an
organized scheme leading to and including a present violation,  so that  it  is  the cumulative
effect of a  discriminatory practice or single conspiracy,   plaintiffs claims will be tolled under
the continuing violation theory."  *Waltman v. Int'l Paper Co., 875 F.2d 468, 475 (5th Cir. 1989).*
Acts will form a  continuing violation if  "connected by common threads."   *Hadad v. Am.
Airlines,* No. 3:00-CV-0041-D, 2003 U.S. Dist. Lexis 1872 at *9 (N.D. Tex. Feb. 7, 2003) (mem.)).
17.    See US v. Hickman, 868 F.2d 1043 (5th Cir. 2003. TX)(each execution of a
reimbursement claim  for  health  or  injury  benefits  constitutes  a  single act of mail fraud.)
Likewise,  every injury or illness claim  that LILLY refused to reimburse,  constituted an act of
mail fraud or robbery under the Hobbs Act when LILLY withheld these funds.)
18.    See  Living  Designs  Inc. v. E.I. DuPont De Nemours, 431 F.3d 353 (9th Cir.
2003)(litigation misconduct is not immuned from a RICO prosecution.   Fraud under the mail
fraud   statute  is  established  when  opposing  counsel  omits  information  or  fabricates
documents to obstruct an official  proceeding.    In addition,  plaintiff will have a cause of
action for obstruction of justice.); See too Clark v. Stipe lawfirm, 320 F.Supp.2d 1207 (W.D.
OK 2004)  (each proceeding obstructed by the defendant in an overall scheme constitutes a

under color of law  using the criminal process to extort releases of civil causes of action from

LUNDAHL 19,  and;   (4)  criminal interference  with LUNDAHL's ability to  compete in

commerce.  20      Over the past 20 years,  the defendants have damaged LUNDAHL in the

amounts represented by three separate lawsuits, ie.  USDC- California case number 94-21 RJT

in the amount of $ 600 million;  case number USDC-Utah  2:97-CV-951 in the amount of  $700

million;  and this instant action seeking a minimum  of $900 million.   The defendants have

also deprived LUNDAHL of the statutory right of pre-judgment interest on all of these

obstructed cases which to date approaches an amount of  $2.8 Billion dollars.

16.    Furthermore,  at the time LUNDAHL was seized on the 2006 indictment,

LUNDAHL had vested ownership in 1 diet center and had purchased or was in the process of

---

separate act of obstruction of justice.);   Also see Deck v. Engineered Laminates, 349 F.3d 1253
(10th Cir. 2003)(each act of fraud which results in dismissal of a cause of action is remedial
under RICO through the mail fraud statute.);   GI Goldings  v. Baron & Budd,   238 F.Supp.2d
521 (S.D.N.Y. 2002) ("Fixing" evidence,  supplying false affidavits,  backdating court documents,
and falsifying court records  to procure settlement of claims states  mail fraud,  wire fraud and
obstruction of  justice claims.);    Followed in  Lockheed Martin v. Boeing, 357  F.Supp.2d
1350(M.D.Fla 2005)(Giving perjurious testimony,  filing false affidavits and destroying evidence
favorable to the opposing party,   is actionable as mail fraud,  wire fraud,  witness tampering
and obstruction of  justice);    US v. Triumph Capitol Group, Inc., 260  F.Supp.2d 462
(D.Conn.2002)(corruption of the grand jury process through perjury and submission of false
documents actionable under RICO.), and;   U.S. v. Cianci, 210 F.Supp.2d 71 (R.I. 2002)
(Associated in fact enterprises can include government officials.  These officials immunities
will be judged under the same standard as immunities under civil rights act).
19.    See Lusby v.  T. G. & Y. Stores, Inc., 749 F.2d 1423, 1431  (10th Cir. 1984)
(Private parties or public officials who  use criminal complaints to coerce a release of civil
liabilities from injured persons constitutes a form of extortion which may be remedial through
RICO if plaintiff can establish predicate acts prior to a probable cause hearing  which are not
protected by any immunities), and;  Gillmor v. Thompson, 490 F.3d 791, 799 (10th Cir. 2007)
("Congress meant to punish as extortion any effort to obtain property,  by inherently wrongful
means,  such as force or threats of force,  or criminal prosecution.)
20.    See Deck v. Engineered Laminates, 349 F.3d 1253  (10th Cir. 2003) (Each
interference with ability to compete in commerce is a Hobbs Act violation and remedial
through RICO.)   Malandris v. Merrill Lynch, Pierce, Fenner & Smith, 703 F.2d 1152 (1981)
(Fraud which causes plaintiff to lose life savings and assets are remedial through RICO.); Hy
Cite v, Bad Business Bureau,  418 F.Supp.2d 1142 (Ariz. 2005) (RICO claim stated for exortion
and wire fraud when defendants used the internet to defame plaintiff's businesses in
exchange for obtaining  concessions from plaintiff.)

purchasing 5 more freeway properties to make operational 5 more diet centers making an average prospective income of $1.2 million for each store.   LUNDAHL was extorted of all of her business properties and personal properties by and through the defendants continuing RICO schemes.

17.   In addition, the defendants have committed serious witness tampering acts against LUNDAHL intended to have lethal results.   These witness witness tampering acts even continued during LUNDAHL's imprisonment in jail on the 2006 indictment charges.

18.   Plaintiff alleges that the defendants did associate in fact to create and continue a criminal enterprise contractually established through insurance malfeasance policies, and this associated in fact enterprise did conspire to criminally injure plaintiff over the past 20 years  through acts of mail fraud, wire fraud, extortion under color of law, witness tampering, and obstruction of justice.   Plaintiff was damaged by RICO acts.

19.   Plaintiff alleges that the criminal conspiracy continues through the filing of this complaint,  is open ended, and projects into the future until LUNDAHL obtains a jury trial on her claims herein before an impartial tribunal.

20.   Plaintiff seeks attorneys fees and treble damages in accordance with the provisions of 18 U.S.C. § 1964.

### 5th COA:   DEFENDANTS ARE LIABLE TO PLAINTIFF FOR MALICIOUS PROSECUTION

21.   LUNDAHL alleges that the foregoing defendants pursuant to a contrived conspiracy:  (1) did initiate a criminal action against LUNDAHL, 21  (2) did act as a complaining witnesses either directly or indirectly through their agents and co-conspirators William Thurman, Micheal Johnson, Sonja Sorenson, Lance Edwards, Lilia Chavarin, and

_____

21.   Barton v. City and County of Denver, 432 F.Supp.2d 1178 (D. Colo., 2006) (The term "complaining witness" describes the person (or persons) who actively instigated or encouraged the prosecution of the plaintiff.   This is done through FBI 302 reports and other such evidence obtained by the  government showing acts of instigation.

Glenna Gottfredson,  22   (3)   the criminal action terminated in LUNDAHL's favor pursuant to a nolle prosequi motion by the prosecutor Cy Castle;  23    (4)   Lundahl was innocent of the charges,   (5) the defendants acted without probable cause,  24   (6) the defendants actions were taken with malice because the prosecution  was based upon evidence fabricated by the defendants and upon charges that could not be prosecuted as a matter of law,  25   and  (7) the defendants damaged LUNDAHL and LUNDAHL's businesses.

_____

22.    With respect to  the rule of agency,  the general rule is  that an employer is vicariously liable for the torts of his employees. While, in 1917, in Morrison v. Henke (1917), 165 Wis. 166, 160 N.W. 173,

23.    See  Wilkins v. DeReyes, 528 F.3d 790 (10th Cir., 2008)(The district attorney dismissed charges against Wilkins and Buchner by filing *nolle proseques* in early 2001. "Criminal proceedings are terminated in favor of the accused by the formal abandonment of the proceedings by the public prosecutor."   Restatement (Second) of Torts § 659(c) (1977)(A dismissal by filing a nolle proseque constitutes a favorable termination because it  indicates the innocence of the accused"  when the prosecutor does not believe he will prevail at trial based on the evidence. Cmt a.   See also cmt. D:  "the inability of a prosecutor to prove a case beyond a reasonable doubt at trial is consistent with the  innocence of the accused and deemed a favorable termination in favor of the accused."

24.    "The probable  cause  for  the indictment must not be tainted by malicious actions" of government officials.   *Cornett v. Longois,* 871 F.Supp. 918, 922 (E.D.Tex.1994) (citing *Hand,* 838 F.2d at 1426).    If obtained by improper means, "the issuance of a valid warrant will not shield the officers from liability for malicious prosecution." *Hart,* 127 F.3d at 451.  Evidence that material facts were withheld or that the deliberations of the grand jury or other intermediary were otherwise tainted by the actions of the defendant,   liability for malicious prosecution can attach. *See Taylor,* 36 F.3d at 457; *Hand,* 838 F.2d at 1428.  "When an officer does not frankly convey all of the material facts to the magistrate, the issuance of the warrant is tainted and is not a basis for immunity." (*Id.*)(citing *Murray v. Earle,* 405 F.3d 278 (5th Cir.2005)).   Also *see Malley v. Briggs,* 475 U.S. 335, 344 n. 7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).   The broken causation rule will not apply and the intermediary's decision will not  break the chain of causation and so shield the officers from liability where "the deliberations  of  that  intermediary were  in  some  way  tainted  by  the  actions  of  the [defendants]."   *Shields v. Twiss,* 389 F.3d 142, 150 (5th Cir.2004); *Gordy v. Burns,* 294 F.3d 722, 728 (5th C ir.2002) (reaffirming *Hand v. Gary,* 838 F.2d 1420, 1427, 1428 (5th Cir.1988).

25.    Plaintiff's must establish malice:  See Campbell, 43 F.3d at 981.   Malice is established  when plaintiff proves that the proceedings were  initiated primarily for a purpose other than that of bringing an offender to justice.  See RESTATEMENT (SECOND) OF TORTS § 668 (1977).    See Patterson v. Armatys, 808 F.Supp. 550, 552 (E.D.Tex.1992).    Maliciously tendering false information,  or deliberately concealing or deliberately failing to disclose

**6th COA:    DEFENDANTS  COMMITED  AND CONSPIRED  TO COMMIT
ABUSE OF  PROCESS AGAINST LUNDAHL  AND ASSIGNS**

22.    The defendants did conspire to and commit abuse of process against LUNDAHL through the use of various official's offices and their corporate structures by:  (1) falsifying mental process against LUNDAHL after concluding that LUNDAHL would adamently oppose all attempts to extort her through use of the criminal process, and  for the purpose of obstructing  LUNDAHL's right to self representation,   a prompt disposition of the charges and to preclude  LUNDAHL from  seeking  further  remedies against the defendants;  26        (2) initiating criminal process against LUNDAHL without probable cause  in order to obtain a collateral advantage against LUNDAHL  by causing LUNDAHL's involuntary default on various suits and causes of actions  to which LUNDAHL was entitled remedies on as a matter of law; 27 (3) attaching  LUNDAHL's bank  accounts  and  properties  without authority at law in order to deplete  LUNDAHL's assets and force contrived, complicit and conspiratorial counsels upon

_____

exculpatory information,   gives rise to an inference that the defendant acted with malice in initiating or maintaining a prosecution. *See Martin v. Thomas,* 973 F.2d 449, 457 (5th Cir.1992); *Sanders,* 950 F.2d at 1163;  *Wheeler,* 734 F.2d at 260.  See also  Novitsky v. City of Aurora, 491 F.3d 1244 (10th Cir., 2007) citing *Robinson,* 895 F.2d at 655 (holding sufficient evidence of malice where "the defendants purposely concealed and misrepresented material facts" by manufacturing testimony for the "state's key witnesses".);  And, Barton v. City and County of Denver, 432 F.Supp.2d 1178 (D. Colo., 2006) (evidence that the officers' statements were false establishes  malice.  Malice shows that the primary motive of the defendant was a motive other than a motive to bring to justice a person thought to have committed a crime. S*ee Suchey v. Stiles,* 155 Colo. 363, 366, 394 P.2d 739, 741 (Colo.1964); C.J.I.Civ. 4Th 17:4.  W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 119 (5th ed.1984);  *Flounder v. Jacobs,* 119 Colo. 511, 205 P.2d 236 (1949).

26.    See Schmit v. Klumpyan, 2003 WI 354 (WICA, 2003)  citing to in **Maniaci v. Marquette University**, 50 Wis. 2d 287-300, **184 N.W.2d 168** (1971),    the supreme court held that the filing of a petition for temporary detention under Wis. Stat. § 51.04(1) (1965-66) to detain an individual rather than to examine her mental health - was the seeking of a collateral advantage through improper procedures and entitled plaintiff to damages for abuse of process.

27.    The Fifth Circuit  in *Foster v. City of Lake Jackson,* characterized  "the right of access (even `adequate, effective, and meaningful access' as contemplated by *Crowder,* rather than only a physical right of access)  is  implicated where the ability to file suit was delayed,  or blocked altogether."  28 F.3d 425, 430 (5th Cir.1994).

Lundahl  who  would commit a series of abuses in prosecuting the criminal charges  in order to "fix"  false criminal  or mental charges against LUNDAHL; 28    For example:  (a)  the prosecutor stacked  multiplicious criminal charges against LUNDAHL so that LUNDAHL  would be threatened by an 80 Year prison term.  29    (b)  the defendants  also procured LUNDAHL's pretrial detention even though LUNDAHL had no criminal record,   LUNDAHL had a  lucrative self  operated  business  which  was  destined  to  fold  without  LUNDAHL's  participation, LUNDAHL had no record of flight,   LUNDAHL  supported various family members,   LUNDAHL had a residence with community contacts and financial obligations,   and   LUNDAHL had serious malignant hypertension and other health problems rebounding from a 1995 assault in

_____

    28.    See  Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); Bissell, 866 F.2d at 1352 (quoting $8,850, 461 U.S. at 564, 103 S.Ct. 2005).  Indeed, our law is clear and unambiguous that depriving a defendant of the counsel of his choice by wrongfully freezing his assets,  is a serious and significant impediment to his ability to effectively navigate our nation's criminal procedures and protections.  See Gonzalez Lopez, 548 U.S. at 146, 126 S.Ct. 2557 ("[T]he Sixth Amendment right to counsel of choice  ... provides that the accused be defended by the counsel he believes to be best.");  Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).    A violation of this critically important right constitutes an abuse of process  because it necessarily establishes that every co-conspirator that contributed to this violation had an unlawful  goal to direct the coarse of conduct in the criminal proceedings  through counsel selected by the co-conspirators in order to obtain collateral advantages in their favor through that counsel's misconduct.
          Furthermore,  'The government may not ensnare a defendant  into  the government's  criminal enterprise self controlled from start to finish for purpose of orchestrating a criminal prosecution against the defendant.'    SeeMosley, 965 F.2d at 911 (quoting  United States v. Ramirez, 710 F.2d 535, 539 (9th Cir.1983)) (the government controlled the criminal enterprise and placed the defendant in the compelled position of being part of the enterprise in order to achvieve and illegal objective.)
          29.    In US v. Harris,  997 F.2d 812, 819 (10th Cir. 1993),  the court held that knowingly stacking charges against a defendant for an  extortive  purpose constituted prosecutorial misconduct and abuse of process.  See also  United States v. Bogart, 783 F.2d 1428, 1435 (9th Cir.1986)United States v. Wingender, 790 F.2d 802 (9th Cir.1986) (Stacking of charges occurs when government agents are directing  the crime from beginning to end,  or where the crime is fabricated by officials to  obtain a defendant's conviction rather than to protect the public from criminal behavior,  is inherently illegal.)  Bogart, 783 F.2d at  1436; Greene v. United States, 454 F.2d  783 (9th Cir.1971) Commonwealth v. Mathews, 347 Pa.Super. 320, 520 A.2d 853  (1985).    Stacking charges has no merit whatsoever other than pure intimidation because the multiple charges are barred by the double jeopardy clause.

which the same defendants participated,  30  and,    (c)  The defendants used the criminal prison process  to   further assault  and  torture  LUNDAHL  through  punitive  classification Procedures,  31   orchestrated  assaults   and  deliberately  mismanaged  LUNDAHLS'  health issues which  partly resulted in LUNDAHL suffering a stroke in September of 2007 and in subsequent untreated post traumatic pnuemonia  32    (4)   charging LUNDAHL under a more general charging statute which increased the imprisonment period for the charged crime by  4 times that of the more specific charging statute  33,   (5)   prosecutor acting as health  experts

_____

        30.    The bail reform act precludes detaining a suspect pretrial where the suspect has:  (a)  no criminal record,   (b)   business  contacts in the community,   (c) would likely suffer economic injury  if so detained,   (d)  supports family members,   (e) are not a flight risk and have no history of flight,  and (f)  have serious health issues.  Detention is required to be the  exception to the rule for those who are dangerous and are  a flight risk.
        31.    See  Black v. Warden, US  Penitentiary, 467 F.2d 202 (5th Cir. 1972)(civil rights claim stated when inmate was confined in solitary confinement and deprived of normal privileges accorded other prisoners for 2 months,  had broken no institutional rules and was not given any hearing regarding the severe classification.);   H.C., By Hewett v. Jarrard, 786 F.2d0 (11th Cir. 1986)(14th amendment claim stated when inmate was confined to solitary confinement to silence inmate after prison guard assaulted him, and inmate's  injuries to his shoulder were not  treated for three days.) ;  Battle v. Andersen, 376 F.Supp 402 (1974 Kansas) (prison violated inmate's due process rights by locking inmate down in solitary confinement without granting any disciplinary hearing and taking away prisoner's privileges to access legal materials and other assets to perform legal work);  Walker v. Navarro County Jail, 4 F.3d 410,413 (5th Cir. 1993) citing to Brewer, 3 F.3d at 825 (due process claim when inmate is confined in administrative segregation due to complaints of mail tampering and censorship).
        32.    See  Shannon, 892 S.W.2d at 765 (police held liable where they  employed physical or  psychological coercion against the defendant tantamounting to torture).
        33.    See  U.S. v. LaPorta, 46 F.3d 152 (C.A.2 (N.Y.) 1994)  (The issue is whether the prosecutor engaged in misconduct by charging plaintiff under the more general provision instead of the more specific provision  as a form of extortion against the defendant.)See Busic v. United States, 446 U.S. 398, 406, 100 S.Ct. 1747, 1752-53, 64 L.Ed.2d 381 (1980) ("a more specific statute will be given precedence over a more general one, regardless of their temporal sequence") (citing Preiser v. Rodriguez, 411 U.S. 475, 489-90, 93 S.Ct. 1827, 1836-37, 36 L.Ed.2d 439 (1973)).     Here,   the reason the government charged La Porta with the more general crime under  Sec. 844(h)(1) is fairly transparent.   That section imposes a mandatory minimum sentence, and a consecutive one at that.     In contrast, Sec. 844(f) carries no mandatory minimum.   We dismiss the harsher charge which violates  Busic.

and placing  LUNDAHL's  health at serious risk for the sole purpose of punishing LUNDAHL for opposing the illegal prosecution  34,     (6)  forging  LUNDAHL's name on numerous lawsuits and appeals in furtherance of a plan to adjudicate LUNDAHL a litigious and abusive litigant, and;   (7)  falsifying medical records on LUNDAHL to LUNDAHL's injury  in violation the  state of Texas' Health Board's  ethics  code .  35

_____

34.   Blouin ex rel estate of Pouliot v. Spitzer, 356 F.3d 348, 356-57 (prosecutor not absolutely immuned when intervening  in medical care of detained person because not prosecutorial function.)    See also U.S. v. McDonald, 905 F.2d 871 (C.A.5 (Tex.), 1990) (prosecutor is not immuned if he acts an expert witness on matters before the court).

35.   See Texas Department of  Health State: Board of Examiners of Professional Code- **Subchapter C. Code of Ethics. §681.41. General Ethical Requirements  -** finding the following acts a violation of the code:  (d) A licensee shall make reasonable efforts to prevent others whom the licensee does not control, from making misrepresentations; exaggerated  or  false  claims;  or false, deceptive, or fraudulent statements about the licensee's ... activities.   If a licensee learns of a misrepresentation; exaggerated or false claim; or false, deceptive, or fraudulent  statement made by another, the licensee shall take immediate and reasonable action to correct the statement;    (i)  A licensee shall not engage in activities for the licensee's personal gain at the expense of a client;   (n)  A licensee may take reasonable action to inform medical or law enforcement personnel if the licensee determines that there is a probability of imminent physical injury by the client,  to the client,  or others or there is a probability of immediate mental or emotional injury to the client;     (p)  For each client,  a licensee shall keep accurate records of the intake assessment, the dates of counseling treatment intervention, principal treatment methods, progress or case notes, treatment plan, and billing information;    (v) **A licensee shall not evaluate any individual's mental, emotional, or behavioral condition unless the licensee has personally interviewed the individual.**

Under the Texas Administrative Code for Health Services,  Title 25, part 1, Chapter 441, subchapter A, Rule sec. 441.101,  Abuse is defined as:   (1) An intentional, knowing, or reckless act or omission by provider personnel, a counselor, applicant for counselor licensure, or counselor intern that causes or may cause death, emotional harm or physical injury to a participant or client.   Abuse includes without limitation the following (applicable) acts:   (B) corporal punishment;   (C)  nutritional deprivation or sleep deprivation; (D) efforts to cause fear;     (E) the use of any form of communication to threaten, curse, shame, or degrade a participant or client;   (F) restraint that does not conform with chapter 148 of this title (relating to Standard of Care);   (G) coercive or restrictive actions taken in response to a participant's ...refusal ..of treatments  that are illegal... ; and  (H) any other act or omission classified as abuse by Texas law, including but not limited to,  TEX. FAMILY CODE ANN. §261.001 (Vernon 1996) and TEX. HUM. RES. CODE ANN. §48.002 (Vernon Supp. 2004), which collectively prohibited the falsification of records on the client to the harm of that client.

### 7th COA:   THE DEFENDANTS FALSELY ARRESTED AND IMPRISONED LUNDAHL

23.   The elements to a false arrest/imprisonment claim are: (1) a willful detention, (2) without justification, and (3) without valid authority.

24.   LUNDAHL was willfully detained commencing October 16, 2006, without her consent, and without valid authority of law given  LUNDAHL's detention was based on false and fabricated evidence tendered to a grand jury.   LUNDAHL continued to be detained until January 23,  2009 at which time her false imprisonment ceased by physical release. LUNDAHL was damaged thereby and seeks all damages  accorded by law.

### 8th COA:   THE BANKING DEFENDANTS WITH THE AID OF FEDERAL OFFICIALS IN  BAD FAITH BREACHED LUNDAHL'S  COMMERCIAL  CONTRACTS

25.   The banking defendants in addition to conspiring among themselves and with government actors to breach Lundahl's  sixth amendment right to counsel of choice,   also in bad faith breached LUNDAHL's  deposit and credit contracts with the banks which had previously existed without impairment for several years.    Furthermore there was no reasonable basis for this bad faith breach and the defendants knew that there was no justifiable basis for the breaches as admitted by SORENSON on October 20, 2006.   36

### 9th COA:   ALL  DEFENDANTS TORTIOUSLY INTERFERRED WITH LUNDAHL'S PROSPECTIIVE BUSINESS  RELATIONS AND ECONOMIC ADVANTAGES

26.   LUNDAHL  had a reasonable expectation of entering into and continuing

_____

36.   See Texas  Farmers  Ins.  Co.  v.  Soriano,  881 S.W.2d 312,  317 (Tex.1994)( A bad faith claim is stated when there is an absence of  a reasonable basis for breaching a contract  promising benefits or some other type of implied benefit.);    Love v. US, 915 F.2d 1242, 1247 (9th Cir. 1989)(Banks owe a duty and convenant to a banking client to act in good faith and fair dealing with a client's funds by operation of law citing to Tribby v, Northwestern Bank of great Falls, 217 Mont. 196, 704 P.2d 409 (1985).   The US is liable under the FTCA when officers conspire to breach the covenant of good faith and fair dealing. Id 1247-48.); Also see Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 18 (Tex.1994) (the tort of  bad faith in Texas has two elements:   "that the defendant had no reasonable basis for denying or breaching its obligations to plaintiff ,   and that the defendant knew that fact.")

contractual relationships with diet clients whom paid LUNDAHL for services rendered or for dietary supplements or supplies.   These contractual relations resulted in monthly purchases of $45,000  minimum per  month  for one commercial facility that  LUNDAHL had operating  at the  time defendants interferred with LUNDAHL's businesses. 37      These contracts  were paid through credit card transactions and bank drafts.   It is not disputed that LUNDAHL could only  acquire  negotiation  of  the  bank  drafts  and  credit  card  vouchers   through  a  bank. LUNDAHL  had  three  pending   business  accounts  under  her  business  name "the  MD  Diet Companies",  at  the  time  she  was  arrested  on  October  16,  2006,  to  wit:     Wells  Fargo, Washington Mutual  and US Bank.  LUNDAHL seeks damages for loss of those monthly sums for the 2½ years she was incarcerated plus punitive damages for the lost future expectation interests in these funds and exponential funds which LUNDAHL no longer enjoys.

27.   LUNDAHL  also seeks damages for the conversion of all freeway commercial real  properties  LUNDAHL  acquired  before  LUNDAHL  was  falsely  imprisoned  in  jail  and  for "Tortious  Interference  With  Business  Relations  And  Prospective  Economic  Advantages" associated with these 5 commercial facilities - at the established income rate of $1.2 million annually."  38

28.   Upon LUNDAHL'S  extradition back to the state of Utah on the arrest warrant, FBI officer Sonja Sorenson admitted to LUNDAHL in the car that she knew that LUNDAHL's bank accounts had been unilatterally closed because of the charges pending against LUNDAHL. At  a  subsequent  detention  hearing,   Sorenson  testified  that  she  had  contacted  US  bank  in Malad City Idaho subject to an investigation of possible bank fraud,  and  conceeded to letting

_____

37.   See Small  Business Assistance Inc.  v. Clear Channel Broadcasting,  Inc . et al, case no. No. 98-51200  (5th Cir. 2000)( Texas has a cause of action for  Tortious Interference With  Prospective  Business  Relations.   The  elements  of  that  tort  require:  (1)  a  reasonable probability  or  expectation  of  entering  into  contractual  relationships;   (2)  intentional  and malicious  conduct  by  the  defendant  that  prevents  consummation  of  the  contracts;  (3)  no justification  or  privilege  shields  the  defendant;  and  (4)  actual  harm  or  damages  caused  by defendant's conduct.   See AT&T Corp. v. Southwestern Bell Tel. Co., 2000 WL 14711 (Tex. App.-Dallas), at *3.
38.   The  MD  Diet  offices  are  restricted  franchise  offerings.   The  Salt  Lake  M.D. Diet office is owned by another person but will have to be the model  for damages.

the banks shut down LUNDAHL's business and personal accounts on the alleged assertion that LUNDAHL had forged bank notaries on hers and Jim Keddington's declarations which were filed with the Idaho federal court in re 05-CV-145,  LUNDAHL v. COMPTON, et al.    On Cross examination,     Sorenson was asked if the alleged forgery of the bank notaries constituted bank fraud when the banks suffered no loss from the alleged forgeries which merely authenticated the signatures of the persons executing the declarations.   Sorensen admitted no.   When Sorenson was asked to provide proof of the corpus delicti of the bank notarial forgery charges,  Sorenson admitted that no victim suffered an injury from the alleged forged bank notaries and hence corpus delicti could not be established.   Accordingly,  there was no justification for the banks unilaterally closing  down LUNDAHL's business  bank accounts.

29.   Sorenson's admissions established  that a conspiracy with the banks existed as a matter of law,   that the actions taken by the banks were not taken pursuant to any justified ground,  and therefore,  the banks actions were taken for an ulterior purpose to adversely impact LUNDAHL's criminal proceedings and financial status   in aid of it's   corporate malfeasance insureds and vested interests:  ELI LILLY and LILLY's other corporate insurers;  all named in this action and LUNDAHL's prior obstructed actions.

### 10th COA:   THE BANKING DEFENDANTS AND  THE FDIC ARE  LIABLE  TO LUNDAHL FOR CONVERSION

30.    LUNDAHL was the owner of the payments factored through the credit card company under her business name of MD Diet Companies.    The Bank defendants unlawfully and  without  LUNDAHL's  authorization  exercised  dominion  and  control  over  LUNDAHL's factored credit card payments and other bank drafts  to the exclusion of LUNDAHL's rights as the  owner  thereof.     LUNDAHL  demanded  these  factored  and  negotiated  payments  be returned to LUNDAHL.   The banks refused to return LUNDAHL's proceeds thereby committing repetitive acts of conversion. 39   LUNDAHL  subsequently  filed  a  claim  with  the  FDIC  who

_____

39.    See Vibbert  v. Par, Inc., case no. No. 08-05-00167-CV (Texas Court of appeals, 8th District) (elements to the tort of conversion are:  (1)  the plaintiff owned or had legal

failed to resolve the claim.    LUNDAHL seeks general damages, loss of use damages and punitive damages from the defendants for converting LUNDAHL's monies for illicit purposes to gain a collateral advantage in the 2006 criminal prosecution on behalf of their insureds and vested interests Eli LILLY and LILLY's other insurers.  40

### 11th COA:    LUNDAHL IS ENTITLED TO   DECLARATORY JUDGMENTS DECREEING  FOUR PRE-FILING ORDERS ENTERED AGAINST LUNDAHL OVER THE PAST 12 YEARS VOID AND FOR DEFAMATION AND LIBEL DAMAGES

31.     Amongst the many crimes committed by the LILLY defendants over the years is the crime of forgery.   As the fact allegations of this complaint show,   while LILLY successfully imprisoned LUNDAHL in jail from 1995 to 1997,   LILLY forged LUNDAHL's name to more than 20 notices of appeals  LILLY filed in the 9th circuit Court of appeals.  41     LUNDAHL notified the clerk of the court Susan Gelmis  that the notices of appeals had been forged and that LUNDAHL was in jail and could not have,  nor did LUNDAHL,  file the notices of appeals.   All of the appeals were dismissed for lack of subject matter jurisdiction without penalizing anyone in LILLY's camp.     LILLY subsequently moved the 9th circuit to declare LUNDAHL vexatious.

_____

possession of the property or entitlement to possession;   (2)  the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of,  or inconsistent with, the plaintiff's rights as an owner;    (3) the plaintiff demanded return of the property; and  (4)  the defendant refused to return the property. Whitaker v. Bank of El Paso, 850 S.W.2d 757, 760  (Tex.App.--El Paso 1993,  no writ).    See Peoples Westchester Sav. Bank FDIC, 961 F.2d 327 (2nd Cir. 1992)(Owner of general deposit is general creditor to the bank and entitled to sue for misappropriation  with securities/funds).

40.     Implied malice exists when wrongful conduct is intentional and without just cause or excuse. Accent Builders v. Southwest Concrete Sys., 679 S.W.2d 106, 111 (Tex.App.--Dallas 1984, writ ref'd n.r.e.).   A court may imply malice when the defendant knew or should have known it had no legal right to the property.  First Nat'l Bank of McAllen v. Brown, 644 S.W.2d 808, 810 (Tex.App.--Corpus Christi 1982, writ ref'd n.r.e.).  First Interstate Bank v. Interfund Inc., 924 F.2d 588  (5th Cir. 1991) (punitive damages were properly awarded on the tort of conversion as the defendants knew  that their actions would deprive the plaintiff of possessory rights and use to their property.)

41.    A document is void if the signature is forged.  (*Erickson v. Bohne, supra,* 130 Cal.App.2d at pp. 555-556.)

Irrespective that no appeal was pending before the 9th circuit,  Susan Gelmis invoked non existent jurisdiction under the All Writs Act and executed a pre-filing order against LUNDAHL. LUNDAHL now seeks a declaratory judgment decreeing the pre-filing order void as a matter of law because it was predicated on forged process and because it was entered in violation of Supreme Court rule:   Syngenta Crop Prot., Inc. v. Henson, 537 U.S. 28, 31-34 (2002) which held that a federal court lacks subject matter jurisdiction over any matter unless that matter pleads another ground for federal jurisdiction.  42    At the time Susan Gelmis entered the pre-filing order against LUNDAHL under the All Writs Act ex parte,  no appeal by LUNDAHL was pending in the 9th Circuit.    Accordingly the pre-filing order was void as a matter of law under Article III of the US Constitution because no federal question was before the 9th circuit court.

32.    LUNDAHL also seeks a declaratory judgment decreeing an abusive litigant order entered by Judge Richard Tallman void as in violation of the 5th & 6th amendments.   On August 1, 2006,    Richard Tallman in re USDC-Idaho case no. 05-CV-127 entered what was in fact a criminal contempt judgment against LUNDAHL for the same criminal conduct alleged in the criminal proceedings underlying this action.    LUNDAHL had properly appealed judge Tallman's order but was put in jail on the underlying charges immediately after the appeal was filed.  LUNDAHL was not able to prosecute this appeal while she was in jail and her access to legal material was impeded by jail authorities.   The appeal  was ultimately  dismissed for failure to prosecute.    The 9th circuit has refused to reopen the appeal leaving LUNDAHL no other remedy than to attack the void order in this court.   Judge Tallman's order was presented to the  underlying criminal court as justification for denying LUNDAHL bail based on the

_____
42.    See Borkowski v. Abood, 861 N.E.2d 872, 169 Ohio App.3d 31, 2006 Ohio 4913 (Ohio App., 2006)  (where a judge knows that he lacks jurisdiction, or acts in the face of clearly valid statutes or case law expressly depriving him of jurisdiction,  he acts in a clear absence of jurisdiction and, as a result,  judicial immunity is lost.  See *Rankin v. Howard* (C.A.9, 1980),  633 F.2d 844,  849.   Here, there was no evidence or allegation that appellant failed to comply  [861 N.E.2d 876]  with the federal rule.  Thus,  at the time appellant filed his removal petition,  the applicable law expressly deprived the appellee  judge of jurisdiction over the eviction action.  In light of this conclusion,  we are constrained to find that the appellee judge acted in the  clear  absence  of  jurisdiction,   rather  than  in  excess  of  his  jurisdiction,   and, therefore,  lost judicial immunity in this case. See *Rankin, 633 F.2d. 309.*

prosecutor's claim that LUNDAHL was a danger to the public because LUNDAHL sued persons involved in criminal litigations against LUNDAHL and therefore frightened the government's witnesses.   LUNDAHL procured her attorneys to attack the order as void,  but the court appointed attorneys instead conspired with the clerk of the court to graft LUNDAHL's attack on Tallman's order from the court file.  The order is void and is required to  be vacated.

33.   LUNDAHL seeks to have a pre-filing order entered by Judge Dee Benson also declared void and vacated.   That Judgment is void for lack of subject matter jurisdiction, for lack of personal jurisdiction, and because it was entered in violation of due process.  At ADD. "32",  is points and authorities showing how Benson's pre-filing order is legally and factually incompetent.   Adopting Abood, supra@ fn. 42, this order should be declared void and vacated.

34.   Finally,  LUNDAHL seeks to have the pre-filing order entered by Stephanie Seymour declared void and vacated on the grounds of wholesale due process violations, including the fact that Stephanie Seymour owned upwards of  $1.8 million dollars in the tort defendant's companies that petitioned her for the pre-filing order;  therefore as a matter of statutory construction Judge Seymour's contempt order was  void as in violation of 28 USC section 455(b).  43

### 12th COA:   THE  NON-IMMUNED DEFENDANTS,  PRIVATE PARTY DEFENDANTS AND  THE UNITED STATES ARE LIABLE TO  LUNDAHL  FOR  INTENTIONAL  INFLICTION  OF EMOTIONAL DISTRESS

35.   The non-immuned defendants,  private  party  defendants  and  the United

_____

43.    To obtain redress,  LUNDAHL  needs  to seek  declaratory  relief against the void contempt orders which continue to block  LUNDAHL's access to the courts.   See   Ellis v. Dyson, 421 U.S. 426, 432, 95 S. Ct. 1691,44 L.Ed.2d 274 (1975)  ("[F]ederal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of continued enforcement of a disputed statute,  law,  rule or order  as applied to plaintiff."   See also Murphy v. Hunt, 466 U.S. 478, 481,102 S. Ct. 1181, 1183,71 L.Ed.2d 363 (1982) (requiring '"a reasonable  expectation  that  the  same  complaining  party  would  be subjected to the same action again and that the injury is ongoing.'" (quoting Ill. Elections Ed. v. Socialist Workers Party,  440 U.S. 173, 187,99 S. Ct. 983,991,69 L.Ed.2d 230 (1979)).

States are liable to LUNDAHL for the tort of intentional infliction of emotional distress.  The defendants collectively:  (1) intended to inflict emotional distress or that they knew or should have known that emotional distress was the likely result of their conduct;   (2) their conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community;   (3)  the actions of the defendant were the cause of the plaintiff's distress; and  (4)  the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.  44

36.   Here the defendants over the coarse of 20 years have endeavored to frame LUNDAHL for crimes LUNDAHL did not commit, have repeatedly maliciously prosecuted LUNDAHL,  have witness tampered with LUNDAHL numerous times in an attempt to cause LUNDAHL's death;  have destroyed LUNDAHL's livelihood at least 3 times;  have destroyed and tampered with official records to avoid prosecution;  have bribed judicial officials to block LUNDAHL's access to the courts, and;  have put LUNDAHL in harms way while in the government's custody.   This pattern of misconduct has been intentional,  extreme and outrageous, such that no reasonable man could be expected to endure the distress resulting therefrom.  LUNDAHL therefore asserts that she is entitled to a judgment in her favor as a matter of law on her cause of action for intentional infliction of emotional and mental distress.

**13th COA:     LUNDAHL IS ENTITLED TO A  BACKWARDS ACCESS CLAIM ON THREE  RELATED LAWSUITS WHICH LUNDAHL CAN NO LONGER PURSUE BECAUSE OF THE CO-CONSPIRATORS LATEST SCHEME OF HAVING IMPRISONED LUNDAHL IN JAIL FOR 2 ½ YEARS - MOSTLY UNDER SUPERMAX CONFINEMENT  -  IN ORDER TO PREVENT LUNDAHL FROM COMMUNICATING WITH ANYONE ON THE OUTSIDE;  OR IN THE ALTERNATIVE,  CONSTRUE LUNDAHL'S CLAIMS AS PART OF AN ONGOING CONSPIRACY THAT ALLOWS LUNDAHL  TO PURSUE DAMAGES FOR THE LAST 20 YEARS**

_____

44.    See **Limone v. U.S., No. 08-1327 (1st Cir. 8/27/2009) (1st Cir., 2009) (**We hold that the district court had subject matter jurisdiction to adjudicate the claims for intentional infliction of emotional distress under the FTCA.   Where the FBI knew that the scapegoats were not involved in the slaying;   where the  FBI told state authorities who were considering petitions for commutation and/or parole that Limone,  Greco, and Salvati had continuing ties

37.    As a result of  the present incarceration as a pre-trial detainee for nearly 2 ½

years,   LUNDAHL was prevented from refiling the original federal lawsuit filed against LILLY

and  LILLY's corporate  indemnifiers  under  the  Utah  Savings  statute  after  this  lawsuit  was

dismissed without prejudice prior to LUNDAHL's  false seizure on the underlying 2006 criminal

prosecution.   In addition,  the record will show that the defendants have obtained void pre-

filing  orders  against  LUNDAHL  by  financially  interested  judges  and  which  have

unconstitutionally blocked LUNDAHL's  access to the courts to pursue LUNDAHL's rightful

remedies.   Finally,  this record will show that one of the reasons LUNDAHL was incarcerated

for the last 2 ½ years was so that the defendants could use the criminal process to do civil

discovery  for  injuries  LUNDAHL  sustained  during  an  assault  scheme  orchestrated  against

LUNDAHL by these same defendants in September of 1995.   It became evidently clear that

LUNDAHL was being repeatedly sent back to the Federal Medical Center in Carswell, Texas to

malign the injuries LUNDAHL sustained in the 1995 assaults at the hands of IRS officers, hca

and  the  LILLY  defendants.    LUNDAHL  asserts  that  all  of  the  schemes  employed  against

LUNDAHL have  in  fact  been  a  single  conspiracy lasting  for  the  last  20  years  to  punish

_____

to organized crime;   where the  FBI even went so far as to have agents visit the office of a
parole board member to voice opposition to Limone's  petition for commutation;   these acts
present  a manifest  record of Brady violations  and  a broader scheme by the defendants to
frame the plaintiffs.   **Furthermore,  the government's after-the-fact attempt to conceal
what it had done became part of the same scheme.**   Id. at 202.   **It is very clear that claims
for intentional infliction of emotional distress may be founded on a pattern of misconduct.**
See, e.g., Boyle v. Wenk, 392 N.E.2d 1053, 1055 (Mass. 1979).   Thus, it was appropriate for the
district court,  on a pattern of conduct theory,  to weigh the significance of the FBI's failure to
provide exculpatory evidence.   See, e.g., Burrell v. Adkins, No. 01-2679, 2007 WL 4699166, at
*18 (W.D. La. Oct. 22, 2007).    The FBI clearly  covered up their perfidy by stonewalling the
scapegoats' petitions for post-conviction relief.   The district court concluded that this pattern
of conduct was extreme and outrageous.   Limone IV, 497 F. Supp. 2d at 227.   The conclusion
that the government indulged in extreme and outrageous conduct must stand. See, e.g., Pitt v.
Dist. of Columbia, 491 F.3d 494, 506 (D.C. Cir. 2007); Wagenmann v. Adams, 829 F.2d 196, 214
(1st Cir. 1987); Newton v. City of New York, 566 F. Supp. 2d 256, 281 (S.D.N.Y. 2008); Harris v.
Harvin, No. 01-2292, 2005 WL 2461876, at *2 (Mass. Super. Ct. Aug. 4, 2005); Sarvis v. Boston
Safe Deposit & Trust Co., No. 94-1215, 1994 WL 879797, at *3 (Mass. Super. Ct. June 6, 1994).
The FBI's acts and omissions were deliberate.   The  FBI knew that its misconduct was likely to
cause emotional distress. See, e.g., Wagenmann, 829 F.2d at 214.

LUNDAHL for whistleblowing against ELI LILLY in February of 1991.  If this court does not agree, then LUNDAHL seeks backward access claims against the defendants to redress the claims lost because of the defendants serious 20-year misconduct incorporating government officials.   45

### 14th COA:      LUNDAHL SUES OLIVER, CORPORON AND STEELE FOR LEGAL  MALPRACTICE

38.     LUNDAHL sues her attorneys  Oliver,  Corporon  and  Steele and the federal public defenders office for attorney malpractice,  gross violations of the professional ethics codes for attorneys in both the states of Utah and Texas,   conspiracy to violate the Health care Code for mental health specialists in the state of Texas and,  the public defenders office for failure to adequately supervise the conduct of its attorney Robert Steele.  46

---

45.    See *Christopher v. Harbury,* 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)( "A backwards access claim covers claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence),  no matter what official action may be in the future.   The official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case, e.g.,  Foster v. Lake Jackson, 28 F.3d 425, 429 (C.A.5 1994);   Bell v. Milwaukee, 746 F.2d  1205, 1261 (C.A.7 1984)  (`[T]he cover-up and resistance of the investigating police officers rendered hollow [the plaintiff's] right to seek redress'),  the loss of an opportunity to sue, e.g.,  Swekel v. River Rouge, 119 F.3d 1259, 1261 (C.A.6 1997) (police coverup extended throughout `time to file suit ... under ... statute of limitations'),  or the loss of an opportunity to seek some particular order of relief,  as Harbury alleges here.    These cases do not look forward to a class of future litigation,   but backward to a time when specific litigation ended poorly,  or could not have commenced,  or could have produced a remedy subsequently unobtainable.   The ultimate object of these sorts of access claims,  then,  is not the judgment in a further lawsuit,  but simply the judgment in the access claim itself,  in providing relief obtainable in no other suit in the future.    Also,  the longer the delay caused by officials ,  the more likely it is considered the defendant's actions resulted in constitutionally cognizable harm to the plaintiff. *See, e.g., Bell v. City of Milwaukee, 746 F.2d 1205, 1261-62 (7th Cir.1984)* (holding that official obstruction  which caused a twenty-year delay violated plaintiffs' right of access to the courts); *re Cincinnati Radiation Litig., 874 F.Supp. at 824* (holding that a cover-up which caused a twenty-two to thirty-four-year delay violated plaintiffs' right of access to the courts);  *Fisher v. City of Cincinnati, 753 F.Su*A lawyer has a general duty to represent a client competently.
46.    See Anthony v. Baker, 767 F.2d 657, hn. 1 (10th Cir. 1985)(private parties, their superiors,  and state and federal government officials can be held liable under section 1985(2) when they conspire to procure groundless indictments and charges to bring about a trial).

39.     LUNDAHL was profoundly damaged by these attorney's violations of LUNDAHL's sixth amendment rights and of their duties set forth under the ethics codes. LUNDAHL also seeks declaratory and injunctive relief against the false mental health records created by these defendants and psychological officials, friends of these court officers.

## II.     PERSONAL JURISDICTION ALLEGATIONS

40.     In accordance with 18 USC section 1402,  jurisdiction under the Federal Torts claims Act is where part of the events giving rise to plaintiff's claim occurred and where the plaintiff resides.    Hence personal and venue jurisdiction is proper in Texas.

41.     Many of the officers sued under LUNDAHL's Bivens claim are residents of the state of Texas,  accordingly personal jurisdiction over them is proper in Texas.     A couple of officers are residents of the state of Utah and California.  This Court has pendent personal jurisdiction over LUNDAHL's Bivens claims against these officers pursuant to  the FTCA and the constitutional theory that all facts in relation to a common nexus and supporting a single transaction,  should be brought in one action where ever possible.   47

42.     Finally,  Personal Jurisdiction exists over all  individuals in the state of Texas under the Federal RICO Act:  18USC section 1965,  as at least one defendant resides in the State of  Texas in this multi- district conspiracy action.

## III.     UNCONTROVERTED FACTUAL ALLEGATIONS

43.     The indictment found at exhibit "1" attached to the supporting addendum filed under separate cover herein and hereinafter referred to as  ("ADD. Ex. "1"),   supports plaintiff's claim that this action is brought pursuant to a single conspiracy theory which to date has existed over a period of 20 years.   In the alternative,  if  this  court does not construe this

_____

47.    See  Ortiz v. Pearson, 58 F.Supp.2d 151 (S.D.N.Y. 1999) citing to  Engle, 24 F.3d at 134 (2nd Cir. 1995) (plaintiff is entitled to have her FTCA and Bivens claims bifurcated for trial with her BIVENS claims being heard first to a jury.  This protects plaintiff's 7th amendment right to a jury trial on legal claims and protects against potential arbitrary decision making by a judge required to decide Plaintiff's tort claims against the United States.)

action as a single conspiracy covering the last 20 years and put an end to the conspiracy,  then plaintiff seeks in the alternative  "backwards access claims"  on the cases obstructed or lost as a result of the defendant's fraudulent,  illicit and criminal conduct.

44.    As  the indictment underlying criminal case no USDC 2:06 CR 693,  USA v. Holli Lundahl  shows in counts  4 and 5,   the government charged LUNDAHL with forging two courts orders,  one dated October 1, 1993 and the other dated October 17, 1994.    The facts underlying these judgments commenced  in 1990 and 1991 when LUNDAHL, as a doctor, whistleblew on Eli Lilly and Company for massive fraud.   In essence,  ELI  LILLY  was acting as it's own self appointed workers compensation insurance carrier  in violation of a California conflict of interest rule  and California laws mandating acquisition of independent carriers. ADD. "2" .   LILLY'S illegal capacity ultimately resulted in  employees  who were permanently disabled by LILLY's work place misconduct,   being relegated to the welfare market in the state of California where the California tax payers subsidized these permanent injuries when ELI LILLY denied the permanent injuries were work related.


A.    THE 1991 STATE CRIMINAL PROSECUTION IN CR44162


45.    LUNDAHL'S medical and alternative health clinics treated approximately 80 LILLY employees,  a substantial number who had been seriously injured at LILLY's medical equipment manufacturing plant.   LUNDAHL's clinics submitted  workers compensation injury claims to ELI LILLY in accordance with LILLY's protocol and predicated upon  LILLY's claim via principle employee Lori Pivo,  that  LILLY reported  all of it's workers compensation claims to the California Workers Compensation Board in accordance with mandate.      Initially, LUNDAHL'S clinics were compensated for the work injury claims submitted to LILLY.

46.    In  about February of 1991,   LUNDAHL began receiving complaints from the injured employees that LILLY was violating the doctor's  treatment  orders and hence causing the employees  to suffer exacerbated injuries and severe pain.     LUNDAHL contacted the Workers Compensation Board to report the complaints as required by law.   The Board  denied

that LILLY had reported any work related injury concerning  a  LILLY employee and also  denied that LILLY had acquired any workers compensation  insurance.

47.    The  Board  issued  an  administrative subpeona  to  LUNDAHL  directing LUNDAHL to provide all treatment records on all injured LILLY employees as well as copies of all future reimbursement checks tendered by LILLY to pay for the work comp injuries.    The Board also advanced  LUNDAHL's  clinic's  treatment records to OSHA for an investigation into dangerous work place issues.    After OSHA received the complaints,   a local division of OSHA contacted LILLY in advance and informed LILLY  that OSHA  would be conducting an inspection of  LILLY's  ACS manufacturing plant  to  investigate  into  the  complaints.

48.    Subject  to  improperly  receiving  this  advance  notice  by  OSHA,    LILLY fired  a substantial number of  injured  employees  to  avoid  detection on the OSHA  violations. (Much later,   LILLY would deny  that these employee's injuries were work related  and relegate these employees to the welfare market in the state of California where the tax payer would pick  up the bill  for LILLY's  illegal conduct.)

49.    OSHA  did subsequently conduct an   investigation without the benefit of confronting the employees who were injured by LILLY's workplace dangers because LILLY had fired these employees.    Even so,    OSHA still  cited LILLY for providing a dangerous work enviroment,    issued  a  corrective  injunction  order  and  directed  LILLY  to  pay  investigation sanctions.

50.    In the interim,    LUNDAHL endeavoring to comply with the administrative subpeona,    collected all the payment records on the work injury claims and noted  that corporate  LILLY  was  funding  the  injury  payments  out  of  their  corporate  account  in Indiannapolis,  Indiana;   hence proving that LILLY was not using an independent workers compensation carrier to fund the treatment of work injuries.    A board member leaked information regarding   LILLY's work injury and illness payments being negotiated through LILLY's corporate account - to a principal at LILLY.    This resulted in  LILLY's  legal department putting  stop payments   on  all  workers compensation injury and illness claims which had been submitted  to LILLY  by LUNDAHL in order  to hinder proof of LILLY's regulatory violations.

51.    LILLY then authored defamatory memos which LILLY caused to be dispatched to the public at large - accusing LUNDAHL's clinics of committing health care fraud. In addition,  LILLY issued other memos to it's remainder employees that if these employees sought treatment from LUNDAHL's clinics for any reason, the employees would be discharged. Finally,    LILLY contacted it's corporate malfeasance insurers and other parallel health insurance carriers, and conspired and schemed to discredit LUNDAHL and destroy LUNDAHL's livelihood in retaliation for LUNDAHL's whistleblowing acts.

52.    When LILLY refused to reimburse LUNDAHL's clinics for the treatments rendered,   LUNDAHL brought suit against LILLY for the unpaid bills in the municipal courts in the state of California.    After filing  dispositive papers with the courts wherein LILLY claimed  health care fraud against LUNDAHL and LUNDAHL claimed a retaliation claim against LILLY,    LILLY's corporate legal counsel  sent LUNDAHL an accord and satisfaction letter seeking to settle certain claims to prevent exposure.  ADD. "3".    LUNDAHL negotiated these payments with written disclaimers affixed to the checks which asserted that LUNDAHL was EXCEPTING from resolution her defamation claim against LILLY which exceeded the municipal court's jurisdiction.    LILLY then procured a visiting judge to sit on these municipal court lawsuits and to dismiss these lawsuits with prejudice based on the doctrines of accord, satisfaction and settlement.    The judge subsequently ordered LUNDAHL to issue dismissal with prejudice and release stipulations on the settled claims subject of the municipal court lawsuits in order not to be found in contempt.  LUNDAHL did so.  See ADD. "4".    LUNDAHL subsequently brought a  multi million dollar civil suit against LILLY for defamation,  tortious interference with business relations, and to seek payment on the other unpaid bills for LILLY employees, in the Riverside Superior Court State of California.  LILLY was served with this lawsuit on October 8, 1991.

53.    Shortly thereafter,    LILLY  filed  a civilian's complaint through it's principal employee Lori Pivo demanding that LUNDAHL be arrested for grand theft and insurance fraud. ADD. "5".

54.    Criminal proceedings were initiated against LUNDAHL by grand jury

indictment based on false testimony by LILLY principals.   LUNDAHL was arrested on 12-26-91 for insurance fraud and grand theft and Lundahl's bail was set at $250,000.00 ADD. "6".

55.   Pursuant to LILLY's direction, the prosecutor later increased the number of charges to 6 felony counts in order to twice meet the 3 strikes rule in the state of California and to obtain a judgment for 2 life imprisonment terms against LUNDAHL. Later, LILLY wrote the prosecutor a letter compelling the prosecutor to require LUNDAHL to dismiss her multi-million dollar civil suit against LILLY with prejudice as restitution that LUNDAHL should owe LILLY. ADD. "12".   A few months later, **LILLY authored a stipulation** wherein LILLY concluded that most if not all of the issues presented in LUNDAHL's multi-million civil suit were identical to the issues presented in the criminal case, and accordingly, LILLY requested that all parties agree to be bound by the final criminal judgment. 48 (See ADD. "7" for this stipulation.)   LILLY and LUNDAHL signed the stipulation on June 10, 1993 and on June 14, 1993 the superior court judge in LUNDAHL's civil tort action against LILLY, et al. adopted and filed the stipulation into the record for later enforcement.

56.   LUNDAHL contends that LILLY initiated, controlled and directed the criminal action which was directed primarily at LILLY's interests   The following acts showed LILLY's control over the litigation.   LILLY initiated the prosecution as the primary complaining witness (ADD. "5").   LILLY directed the prosecutor to change the charges to 6 felony counts instead of two as presented on the arrest warrant (ADD. "6").   LILLY created evidence, filed false reports and committed perjury before the grand jury to secure LUNDAHL's criminal prosecution.   LILLY controlled the prosecutor's litigation strategies and plea negotiations (ADD. "12").   And when the prosecutor finally withdrew from LILLY's control, LILLY arranged to have the prosecutor fired.

57.   On July 19, 1993, the prosecutor wrote a lettered motion to dismiss the

---

48.   Parties can agree to the entry of a judgment conditioned on certain predicates. Such agreement will strip a court of jurisdiction to decide the controversy of the matter therein and render the controversy moot. J. Aron & Co. v. Mississippi Shipping Co., 361 US 115, 4 L Ed 2d 148, 80 S Ct 212 (1959) Smith v. Sumner, 994 F.2d 1401, 1406 (9th Cir. 1993) (consent agreement created a liberty interest.)

criminal action and tendered this letter to the criminal court.   (See ADD. "8" for a true and correct copy of this lettered motion to dismiss.)   As shown therein, the prosecutor admitted that he had conducted a complete investigation into the criminal matter including investigated into LUNDAHL's rebuttal evidence and under the substantial evidence standard, concluded that LUNDAHL had not committed any crime.   Furthermore, the prosecutor admitted that LILLY'S employees had committed wholesale perjury and filed false reports to seek the wrongful prosecution of LUNDAHL.   ADD. "8".   The prosecutor moved for a dismissal of the action in the interests of justice for insufficient evidence and lack of any material witness that LUNDAHL had committed a crime as authorized under section 1385 of the California penal code.   On July 23, 1993, the judge ordered LUNDAHL exonerated from the charges and dismissed the criminal action with prejudice.

58.   On October 1, 1993 at 9:00 a.m., the criminal court reconvened for the purpose of creating a written minute order which identified the grounds for dismissal of the criminal action and also to direct that all evidence in the prosecution be preserved.   On October 1, 1993, the judge recorded in the court's official transcript the grounds for dismissal of the criminal action as being "lack of any material witness", "insufficient evidence" and "in the interests of justice." ADD. "9".   (In California, the hearing transcript is usually used to identify and commit the rulings of the court; unless a party prepares a "Written Statement of Decision" and acquires the judge's signature as required under California Code of Civil Procedure section 632.) 49   Also during this hearing, the Court declared that the entire criminal file and supporting records had been destroyed and recommended that LUNDAHL file charges with the Attorney General's office regarding the destruction of court records and the perjury committed by LILLY's principals.   As a result of the destruction, the Court directed LUNDAHL to contact the prosecutors office and obtain whatever records the

_____

49.   See US v. Cejas, 817 F.2d 595, (9th Cir. 1987) (Whenever the parameters of a judge's ruling is question, the court should look to the hearing transcript to determine the parameters of his ruling.); Followed in McNeely v. Blanas, 336 F.3d 822 (9th Cir. 2003) (defendant made allegations about counsel's ineffective assistance on the record; the hearing transcripts were ordered to verify the conspiracy charges of the defendant).

prosecutor had in his possession in order to reconstruct the criminal file.

On the afternoon of October 1, 1993, LUNDAHL reported to the court that the D.A.'s office had also destroyed all records pertaining to LUNDAHL's criminal prosecution. The Court indicated that he would make a record of this destruction for a later presumption charge in LUNDAHL's favor. Finally, LUNDAHL submitted a written statement of decision as required under California Code of Civil Procedure section 632 and asked the court to sign the dismissal order which paralleled the rulings made in the 10/1/1993 hearing transcript. ( See ADD. "10" for a true copy of the written dismissal order.) Over the next 17 years to todays date, LILLY would claim this judgment was forged to avoid liability.

### B.    THE 1991 CRIMINAL PROSECUTION WAS FUNDED BY A THIRD PERSON

58.    The criminal prosecution was funded by a third person who was present at the 10/1/93 criminal hearing. This person also obtained a certified copy of the 10/1/1993 minute order dismissing the criminal action and recorded that dismissal order as an exhibit attached to a consent judgment executed between LUNDAHL and Lorinda Bracken as trustee to Heatland Trust. This consent judgment was recorded in LUNDAHL's civil tort action filed against LILLY, et al. as a lien thereto on January 21, 1994. (See ADD. "11" for copy of the court docket in re Riverside County case no. 219124 and showing a notice of ruling re hearing on 1/14/94 which records this consent judgment along with the attached 10/1/1993 criminal dismissal order.)

### C.    THE POST CIVIL RIGHTS LAWSUIT: USDC-CALIFORNIA CASE NO. 94-45 GLT

59.    On January 13, 1994, LUNDAHL filed a federal civil rights action in the federal court against LILLY et al. as case number 94 CV 045. The state action was removed to the federal court and then merged with case no. 2:94 CV 045 GLT. The LILLY defendants moved for dismissal of the civil rights action on the statute of limitations grounds in March of

1994.    LUNDAHL opposed the argument.    On  April 25, 1994,  the federal court denied
LILLY's  statute  of  limitations defense.

60.    In September 1994,   the federal court directed the parties to prepare and
submit mandatory settlement statements  to the court as provided under a local rule for the
US District Court Central District of California.   The Court instructed the parties that they were
to  present  their  theories  of  the  case  and  defenses  and  argue  which    claims    could  be
summarily disposed by rule of law.     LUNDAHL provided the court  with  the  arrest  warrant
setting  forth  the   global  charges  of  grand  theft  and  insurance  fraud (ADD. "6");    LILLY's
stipulation agreeing to be bound by the final dispositions in the criminal case (ADD. "7");   the
letter by the prosecutor admitting that LILLY had engaged in wholesale perjury and the filing of
false reports to bring about the criminal prosecution (ADD. "8");   the final 10/1/93 dismissal
order (ADD. "10");    the criminal court's  hearing transcript dated 10/1/93 and affirming the
dispositions in the written minute order (ADD. "9") and;  another minute entry by the state
criminal  judge  admitting  that  the  criminal  file  had  been  destroyed  after  LUNDAHL  won  the
criminal  case.     LUNDAHL  provided  the  following  argument  to  the  federal  court  in  her
**Mandatory Settlement Statement:**

"    I.    LILLY AGREED TO BE BOUND TO THE FINAL      "
CRIMINAL JUDGMENT

Attached hereto as exhibit "1" is the 6/14/93 stipulation authored by ELI
LILLY's attorneys agreeing to be bound by the final judgment.  Lilly agreed
that the final judgment  in the criminal action would decide the same or
related issues presented in this civil case and therefore LILLY is bound by
agreement  to  a disposition of  LUNDAHL's claims in LUNDAHL's favor.
See  J. Aron  Co. v. Mississippi Shipping Co., 361 US 115, 4 L Ed 2d 148, 80
S Ct 212 (1959)  (Parties  can agree to the  entry  of  a  judgment
conditioned on certain predicates.   Such agreement will strip a court of
jurisdiction to decide the controversy of the matter therein and render
the controversy moot.)  Accord in Smith v. Sumner, 994 F.2d 1401, 1406
(9th Cir. 1993)(consent agreement created a liberty interest.)   Lundahl
has a liberty interest in enforcement of the stipulation authored by
LILLY's counsel.

II.   THE CRIMINAL   PROCEEDINGS WERE DISMISSED AT
      A LOWER  CIVIL PROBABLE CAUSE STANDARD OF PROOF
      AND THEREFORE THE FINAL CRIMINAL JUDGMENT DECIDED
      ALL ELEMENTS OF LUNDAHL'S FALSE IMPRISONMENT;
      BAD FAITH BREACH OF CONTRACTS;  FIDUCIARY FRAUD;
      RICO EXTORTION UNDER COLOR OF LAW;  MALICIOUS
      PROSECUTION  AND  ABUSE OF PROCESS  CLAIMS IN
      LUNDAHL'S  FAVOR AS A MATTER OF LAW

Federal Courts hold that "once a court has decided an issue of fact or
law necessary to its judgment,  that decision may preclude re-litigation
of the issue in a subsequent suit on a different cause of action involving
a party or party in privity to the first case."   Montana v. United States,
440 US 147, 59 L Ed 2d 210, 99 S Ct 970 (1972);   Haupt v. Dillard (9th
Cir.1993) 17 F.3d 285: Murdock v. Ute Indian Tribe of Uintah,  975 F.2d
683, 686 (10th Cir. 1992).    It is now clear that the doctrine of collateral
estoppel may be employed in a civil action to preclude the re-litigation
of issues necessarily determined in a prior criminal action.  (*Hooks v.
Middlebrooks* (1984, 4th Dept) 99 AD2d 663, 472 NYS2d 54);   Lowther
v. U.S., 480 F.2d 1031 (C.A.10  (Okl.),  1973) (subsequent  civil  action is
subject  to collateral estoppel  bar based upon determination of the
same factual issues presented in a prior criminal case.)

 The correct inquiry is the timing and circumstances of  the dismissal of
 the prior action.   Allen v.  McCurry, 449 U.S. 90, 95, 101 S.Ct. 411, 415,
 66  L.Ed.2d 308 (1980).     The doctrine of collateral estoppel or issue
 preclusion is a secondary form of res judicata.  (People v. Sims (1982) 32
 Cal.3d @ 477, fn. 6, 186 Cal.Rptr. 77, 651 P.2d 321.)  It prevents a party
 who had a full and fair opportunity to litigate a particular issue in a prior
 proceeding from  re-litigating that issue  in a subsequent proceeding.
 (7 Witkin, Cal. Proc. (4th ed. 1997) Judgment,  § 339,  p. 894.)    "A
 prior  determination  by a tribunal  will  be given  collateral  estoppel
 effect when  (1)  the  issue  is  identical  to that  decided  in  a former
 proceeding;  (2) the issue was actually  litigated and  (3) necessarily
 decided;  (4)  the  doctrine  is  asserted against  a party  to the former
 action or one who was in privity with such a party;  and (5) the former
 decision is final and was made on the merits."  (Kelly v. Vons Companies,
 Inc. (1998) 67 Cal.App.4th 1329, 1339, 79 Cal. Rptr.2d 763. ) Federal
 and state courts have consistently held that the doctrine  of collateral
 estoppel  may  preclude  re-litigation  in  a civil suit  of  issues  that were
 decided in a prior criminal proceeding.  See e.g.,  Allen  v.  McCurry
 (1980)  449 US  90, 104,   101  S. Ct. 411,   66  L. Ed.2d  308.    A

finding regarding probable cause in the state of California is a final judgment on the merits for the purposes of collateral estoppel because the accused can file a writ of prohibition under several sets of rules in order to halt the prosecution. Also, the issue of probable cause cannot be litigated further because it cannot be used as a defense at trial. (People v. Gaines (1966) 247 Cal.App.2d 141, 147, 55 Cal.Rptr. 283.)

III.   THE ISSUE OF PROBABLE CAUSE WAS DECIDED IN LUNDAHL'S FAVOR AS INDICATED BY STOCK'S LETTERED MOTION TO DISMISS ADMITTING THAT LILLY PRINCIPALS HAD COMMITTED WHOLESALE PERJURY AND FILED FALSE REPORTS TO SECURE LUNDAHL'S PROSECUTION

A ruling on sufficiency of the evidence at a probable cause hearing would, in most cases, meet the identity of the issues requirement in a subsequent civil rights suit. People v. Campa (1984) 36 Cal.3d 870, 879, 206 Cal.Rptr. 114, 686 P.2d 634 [ In determining the sufficiency of an affidavit for the issuance of a ... warrant, the test of probable cause is approximately the same as that applicable to the probable cause determination in a subsequent civil rights suit."]

Gerstein Hearings provide the opportunity to test probable cause determinations in California. (Cf. Herbert v. Superior Court (1981) 117 Cal.App.3d 661, 666, fn. 3, 172 Cal. Rptr. 850.) Through these hearings the defendant can exchange evidence and confront witnesses and plaintiff can also challenge false evidence which may have been presented to the prosecutor to initiate the prosecution. (Harris v. Roderick (9th Cir.1997) 126 F.3d 1189, 1198.) During this hearing, both parties are given the opportunity to test the state's case. This hearing can take place at any time before trial.

People v. Superior Court (Missamore), 45 Cal.Rptr.2d 392, 38 Cal.App.4th 1358 (Cal.App. 1 Dist., 1995). If the prosecutor dismisses the case pre-trial for insufficient evidence, this determination is a ruling on the merits of probable cause and is entitled to collateral estoppel effect in a subsequent action if privity can be established between the complaining witness and the government. People v. Sims, 32 Cal.3d 468, 186 Cal.Rptr. 77 (Cal., 1982). "Another *prima facie* way to establish probable cause in plaintiff's favor in a subsequent civil rights suit is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other

wrongful conduct undertaken in bad faith." *Awabdy,* 368 F.3d at 1067. Here, the lettered motion to dismiss filed by the prosecutor admits that the prosecution was laced with wholesale perjury by ELI LILLY's witnesses; thereby negating probable cause for the prosecution of LUNDAHL. See Stock's Lettered motion to dismiss; the 10/1/1993 hearing transcript and the court's 10/1/1993 order; all of which admit to perjury and false documents tendered by LILLY in order to procure the malicious prosecution. Accordingly, LUNDAHL contends that: (a) the lack of probable cause was established in her favor at the criminal trial, (2) the probable cause issue in the criminal trial is identical to the probable cause issue in LUNDAHL's malicious prosecution claim, and therefore, LUNDAHL has met the identity of issues requirement, and (3) LUNDAHL has shown that the probable cause issue was fully and fairly litigated during the 2 year criminal prosecution.

> LILLY IS BOUND BY THE PRIOR DETERMINATION OF LACK OF PROBABLE OF CAUSE MADE IN LUNDAHL'S FAVOR - AS A PARTY AGREEING TO BE BOUND BY THE FINAL CRIMINAL JUDGMENT AND AS A PARTY HAVING A SIGNIFICANT INTEREST IN AND SOME CONTROL OVER THE PRIOR LITIGATION

Sims, supra opined that the concept of privity referred "to a relationship between the party to be estopped [32 Cal.3d 487] and the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify application of the doctrine of collateral estoppel." (Clemmer v. Hartford Insurance Co. (1978) 22 Cal.3d 865, 875, 151 Cal.Rptr. 285, 587 P.2d 1098; see also Lynch v. Glass, supra, 44 Cal.App.3d at 948, 119 Cal.Rptr. 139; People ex rel. State of Cal. v. Drinkhouse (1970) 4 Cal.App.3d 931, 937, 84 Cal.Rptr. 773; People v. One 1964 Chevrolet Corvette Convertible (1969) 274 Cal.App.2d 720, 731, 79 Cal.Rptr. 447.) Citing to Jackson v. Hayakawa, 605 F.2d 1121, 1126 (9th Cir. 1979), "One who was not a party of record will be bound by the judgment if that party had sufficient interest and participated in the prior litigation." When one acts as a complaining witness and procures the prosecution to obtain a collateral advantage in his own interest, that person is in privity with the prosecutor and will be bound by any judgment." Restatement of Judgments sec. 83 (1942) 1B Moore's federal practice para. 0.411 (2d ed. 1965). Montana v. United States, 440 US 147, 59 L Ed 2d 210, 99 S Ct 970 (1972); Collateral estoppel has been applied against nonparties who had a proprietary or financial interest in and control of a prior action.

*Lynch v. Glass,* 44 Cal. App. 3D 943, 949, 119 Cal.Rptr. 139 (1975). Collateral estoppel further applies when the `nonparty has an interest "in the determination of a question of fact or law with reference to the same subject matter or transaction." *Stafford v. Russell,* 117 Cal.App.2d 319, 320, 255 P.2d 872 (1953), *cert. denied,* 346 U.S. 926, 74 S.Ct. 315, 98 L.Ed. 419 (1954).   The principle may be invoked to protect against vexatious litigation  (see People v. One 1964 Chevrolet Corvette Convertible, Supra;  O'Connor v. O'Leary (1967) 247 Cal.App.2d 646, 650, 56 Cal.Rptr. 1; Taylor v. Hawkinson (1957) 47 Cal.2d 893, 897, 306 P.2d 797),  to further the finality of litigation in which public interests are involved  (see People ex rel.  State of Cal. v. Drinkhouse (1970) 4 Cal. App.3d 931, 939, 84 Cal.Rptr. 773;  56 Cal.L. Rev. 1099),  or to promote the stability of adjudications in prior criminal actions (People v. One 1964 Chevrolet Corvette Convertible,  Supra,  274 Cal.App.2d at p. 730, 79 Cal.Rptr. 447;   People ex rel. State  [44 Cal.App.3d 948]  of Cal. v. Drinkhouse, Supra, 4 Cal.App.3d at p. 938, 84 Cal.Rptr. 773; see also Teitelbaum Furs, Inc. v. Dominion Ins. Co., Ltd., Supra, 58 Cal.2d at p. 606, 25 Cal.Rptr. 559, 375 P.2d 439).  See also Southwest Airlines Co. v. Texas  Intern. Airlines,  546 F.2d @ 96-98 (5th Cir. 1977);   In re Schimmels, 127 F.3d 875 (9th Cir. 1997).  Temple, 605 F.2d @1176 (10th Cir. 1979) (anyone who procures and assists the prior prosecution where his interests are represented by another, will be bound by the resulting judgment.).  See Sanders v. English, 950 F.2d 1152, 1163 (5th Cir. 1992)("an officer   maliciously causes a criminal proceeding to be brought by providing false or misleading information to a prosecuting attorney or grand jury ".)

Additional recent cases which have applied a broadened concept of privity include Cauefield v. Fidelity and Casualty Company of New York (5 Cir. 1967) 378 F.2d 876, 879, cert. den. 389 U.S. 1009, 88 S.Ct. 571, 19 L.Ed.2d 606;  Council Brothers, Inc. v. Ray Burner Company (5 Cir. 1973) 473 F.2d 400;   Colditz v. Eastern Airlines, Inc. (S.D.N.Y.1971) 329 F.Supp. 691, 695;  Proctor and Gamble Co. v. Byers Transportation Co., Inc. (W.D.Mo.1973) 355 F.Supp. 547, aff'd (8 Cir. 1974) 501 F.2d 928;  Burns v. Unemployment Compensation Board of Review (1949) 164 Pa.Super. 470, 65 A.2d 455.

Thus,  the question of privity  has been restated in terms of whether a nonparty was 'sufficiently close' to an unsuccessful party in a prior action  as to justify the application of collateral estoppel against the nonparty.  (People v. One 1964 Chevrolet Corvette Convertible, Supra, 274 Cal.App.2d at p. 731, 79 Cal.Rptr. 447; People ex rel. State of Cal.

v. Drinkhouse, Supra, 4 Cal.App.3d at p. 937, 84 Cal.Rptr. 773; 47
So.Cal.L.Rev., Supra, at p. 361; 56 Cal.L.Rev. 1102.)


Notwithstanding these developments, collateral estoppel may be
applied only if the requirements of due process are met. (Blonder
-Tongue v. University Foundation (1971) 402 U.S. 313, 329, 91 S.Ct.
1434, 28 L.Ed.2d 788;  Bernhard v. Bank of America, Supra, 19 Cal.2d
at p. 811, 122 P.2d 892;  Dillard v. McKnight, Supra,  34 Cal.2d at pp.
214--215, 209 P.2d 387;  56 Cal.L.Rev., Supra, at p. 1103.)  Zaragosa
v. Craven (1949)  33 Cal.2d 315, 321,  202 P.2d 73;  Rynsburger v.
Dairymen's Fertilizer Coop., Inc. (1968) 266 Cal.App.2d 269, 277--278,
72 Cal.Rptr. 102;  People v. One 1964 Chevrolet Corvette Convertible,
Supra, 274 Cal. App. 2d  at p. 732,  79 Cal.Rptr.  447;  People ex rel.
State of Cal. v. Drinkhouse, Supra.)  The circumstances must also have
been such that the nonparty should reasonably have expected to
be bound by the prior adjudication.  [44 Cal.App.3d 949].   A nonparty
should  reasonably be expected to be bound if he had in reality
contested the prior action even if he did not make a formal
appearance.    Thus,  collateral estoppel has  been applied against
nonparties who had a proprietary or financial interest in and sought to
advance those interests in the prior litigation.   (See, e.g., Zingheim v.
Marshall (1967) 249 Cal.App.2d 736, 745, 57 Cal.Rptr. 809,  cert. den.
389 U.S. 831,  88 S.Ct. 98,  19 L.Ed.2d 89;   Stafford v. Russell (1953)
117 Cal.App.2d 319, 320, 255 P.2d 872, app. dismissed 239 Cal.App.2d
56, 48 Cal.Rptr. 415.).   See Seattle-First Nat'l Bank v. Cannon, 26 Wn.
App. 922, 927-28, 615 P.2d 1316 (1980) (Holding that conviction of
conspiracy and aiding and  abetting  embezzlement  of funds from a
bank conclusively  established  wrongful  taking  of  those  funds  in
subsequent civil action.  The bank as the complaining witness in the
prior criminal action was entitled not to have the issue of
embezzlement retried in a subsequent civil action. ).


### V.  THE PRIOR ACTION TERMINATED IN LUNDAHL'S FAVOR

At common law,  the trial court did not have a unilateral power of
dismissal.  (People v. Bruzzo (1864) 24 Cal. 41, 51.)  " Nolle prosequi"
was the term used for  a  formal record entry  representing a
prosecutor's decision to terminate prosecution.  (See Black's Law
Dict. (6th ed. 1990  p. 1048, col. 2.)   At common law,  the
prosecutor had unrestricted authority to enter  nolle prosequi
without consent of the court at any time before  a  jury was

impaneled.   (See United States v. Salinas (5th1. Cir.1982) 693 F.2d
348, 350.)   "In California this right has been committed to statute.
The prosecuting attorney has a unilateral right to dismiss a
prosecution "in the furtherance of justice" pursuant to Section 1385
if there is insufficient evidence or lack of reasonable belief to
prove the defendant committed a crime." Id. @ 51.

Having established all elements in her favor, LUNDAHL is entitled to a
judgment in her favor as a matter of law on her malicious prosecution,
abuse of process and false imprisonment claims, as well as on her
related and necessarily decided claims for bad faith breach of contract,
fiduciary fraud, and RICO extortion.

                                    ******

61.   Based on the foregoing,   because LILLY contractually agreed to be bound by

the final criminal judgment pursuant to the June 14, 1993 stipulation and because LUNDAHL

met all of the other elements to establish judgments in her favor on all of her related causes

of action,   on October 18, 1994 at a mandatory settlement conference,  a federal judge

granted LUNDAHL summary judgment.   50

### D.   THE FEDERAL CASE WAS TRANSFERRED TO A NEW JUDGE AND ASSIGNED CASE NO.   2 :1994 CV 021

62.   Two Days after the 10/17/1994 judgment was signed,  the action was

transferred toanother federal judge.   In violation of the law of the case doctrine,  to attack

the 10/1/93 and 10/17/1994 orders entered against LILLY's interests and to avoid enforcement

of the stipulation authored and signed by LILLY (see ADD. "7"),     LILLY filed an OSC re

contempt against LUNDAHL charging LUNDAHL with abusive and vexatious litigation tactics by

allegedly forging  the 10/1/1993 and 10/17/1994 orders and engaging in other abusive

litigation extra judicially.   On March 16, 1995 in re federal case no. 94 CV 021,  the new

_____

50.   LUNDAHL also sued the banks in 1994 for the same conduct committed by the
same banking defendants in the 2006 seizure.  In 1991 Heatland Trust subsidized LUNDAHL's
1991-1993 criminal prosecution because the banks sought to deprive LUNDAHL of her counsel
of choice in 1991.  See Heatland's consent judgment recorded 1/21/1994 as referenced in
ADD. "11".   This suit against the banks would be dismissed while LUNDAHL was on trial for
the assault charges against the IRS officers in re USDC California case no. 95 CR 0114 AAH.

federal judge issued a criminal contempt OSC against LUNDAHL re the  forgery and other alleged abusive litigation tactics.    ADD. "13".    On June 13, 1995,  the federal court under a lower standard of proof denied  that LUNDAHL had engaged in any abusive litigation tactics. See ([People v. Sims (1982) 32 Cal.3d @ 477](#), 186 Cal.Rptr. 77, 651 P.2d 321 ) (determination of a criminal charge under a lower standard of proof bars prosecution of that same charge under a higher standard of proof).   See also  Harris v.  Cockrell,  313 F.3d 238, 246  (5th Cir. 2002) (state precluded from re-litigating an issue which was decided against the state in the former proceeding  - at a lower standard of proof, citing Dowling v. United States, 493 US 342, 349, 110 S. Ct. 668, 107 L.Ed.2d 708 (1990)).


   **E.    FIVE YEARS AFTER THE LAST BILL WAS SUBMITTED TO LILLY FOR PAYMENT; THE  LILLY DEFENDANTS COMMENCED AN ILLEGAL ADMINISTRATIVE ACTION AGAINST LUNDAHL;  LATER  OPINED AS  VOID  BY  A CRIMINAL TRIAL JUDGE**


   63.    In  mid September 1995  to attack the federal court's 6/13/1995 ruling and to avoid a jury trial on the remainder of LUNDAHL's RICO and tortious interference claims,  LILLY and LILLY's insurers CNA,  GTE,  PIMCO,  CITIGROUP, GE  and FIDELITY fraudulently procured LUNDAHL's appearance in the state of  California  subject  to  a  false   deposition  notice issued  by  LILLY's attorneys in the federal case.

   64.    LUNDAHL  appeared in Los Angeles, California  for the deposition and was unlawfully seized by San Diego police officers and taken to San Diego California,  where LILLY obtained an of counsel attorney from LILLY's San Diego lawfirm just recently appointed to the administrative law bench,  to conduct an administrative proceeding on the claims  MOOTED by the prior adjudicated and released civil judgments found at ADD. "3" and "4",  and on 3 other claims adjudicated in LUNDAHL's favor at the 1991 - 1993 criminal trial.    LUNDAHL objected to the jurisdiction of the administrative law judge on the grounds of violations of:  (1) Article II, section 2 of the California Constitution in that no case or controversy was presented by the charges;    (2) the Ex Post fact clause because the civil judge was attempting to prosecute a time barred criminal charge,   (3)  the sixth and fourteenth amendments in that

the de facto criminal charges were barred by the double jeopardy and collateral estoppel clauses of the US Constitution, and (4) the California Administrative Procedures Act which prohibited an administrative law judge from prosecuting claims outside of his jurisdiction unless the respondent had a business or lived in San Diego. 51 LUNDAHL never had a business or lived in San Diego California. The ALJ nevertheless ordered LUNDAHL detained to force LUNDAHL's appearance.

65.     LUNDAHL was falsely imprisoned by San Diego police officials on a day to day basis for the duration of the administrative proceedings - without any process to authorize the seizure.

66.     LUNDAHL filed a writ of habeas corpus in a Los Angeles Superior Court demanding her immediate release from custody. LUNDAHL also filed an injunction in her federal case against LILLY 94-CV- 021 RJT on or about September 21, 1995 seeking to enjoin the illegal administrative proceedings under the Federal Anti injunction Act.

### F.     THE DEFENDANTS COMMITTED NUMEROUS ACTS OF WITNESS TAMPERING, THEFT AND EXTORTION UNDER COLOR OF LAW

67.     LUNDAHL retained a video-grapher to film the illegal proceedings under the Open Meetings Act with intent to use the film in a subsequent false imprisonment action against LILLY and others. During the coarse of filming the proceedings, LUNDHAL obtained videotaped footage that LILLY had destroyed their true insurance plan to secure LUNDAHL's 1991-1993 conviction for insurance fraud. LILLY therefore defrauded almost 3500 employees, and tens of Thousands of health care providers - of the true benefits promised under the real insurance plan.

68.     To obtain LUNDAHL's videotapes and to default LUNDAHL on all of her claims, LILLY, CNA, GE, GTE, PIMCO and FIDELITY through their mutual attorneys who

_____

51.     A litigant has a "federal right to be free from bad faith prosecutions", holding that showing such prosecution "is equivalent to a showing of irreparable injury for purposes of the comity restraints defined in Younger [v. Harris, 401 U.S. 37 (1971)]".

appeared daily at the illegally convened administrative proceedings,     conspired with IRS officials to provide security at   this hearing in order witness tamper and commit theft by deception.     On the morning of September 27, 1995,    IRS officers told LUNDAHL that she had violated a building policy by filming in the building.   The officers told LUNDAHL they were going to seized her original trial documents and videotapes to prove the violation.  No officer had an arrest warrant or search warrant in their possession to authorize the seizure.

69.    While  the film  was running,    LUNDAHL objected to her properties being taken without any legal process to authorize the taking and accused the officers of attempting to obstruct  justice in both a state and federal court proceeding.

### G.    THE  DEFENDANTS ASSAULTED,  KIDNAPPED AND FALSELY IMPRISONED LUNDAHL

70.    LUNDAHL  attempted  to  enter  the hearing room to place the attempted witness tampering and obstruction of justice on the record.   Officer TILLMAN,  a 300 lb large statured  afro- american IRS officer,   obstructed LUNDAHL's entrance into the hearing room by assaulting LUNDAHL with a baton,  doublehanded,   with such force that it sent LUNDAHL sprawling across the 8 foot wide concrete hallway.  When LUNDAHL attempted to get up, TILLMAN jumped on top of LUNDAHL,  yelled for the assistance of 4 other IRS officers,  all of whom  shackled and cuffed LUNDAHL from behind while LUNDAHL was lying sideways  on the concrete floor,  and subsequently all of the officers commenced  kicking  LUNDAHL repeatedly in the  abdomen and around LUNDAHL's spine.   LUNDAHL was subsequently arrested for videotaping in the building and instead of being taken  to an emergency room for treatment or to a local jail,     officer TILLMAN transferred LUNDAHL to an HCA mental hospital owned by federal Senator  Bill  Frist's family,   ELI  LILLY and  GE with premises insurance  by  CNA.

71.    LUNDAHL's  forceful  seizure  was  documented  in  a  report  by  an  IRS supervisor pursuant to required procedures.   (At the time of trial,  this supervisor would no longer be working at the IRS office and would be unavailable for trial).

72.    Two Orderlies met  TILLMAN and LUNDAHL at the back of the hospital and

seized LUNDAHL, who was handcuffed, out of TILLMAN's car.      LUNDAHL was taken through a back entrance on the "suicide" ward and dragged into a solitary confinement room that had a wooden bed in the center of the room with chains and cuffs affixed to the wooden frame. LUNDAHL was forcibly chained face down to the wooden bed in 5 point insertions in spite of open fractures, broken bones, a ruptured stomach and copious amounts of blood expressing from LUNDAHL's body.    All the while LUNDAHL was screaming to be taken to a hospital, but to no avail.    The 2 orderlies left the room while TILLMAN remained.    One orderlie later returned to the room with a syringe filled with an unknown substance, jumped onto the middle of LUNDAHL's already compromised back causing immediate paralysis from the waist down, and injected LUNDAHL with this unknown substance while TILLMAN looked on.    When LUNDAHL subsequently began to scream that the orderlie had paralyzed her, the orderlie later returned with a second injection that caused LUNDAHL to go into convulsions, become cyanotic and succumb to a heart attack.  Thereafter LUNDAHL went into a coma.

73.    LUNDAHL's father, a medical doctor, was subpeoned by the state to appear at this administrative hearing on September 27, 1995.    The Administrative Law Judge aka "ALJ" sent Dr. Jerry Lundahl home and recalled Dr. Lundahl's appearance for September 28, 1995 given Holli LUNDAHL's seizure by the IRS officers on September 27, 1995.  (It was later learned at the assault trial via testimony of TILLMAN that the ALJ actually continued the hearing without LUNDAHL's presence or representation on September 27, 1995 – and that the ALJ consorted with the attorneys representing LILLY, CNA, GE, CITIGROUP, PIMCO and FIDELITY on the next plan of action to be taken against LUNDAHL while LUNDAHL remained in a coma at LILLY's proprietarily owned mental hospital.  TILLMAN testified that he returned to the Administrative hearing and committed testimony to that record about HOLLI's involuntary admission.).

74.    When Dr. Jerry Lundahl returned the next day pursuant to the modified subpeona, he demanded to know where his daughter had been taken.    The ALJ denied knowledge of LUNDAHL's whereabouts in spite of **receiving testimony** on the administrative

record from TILLMAN the afternoon of September 27, 1995 that:   (1) TILLMAN had involuntarily admitted LUNDAHL into the HCA mental hospital;   (2) TILLMAN  and 2 orderlies chained LUNDAHL down to a bed;   (3) LUNDAHL immediately exhibited superhuman strength and broke right through the chains causing hospital personnel to have to use external handcuffs to re-chain LUNDAHL to the bed, and;   (4) LUNDAHL was given another injection which put LUNDAHL "out".

75.    Subject to this evasive and fraudulent response,  after Dr. Jerry Lundahl  was discharged as a witness from the hearing,   Dr. Jerry LUNDAHL called Holli Lundahl's federal senator's office in  Salt Lake City Utah and reported to Senator Hatch's counsel Ron Madsen that HOLLI LUNDAHL had been essentially kidnapped from the hearing and taken to an undisclosed location.   Ron Madsen promised to look into the matter.   Dr. Jerry Lundahl then used his religious contacts with a state assistant district attorney to locate the whereabouts of his daughter.   On September 30, 1995 ,  the assistant D.A.  traced LUNDAHL's whereabouts to an HCA mental hospital in California.

76.    Dr. Jerry Lundahl  called the mental hospital and  demanded  release of his daughter.   The  hospital  denied LUNDAHL's custody therein.   Dr. Jerry  Lundahl than called Ron Madsen back and informed Senator Hatch's counsel that he had learned of the location of his daughter from an assistant district attorney.   Dr. Jerry Lundahl insisted that his daughter was being falsely imprisoned inside a  mental hospital  against her will  by ELI LILLY's principals,  as  his daughter did not,  nor had she ever,  suffered from any mental disease.

### H.    PROSECUTION OF USDC – CALIFORNIA,  CASE NO.  2:1995-mj-02041

77.    On September 30, 1995,  Senator Orin Hatch's counsel  called  the  mental hospital demanding to know the whereabouts of Holli Lundahl.   According to admissions made to Dr. Jerry Lundahl and later to Holli Lundahl by Ron Madsen,   Attorney Madsen was told by hospital staff that Holli was not at the hospital.   Within three hours of  Orin Hatch's office contacting the HCA mental hospital,    LUNDAHL while in a coma  was transferred from the hospital to the federal metropolitan detention center in Los Angeles, CA  for a yet to be

filed charge that LUNDAHL had feloniously assaulted 2 IRS officers while these officers were performing their official duties.   On October 3, 1995,  a criminal complaint was executed by Magistrate Brian Robbins who also executed the supporting probable cause verification. The criminal complaint was back dated to September 29, 1995 and opened up  USDC Central District of California criminal case no. 2:1995-mj-02041 on October 3, 1995.

78.   On October 3 1995,  six days after LUNDAHL's September 27, 1995 seizure,  a detention hearing was conducted.   At this hearing it was learned that no arrest warrant existed on September 27, 1995 which authorized the IRS to seize LUNDAHL.  Furthermore,  no criminal complaint  existed  at the time LUNDAHL was seized by federal officials and taken to the federal metropolitan detention center on September 30, 1995.   Finally,  Magistrate Brian Robbins had back dated the September 29, 1995 criminal complaint and supporting probable cause verification - rendering the criminal complaint void and precluding Magistrate Robbins from sitting on the criminal case.  52      Magistrate Edwards issued an order directing LUNDAHL's release on the basis that LUNDAHL's detention was unlawful.   LUNDAHL was never released but rather remained in jail while AUSA Jack Weiss secured an indictment against LUNDAHL on October 20, 1995 charging LUNDAHL with two counts of felony assault against the IRS officers that forciably seized LUNDAHL on September 27, 1995.   The new case was assigned USDC-California case no.  95-CR-0114 AAH,   USA  v. Holli Lundahl.


**I.    PROSECUTION OF USDC – CALIFORNIA,  CASE NO.  95-CR-0114 AAH**


79.   Approximately 10 days after LUNDAHL arrived at the metropolitan detention center,   her paralysis began to resolve.   LUNDAHL was  diagnosed with numerous injuries from the assaults.   In addition,  an MDC dentist reported 15 fractured teeth on LUNDAHL  as a result of the drug induced convulsions and heart attack.   Blood tests taken at the MDC

_____

52.   Whom ever signs a probable cause affidavit  to support an unlawful fourth amendment seizure is stripped of all immunity if it can be established that the facts were false.     See  Kalina v. Fletcher, 522 US 118 (1997) (prosecutor not entitled to immunity for signing a probable cause statement that initiates a prosecution because acting as a complaining witness.)

confirmed that LUNDAHL was in post cardiac shock and had a systemic infection.   Medical Assistants documented that LUNDAHL was throwing up blood.   This latter complication led to an examination  of LUNDAHL's stomach which had now perforated  from the assault with the baton by officer TILLMAN.   LUNDAHL underwent  a gastric operation by a BOP contracted afro-american male doctor approximately 60 years old.

80.    The October 20, 1995 indictment was based on the false testimonies and reports given by  LILLY's,  CNA's, PIMCO's,  GE's,  CITIGROUP's and FIDELITY's mutual attorneys during the grand jury proceedings.   These attorneys claimed that they witnessed LUNDAHL's assaults upon the 2 IRS officers in the hallway of the Hollifield building on September 27, 1995 when in fact it was later admitted by the IRS officers at pre-trial proceedings,  that these attorneys never saw any part of the assault because they were inside the hearing room and not in the hallway on September 27, 1995.   Consequently,  the federal trial judge barred any attorney from testifying about LUNDAHL's alleged assault against IRS officials.   LUNDAHL was served the October 20, 1995 indictment while she was still in jail on the void September 29, 1995 criminal complaint  executed by  Magistrate Brian Robbins.

**J.    THE PROSECUTION OF CRIMINAL CASE NO. 95 CR 0114 AAH WAS BROUGHT TO DEFEAT LUNDAHL'S PENDING CIVIL LAWSUITS - BY CAUSING LUNDAHL'S  DEFAULTED  APPEARANCE**

81.    LUNDAHL was kept  detained in jail  while her assault case was pending irrespective that LUNDAHL had no criminal record.   While LUNDAHL was in jail, three cases LUNDAHL had pending were dismissed based on LUNDAHL's defaulted appearance.   One of these cases was against Wells Fargo Bank for converting LUNDAHL's bank funds just prior to the 1991 criminal prosecution -  thereby  attempting to prevent LUNDAHL from obtaining counsel of choice in violation of the sixth amendment.   53

82.    LILLY  moved to dismiss LUNDAHL's civil rights/tort case against LILLY , et al.

_____

53.    See  Hand v. Gary, 838  F.2d  1420 (C.A.5 (Tex.), 1988) (Using a  criminal prosecution of the plaintiff as leverage in a civil suit proves a  constitutional violation.)

on October 18, 1995  in re 94 CV 021,   without ever disclosing to the sitting court that LUNDAHL was in jail due to the collusive and corrupt efforts of the tort defendants in that case.    Hence LUNDAHL'S  co-plaintiff during this period of time,   wrote pleadings  for LUNDAHL  to protect  LUNDAHL's interests in the litigation given BOP officials were keeping LUNDAHL  in maximum lockdown status to prevent LUNDAHL from making any  filings or participating in her defense.    See ADD.  "18" for BOP complaint documenting  failure to provide LUNDAHL with  necessary  legal  assets and stamps to prepare and dispatch legal process.

### K.  LILLY FORGED LUNDAHL'S NAME TO MULTIPLE COURT PROCESS'S TO ACQUIRE A PRE-FILING ORDER AGAINST LUNDAHL WHICH WOULD BLOCK LUNDAHL'S ACCESS TO THE 9TH CIRCUIT COURT

83.    While Lundahl was in jail on the assault charges propounded by the LILLY defendants,      attorneys from "LILLY's camp"   ( "LILLY's camp"  includes LILLY and LILLY's corporate malfeasance insurers)   forged  LUNDAHL's  name  to more than 20 notices of appeals filed in the 9th circuit court regarding USDC case no.  94 CV 021,  LUNDAHL v. LILLY,  et al.,    to  taint  and block LUNDAHL's access to that appellate  court.    LILLY's camp also intended to block  access to any habeas corpus petition LUNDAHL might file.

### L.  THE DEFENDANTS ORCHESTRATED THE THEFT OF LUNDAHL'S UTAH RESIDENCE WHILE LUNDAHL WAS IN JAIL ON THE ASSAULT CHARGES IN ORDER TO STEAL EVIDENCE THEY BELIEVED WAS AT THIS LOCATION

84.    In addition,   CNA  and  Citigroup through it's constituent entity Source One Mortgage Services,   commenced procedures  to  steal  LUNDAHL's  16 year  Utah residence property   while LUNDAHL was in jail  by procuring EMPIRE of AMERICA,    LUNDAHL's mortgagee,   to wrongfully default  LUNDAHL's mortgage note for alleged failure to pay  CNA's home owner's insurance  premiums.

85.    LUNDAHL and  her  sister  sued EMPIRE in California as federal  case no. 95-CV- 7624 - so that LUNDAHL as the primary titled owner could be transferred to any hearing

on the matter;  however LUNDAHL  learned that civil litigation was not possible while in jail as there is no civil authorities in BOP facilities,   and further,   the MDC only permitted a 1 hour visit to the library every two weeks to research "criminal" authorities.     Nevertheless, LUNDAHL's  sister arranged for a settlement of the matter with EMPIRE.   On December 10, 1995,   LUNDAHL and EMPIRE entered into a settlement agreement.

86.    Long  after the settlement agreement was signed by EMPIRE principals and LUNDAHL (see ADD.  "14" for settlement agreement);    SOURCE ONE  acquired LUNDAHL's mortgage note from EMPIRE for corrupt purposes and committed the following illegal acts: (1)  SOURCE ONE back dated EMPIRE'S assignment  contract  of the note and trust deed to a date before the 12/10/95  settlement  agreement between LUNDAHL and EMPIRE;      (2) SOURCE ONE did not record  the assignment  with the Utah County Recorder's office until April 9, 1996  because in fact no such assignment agreement existed  between SOURCE ONE and EMPIRE before April 9, 1996;   and (3)   SOURCE ONE refused to honor the settlement agreement as  the  successor in interest thereto by:  (a)  refusing to take LUNDAHL's mortgage payments anew commencing  April of 1996 and  (b)  refusing to place  LUNDAHL's mortgage in good standing.

87.    In 1999,   EMPIRE agreed to a default judgment being entered against them for their part in allowing SOURCE ONE  to record  a false assignment document with the Utah County recorder's office.  See  ADD.  "15" for default judgment.  Collection on this judgment would later be obstructed by the federal courts as would LUNDAHL's suit against SOURCE ONE.

**M.    THE DEFENDANTS  CONSPIRED WITH THE IRS TO FALSIFY A TAX ASSESSMENT AGAINST LUNDAHL  IN ORDER TO OBSTRUCT THE ASSAULT PROSECUTION**

88.    One week before the jury trial on the assault charges,  the IRS falsified a 1990 tax assessment  against  LUNDAHL  to establish a  motive for  LUNDAHL's  alleged assault against  2 IRS officers at  the  administrative hearing.     At  a pre-trial hearing,   the IRS presented the false 1990 tax assessment and claimed that they had served LUNDAHL with this assessment notice at her administrative hearing and that LUNDAHL became enraged and

attacked the IRS officers.      LUNDAHL provided the following evidence rebutting the veracity of the assessment:

    (a)   LUNDAHL's 1990 IRS return and green certified return receipt showing that LUNDAHL had timely filed her 1990 return with the Tax center wherein LUNDAHL resided which was in Ogden Utah.   The TAX ASSESSMENT provided by the government generated out of the Laguna Niguel, California Tax Center.   LUNDAHL denied that she had ever lived or conducted a business in Laguna Niguel California and therefore this tax office had no jurisdiction to tax LUNDAHL.   Moreover, LUNDAHL pointed out that the IRS officers who beat LUNDAHL and falsely imprisoned LUNDAHL into the HCA mental hospital were from the Laguna Niguel Tax Center;  thus establishing that a void tax assessment was fabricated to obstruct the due administration of justice in the criminal assault action being advanced by these same IRS officers,  and

    (b)   Lundahl also pointed to the assessment which showed that the assessment had been created on June 17, 1996.   LUNDAHL's administrative hearing was conducted on September 27, 1995; therefore the IRS officers could not have been in possession of the challenged tax assessment notice at the time these officers attacked LUNDAHL on September 27, 1995 as the assessment did not yet exist.

    89.   The trial judge agreed that the assessment was void and struck the assessment as a recent fabrication and attempt to obstruct justice in the criminal trial.

    90.   On June 28, 1996, the trial judge out of the presence of the jury indicated that he was going to acquit LUNDAHL in the event the jury did not acquit.  The judge found that he had never before experienced a prosecution that was laced with so many efforts to obstruct justice.    The court made the following findings:   (1)   LUNDAHL was within her rights to videotape the administrative hearing under the Open Meetings Act;   (2) The IRS had

no right to seize LUNDAHL;    (3)  The IRS violated LUNDAHL's constitutional rights;    (4)  The IRS officers brutally beat LUNDAHL on  September 27, 1995 and were also partly  responsible to what happened to LUNDAHL while in the HCA mental hospital, and;  (5)  LUNDAHL had established her defenses of  witness tampering, self defense and defense of property sufficient to grant  a directed  verdict should the jury not acquit.

91.    At the end of the day on June 28, 1996  and again out of the presence of the jury,   the prosecutor announced that his father's legal secretary had been empaneled on the jury and that she should be removed.    LUNDAHL accused the prosecutor of attempted jury tampering.  The juror was immediately removed by the court.  54

92.    On July 1, 1996,  the case was sent  to  the jury.    After 10 minutes of deliberation,   the jury returned  a unanimous  not guilty  verdict  based  on  LUNDAHL's affirmative defenses of witness tampering,  self defense and defense of property.    ADD. "19". The Judge  exonerated  LUNDAHL of  all charges and directed that LUNDAHL be immediately released from custody.

**N.    OVER THE NEXT 9 YEARS  UP TO  LUNDAHL'S 2006 INDICTMENT - TRAFFIC AUTHORITIES WOULD REFUSE TO RENEW LUNDAHL' S DRIVERS LICENSE TO HINDER LUNDAHL'S TRAVELS  TO THE COURTS**

93.    After  LUNDAHL was released,   LUNDAHL  was pulled over by  Los Angeles trafffic authorities,   LUNDAHL's Utah drivers license  was confiscated and LUNDAHL was arrested for driving on a California thoroughfare with a Utah driver's license,  in violation of LUNDAHL's  right  to  travel upon  US highways.  55    LUNDAHL  was  kept  in  jail  again for

_____

54.    In  McGhee  v. Pottawattamie County, 547 F.3d 922 ( 8th Cir. 2008),  The 8th circuit rules that prosecutor's were not immuned for  pre-trial conduct that affected a defendant's right to a fair trial.   The Supreme Court took jurisdiction over the case to decide the parameters of a prosecutors immunity.  However the case was settled in January of 2010 before the case was decided by the Supreme Court.  The 8th circuit seems to support the proposition that no immunity would be accorded jury tampering.
55.    When LUNDAHL returned to her home state of Utah and attempted to obtain a new license,  the Utah DMV refused to renew LUNDAHL's drivers license because California

another 4 months until the traffic citation was dismissed as frivolous by a criminal judge.  See ADD, "16".     LUNDAHL's  Utah drivers license was never returned.

### O.    THE  CONTINUATION OF  USDC-CALIFORNIA CASE NO.  94-CV-021 RJT

94.    After the  IRS criminal  assault  trial termed,     LILLY again  solicited the federal trial court in re USDC case no. 94-CV-021-RJT   to decree LUNDAHL an abusive litigant pointing to the 9th circuit pre-filing order entered by clerk Susan Gelmis while LUNDAHL was in federal jail.   Again, LILLY asserted that LUNDAHL had forged the 1993 criminal dismissal order and the 1994 settlement conference order.    The Court again denied LILLY's attempts to obtain an order adjudicating  LUNDAHL an abusive litigant.

95.    On May 8, 1998,  the Court  advised  LILLY to  withdraw  their Counterclaim suing LUNDAHL for grand theft and insurance fraud under it's civil equivalent of moneys had and received.   The Court opined that LUNDAHL's prior civil judgments  found at ADD. "4" **mooted the controversies** relative to  those contract  reimbursement claims and therefore precluded the Court from acquiring subject matter jurisdiction over those claims.   The Court also advised that the final criminal judgment was decided at the lower standard of proof and barred LILLY from prevailing on any other claims not previously decided in LUNDAHL's favor in the civil courts.    To avoid another judgment being entered against LILLY,     LILLY moved to dismiss their First Amended Counterclaim with prejudice.    This  constituted a  final judgment under rule 77 and the clerks stamped the judgment as final. See ADD. "20".

_____

authorities had suspended LUNDAHL's utah license in spite of the above stated judicial order dismissing the traffic citation as frivolous.    Over the next 9 years Utah would continue to refuse to renew LUNDAHL 's drivers license causing LUNDAHL to be prosecuted  16 more times - with one prosecution occurring while LUNDAHL was incarcerated on the underling 2006 bankruptcy charges.   LUNDAHL won all of the trial cases but appealed the judgments to the Utah appellate court given the unjustified refusal to renew her drivers license.  The appellate courts refused to consider LUNDAHL's appeals and continually dismissed them as moot.  See *United States v. Guest*, 383 U.S. 745, 757, 86 S.Ct. 1170, 1178 (1966)("The constitutional right to travel from one  State to  another,   and necessarily  to  use  the  highways  and other instrumentalities of interstate commerce is a fundamental right.)   The Court in Dunn also declared that "The right to travel is an 'unconditional personal right, ' a right whose exercise may not be conditioned.'"  Id, at 341);

96.    After entry of the final May 8, 1998 judgment,  LUNDAHL  filed a rule 59 motion attacking an earlier ruling made by the court  on September 4, 1996 for manifest error. In June of 1998,  the court summarily denied LUNDAHL's rule 59 motion and  LUNDAHL timely appealed in July of 1998.   The appeal was assigned case no. 98-56850 by the 9th circuit court.

97.    After  the case was appealed to the 9th circuit,   LILLY's attorneys  engaged in an ex parte communication with the trial court and procured the court to enter a default and default judgment under FRCP rules 55(a) and (b)(1) against   LUNDAHL's former businesses who were removed from the litigation on July 17, 1994 by order of Gary Taylor's Court after this judge learned that these businesses had assigned all rights, title and interests in the 1991 judgments to Holli Lundahl in December of 1991.    See ADD. "4" for a list of the judgments assigned to LUNDAHL.    Moreover,  this assignment was established by the December 1991 arrest warrant filed against  LUNDAHL and charging LUNDAHL with grand theft.   See ADD. "6". (The Grand Theft charge was dismissed at a Gerstein hearing in the 1991 prosecution as barred by  People v. Sims (1982) 32 Cal.3d @ 477, 186 Cal.Rptr. 77, 651 P.2d 321.) and the absence of corpus delicti  in the crime charged.)    LUNDAHL also asserted that  the court could not enter the default judgment against her in an alter ego capacity because the court had already dismissed all counter- claims against LUNDAHL individually with prejudice on May 8, 1998 . (Refer back to ADD. "20").   Finally,  LILLY filed no rule 60(b) motion before the court to attack the May 8, 1998 judgment.

98.    LUNDAHL amended her appeal  to  the 9th circuit to include this void default judgment.    During the briefing of this appeal,  LILLY  moved the 9th circuit court for the 5th time  to strike LUNDAHL's appeal for forging the 10/1/1993 criminal dismissal judgment and the 10/17/1994 settlement conference order.    LUNDAHL opposed the strike motion asserting that  res judicata barred the appellate court from re-deciding the forgery issues already decided  during  the criminal contempt trial held by the trial court in March of 1995  and conclusively decided on June 13, 1995  in  Lundahl's favor;  a judgment  which LILLY did not appeal.    Moreover,  LUNDAHL argued that LILLY  had agreed to enforcement of the final criminal judgment in their self authored stipulation ADD. "7"   and that LILLY should not be

permitted to avoid enforcement of the stipulation  because LUNDAHL won the criminal case. As to the void default judgment,   LILLY never raised the default judgment during the appeal because LILLY knew the judgment was incompetent.

99.    LILLY also never sought to collect on the void default judgment until 5 years later during the pendency of LUNDAHL's 2003 bankruptcy case.   Nor did  LILLY   report this default  judgment  against  LUNDAHL's credit report through their insurer and credit reporting agency  GE because LILLY knew the default judgment was void.

100.    LUNDAHL brought  an  independent  action  under  URCP  rule  60(b) attacking the default judgment as void in the Utah state courts in June of 1999.   The Utah state court   stayed LUNDAHL's claims against LILLY while litigation was occurring against another defendant,  Public Storage Inc.      In 2001,  LILLY  appeared and removed  the independent action to the federal court as USDC-Utah case no. 2:2001 CV 752.   Once there, LILLY moved  for  dismissal of the independent action with prejudice on personal jurisdictional grounds.  LUNDAHL objected holding jurisdiction proper in Utah given LILLY was a citizen of the state of Utah under 28 USC section 1391(c) - having a corporate office in Sandy Utah.   See ADD. "17".   The trial court granted the dismissal.   The dismissal judgment  was appealed to the 10th circuit and  10th Circuit Judge McKay vacated the dismissal as an abuse of discretion. The matter was remanded back to the Utah federal court for trial on the merits in July of 2002.

101.    On August 26, 2002,  the 9th circuit in LUNDAHL's  pending  appeal against LILLY,   i.e case no.  98-56850,    mooted the independent action in Utah by  entering a judgment that the trial court had not entered a final judgment in the LILLY litigation pursuant to rule 58.     The court issued an order dismissing the appeal for lack of subject matter jurisdiction and directed the trial court to enter a final judgment. ADD. "22".   When the case was remanded by the 9th circuit,  the trial judge refused to take any action on the LILLY case in violation of  the appellate mandate.   By this time,   LUNDAHL was bankrupt and was forced to file  chapter  13 bankruptcy  against  her  medical  creditors  and  the  IRS  for  illegal  lien attachments.     LUNDAHL would remove the California federal action and associated cases to the bankruptcy court for final adjudication.

### O.   THE PROSECUTION OF UTAH FEDERAL CASE NOS. 2:97 CV 951 AND 2:98CV 639

102.    After the acquittal judgment was entered in LUNDAHL's favor on the IRS assault prosecution 95-CR-0114 AAH,    the IRS nevertheless filed a lien against LUNDAHL's Utah properties seeking to collect on the assessment declared void by the criminal trial judge Andrew Hauk - who died during the pendency of the Utah actions.

103.    Prior to filing the above stated main Utah action in December of 1997, LUNDAHL timely filed administrative claims against the US and the IRS in 1996, before and after the assault prosecution termed in her favor.    LUNDAHL's administrative claims were assigned to justice attorney Paul Brown.    In October of 1997, LUNDAHL had more than 8 conversations with Paul Brown concerning her FTCA claims.    Paul Brown never denied LUNDAHL's claims which sought remedies for assault, battery, abuse of process, malicious prosecution, intentional infliction of emotional and mental distress, breach of the covenant of good faith and fair dealing, and tortious interference with prospective economic advantage. Having failed to deny these claims, LUNDAHL brought suit against the United States under the FTCA, and against LILLY, LILLY's insurers, the IRS officers, Utah and California police officers, and DOES defendants under Bivens, the federal civil rights Act, RICO and for various state law claims to include claims for conversion and theft of LUNDAHL's Utah home as Utah case nos. 2:97 CV 951 merged with 2:98 CV 639.

104.    LUNDAHL's Utah federal cases were consolidated under 2:97 CV 951. Plaintiff's cases were initially assigned to Judge Dale Kimball.    The private party defendants then retained specific lawfirms that were conflicted with certain judges so that they could forum shop LUNDAHL's cases to a particular judge.    The defendants were able to secure 4 judicial recusals until they got LUNDAHL's cases assigned to Judge Tena Campbell who owned upwards of $1.2 million dollars in stock interests in the private corporate defendant's companies.

105.    At the time LUNDAHL filed the above stated FTCA, etc. complaint, LUNDAHL also filed under separate cover, an addendum of exhibits referred to in her

complaint.   Included among these exhibits was the October 1, 1993  criminal dismissal order and the October 17, 1994 summary judgment order,  subject matter of counts 4-7 of the 10/4/06 indictment @ ADD. "1".    LUNDAHL contended in her complaint that these orders were the motive for the  1995  assaults,  witness tampering schemes,  malicious  prosecutions and obstruction LUNDAHL's  commercial enterprises.

106.    At no time did  LILLY's attorney or any other attorney attack the credibility  of any of LUNDAHL's exhibits on the  public record.    Instead,   the private party corporate defendants committed a wholesale fraud upon the court by denying that Utah had either personal or venue jurisdiction over these  corporate  defendants;   in spite of the fact that all of the corporate defendants  did business in the state of Utah and had corporate offices within the county where the federal court sat.    As just one example, LILLY had a corporate office in Sandy Utah which was and is located 15 minutes  driving  time from  Salt Lake City Utah.   See ADD "17" for  LILLY's corporate license in Sandy Utah.   Under  the 14th  and   5th amendments and via 28 USC section 1391(c),    LILLY was a resident of the  state of Utah and therefore subject to the Utah court's personal and venue jurisdiction.     LUNDAHL also claimed that jurisdiction was required in Utah under the FTCA pursuant to 28 USC section 1402 as LUNDAHL was a resident of the state of Utah and because LUNDAHL's home - which was stolen while  LUNDAHL  was incarcerated on the assault charges - was located in the state of Utah.  Finally,  LUNDAHL also claimed that RICO provided personal and venue jurisdiction over all defendants in Utah based upon a multi-district conspiracy and the presence of all corporate defendants in the state of Utah.

107.    On December 3, 1998,  LUNDAHL and other plaintiff parties filed separate mandamus writs   seeking  to  remove  judge  Campbell  from  the  litigation  given  Judge Campbell's financial interests  in the defendant parties,   as case nos. 98-4206,  98-4207,  98-4208 and 98-4209.

108.    While these writ petitions were pending before the  10th circuit court,   judge Campbell in violation of due process on December 16, 1998  granted the majority  of  the  defendant's  motions  to  dismiss  based  on  personal  or  venue  jurisdiction

grounds leaving LUNDAHL's remainder claims against  the USA,  the individual federal defendants,  the Orange County defendants,  SOURCE ONE and EMPIRE  undisposed.

109.    In April of  1999,  Aleta Bodelay (a paralegal  from the Department of justice),   filed a false affidavit stating that no FTCA claim was ever served upon the department of justice at any time in 1996.   In response thereto,  Co-plaintiff's Attorney Mary Hansen,  on April 30, 1999  provided the service affidavit of  Washington DC process server Freeman Woodbury whom attested that he served a Thereasa Nelson at the US Attorney General Janet Reno's office with the administrative claims on March 26, 1996.   Woodbury even described the physical appearance of Thereasa  Nelson as well as the time he served the administrative claims.     LUNDAHL also provided the court with a copy of her phone bill showing over 7 calls made to the Department of Justice in 1997 discussing her claims with justice attorney Paul Brown.     At no time did either Paul Brown or Theresa Nelson file affidavits attesting that they were not served with LUNDAHL's administrative claim. Furthermore,  LUNDAHL challenged the affidavit of Aleta Bodelay as a person having no knowledge of whether a claim had been served  as LUNDAHL had never heard of Aleta Bodelay's name prior to the filing of Bodelay's  perjured and false affidavit in April of 1999.

110.    In spite of the foregoing uncontroverted evidence,  Judge Tena Campbell in violation of due process dismissed LUNDAHL's claims against the US for lack of subject matter jurisdiction in allegedly failing to serve an administrative claim.  The Court also dismissed LUNDAHL's Bivens and RICO claims against the individual federal defendants  for lack of personal  and pendent jurisdiction and against the Orange County defendants  as time barred. Judge Campbell's  May 13, 1999 judgment left remainder claims against SOURCE ONE and EMPIRE with respect to the theft of  LUNDAHL's  Utah home and the IRS with respect to the collection of a void assessment judgment in the amount of  $126,000.00

111.    On June 7, 1999,   the 10th Circuit denied plaintiff's mandamus petition nos.  (98-4206), (98-4207), (98-4208) and (98-4209)  to remove Judge Tena Campbell from plaintiff's action,  in spite of the statutory violations under the judicial disqualification statute showing actual bias.  The Court ruled that plaintiffs could address the actual bias after the

action was finally disposed.

112.     On or about July 12, 1999,  Judge Tena Campbell ordered an indefinate stay in the action to "reportedly" investigate into certain irregularities.    LILLY's attorney had contacted the court ex parte and convinced the court that LUNDAHL had forged the 10/1/1993 criminal dismissal judgment and the  10/17/1994 settlement conference order. Judge Campbell turned the forgery accusations over to the FBI for investigation.    The matter was assigned to FBI Lance Edwards.

P.     **LILLY AND LILLY INSURERS  TWICE  SOUGHT LUNDAHL'S PROSECUTION ON THE IDENTICAL FORGERY CHARGES BEFORE TWO SEPARATE GRAND JURIES DURING THE PROSECTION OF THE 1997 UTAH FEDERAL CASES ASSIGNED TO  BAISED JUDGE TENA CAMPBELL**

113.     On May 3, 2000,     FBI Officer Lance Edwards procured US Attorney Gregory Diamond  to convene a Grand Jury  with the purpose of  indicting LUNDAHL with forgery of the 10/1/1993 criminal dismissal judgment and the 10/17/1994 mandatory settlement  conference order.      Witnesses were called before the grand jury.  See ADD. "23" for one such subpeona for grand jury witness K. Behle in grand jury no. C-699.    On March 3, 2000,  the grand jury voted not to indict LUNDAHL finding that  no sufficient evidence was submitted to establish a reasonable belief that LUNDAHL forged the orders in question.   More than 6 ½  years later in support of the 2006 indictment,    FBI officer  Lance Edwards would complete  an FBI 302 report  where Edwards  would admit to attempting to procure LUNDAHL's 2000 indictment on the forgery charges  and to taking LUNDAHL down in the FBI commercial building on October 30, 2000  when LUNDAHL sought to serve FBI officer Edwards with a complaint for abuse of process and LUNDAHL filmed the service.    See ADD. "24" for 302 FBI report containing this admission.

114.    FBI officer  Lance Edwards  unwilling to accept the 2000  grand jury ruling - continued to  look for more evidence against LUNDAHL.   On September 19, 2001,  Lance Edwards procured AUSA Gregory Diamond to convene another grand jury on the same charges.    This time LUNDAHL was  subpeoned to the grand jury to testify.  See ADD. "25" for

LUNDAHL's grand jury subpeona in grand jury no. C101.      LUNDAHL was also required to submit to a handwriting analysis to prove that LUNDAHL forged these judge's names.    Again on September 19,  2001,  a grand jury voted not to indict  LUNDAHL finding that  no sufficient evidence was submitted  to establish a reasonable belief that LUNDAHL forged the orders in question.

### Q.    BANKRUPTCY CASE NO. 03-21660;   IN RE HOLLI LUNDAHL

115.    On January 31, 2003, LUNDAHL was compelled  to  file  chapter 13 bankruptcy to avoid suits from medical creditors and to challenge the tax lien by the IRS. LUNDAHL's chapter 13 case was assigned  case no. 03-21660.      LUNDAHL notified the non-bankruptcy courts that she had filed bankruptcy.      LUNDAHL did not report ELI LILLY or  LOS ANGELES HOMEOWNERS AID as creditors because LUNDAHL  had pending suits against all of these persons which declared their CLAIMS as void.

116.    On March 13, 2003,   LUNDAHL filed her first plan.    On April 10, 2003, LUNDAHL  filed an amended  financial status report.    On page 3 of this "form" report, LUNDAHL listed her pending lawsuits before various non-bankruptcy courts. ( See ADD.  "27" for this list of LUNDAHL's pending lawsuits which was inadvertently omitted from LUNDAHL's March 13, 2003 filing.).  49      At her confirmation hearing on June 11, 2003,  the bankruptcy

_____

49.  See *Coastal Plains,* **179 F.3d 197,  210(5ᵗʰ Cir. (Tex) 1999)**("[T]he debtor's failure to satisfy its statutory disclosure duty is `inadvertent' when ...the debtor has no motive for their concealment.")   "The duty of disclosure in a bankruptcy proceeding is a continuing one, and a debtor is required to disclose all potential causes of action".  Youngblood Group v. Lufkin Fed. Sav. & Loan Ass'n, 932 F.Supp. 859, 867 (E.D.Tex.1996). " 'The debtor need not know all the facts or even the legal basis for the cause of action;   rather, if the debtor has enough information ... prior to confirmation to suggest that it may have a possible cause of action, then that is a "known" cause of action such that it must be disclosed' ". Id. (brackets omitted; quoting Union Carbide Corp. v. Viskase Corp. (In re Envirodyne Indus., Inc.), 183 B.R. 812, 821 n. 17 (Bankr.N.D.Ill.1995)).   "Any claim with potential must be disclosed, even if it is 'contingent, dependent, or conditional' ". Id. (quoting Westland Oil Dev. Corp. v. MCorp Management Solutions, Inc., 157 B.R. 100, 103 (S.D.Tex.1993)) (emphasis added).   The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements,  and the bankruptcy court, which

court concluded that LUNDAHL never engaged in any misconduct towards her creditors by inadvertently failing to report her lawsuits in her first report filed on March 13, 2003 - because LUNDAHL's plan proposed to pay all of LUNDAHL's allowed creditors 100% of the debt plus 6% annual interest and because LUNDAHL's filing omission in her first schedules was clearly error in not knowing the bankruptcy rules..

117.    In April of 2003, LUNDAHL sued LILLY for malicious prosecution and abuse of process for unlawfully convening two separate grand juries against LUNDAHL in 2000 and 2001 to obstruct justice in pending federal cases,   as adversary proceeding no. 03-2185. LILLY principals were served via mail tracked delivery around April 25, 2003.    On May 5, 2003,  LILLY filed an appearance in LUNDAHL's bankruptcy case and requested notice of all proceedings.  See ADD. "28".    Attorney Micheal Johnson from Snell and Wilner represented the LILLY defendants.  This same attorney represented the LILLY defendants in:  (1) the 1999 Independent action LUNDAHL filed concerning the void 1998 default judgment;   (2) the removed federal case re the independent rule 60(b) action assigned case no. USDC-Utah 2:01-CV 751;   and  (3) the 1997  FTCA, etc. action  assigned case  no. 2:97 CV 951  pending before Judge Tena Campbell.

118.    To group all of her claims in one forum,    LUNDAHL subsequently removed her non-bankruptcy  lawsuits pending before the California federal and state courts against LILLY,   et al.   -  to  the  Utah  bankruptcy  court  for  conclusive  dispositions  as  adversary proceeding no. 03-4202.

119.    On June 11, 2003,   Bankruptcy Judge Judith Boulden conducted a confirmation hearing after granting relief from a trustee's report on June 10, 2003.   Judge

_____

must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure provided by the debtor is incomplete.  Rosenshein v. Kleban, 918 F.Supp. 98, 104(S.D.N.Y. 1996)  See also Johnson Serv. Co. v. Transamerica Ins. Co., 485 F.2d 164, 175 (5th Cir.1973) (applying Texas law on judicial estoppel; "the rule looks toward cold manipulation and not an unthinking or confused blunder").   It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, including contingent and unliquidated claims. 11 U.S.C. § 521(1).

Judith Boulden inquired into LILLY's Notice of appearance filed on May 5, 2003 and LILLY's claim to be  a creditor of LUNDAHL.     LUNDAHL presented LILLY's October 7, 1998 default judgment to the court as the basis of LILLY's creditor claim.  ADD. "21"    LUNDAHL asserted that LILLY obtained the default judgment ex parte and without notice to LUNDAHL based upon a First Amended Counterclaim which had already been dismissed  with prejudice  against LUNDAHL 5 months earlier,     and therefore the Court had  no  jurisdiction over the Counterclaim at the time the default judgment was fraudulently entered ex parte against LUNDAHL.    Furthermore,  LUNDAHL told that court that the claims subject of the default judgment had  been accorded and satisfied by LILLY in July of 1991  (see  ADD.  "3" and "4"), that LILLY demanded dismissals with prejudice on the lawsuits subject of those claims, as well as releases on the settled claims.     Accordingly,  LUNDAHL argued that the controversies subject of the 1991 claims were rendered MOOT  and that the California federal court had no article III jurisdiction to enter any judgment on the mooted claims 7 years later in a default judgment fraudulently obtained ex parte by LILLY.     At the end of the confirmation hearing, LUNDAHL requested that the Bankruptcy court declare LILLY/ACS'  1998 default judgment void and disallow LILLY's claim  in  a  confirmed amended plan.

120.    After deciding that the IRS'  $138,000 tax claim dating back to 1990 was void and  that Los Angeles Homeowners Aid's  $62,000  assignment claim was void,   Judge Boulden concurred with LUNDAHL  that  LILLY's default judgment was void as a matter of law, declared it such,  and disallowed LILLY's,  Los Angeles Homeowners Aid's and the IRS' claims. Judge Boulden confirmed LUNDAHL's  Amended Chapter 13 plan on June 11, 2003 and directed LUNDAHL to record the confirmed amended plan into the court's docket which LUNDAHL did on June 19, 2003.  50   See ADD. "29" for confirmed Amended Chapter 13 Plan.

_____

50.    See **In re Bowen, 174 B.R. 840 (Bankr. S.D. Ga., 1994)** ( The amended Plan was confirmed by the Court on September 22, 1993.    The IRS did not object to the Plan of Reorganization.  The res judicata effect of an order confirming a  plan  of reorganization is contained in both common law notions of res judicata and the  Bankruptcy  Code at 11 U.S.C. § 1141(a) which provides in part:

(a)    Except as provided  in subsections  (d)(2) and (d)(3) of this section,  the

Footnote 50 continued....

_____

provisions of a confirmed plan bind the debtor,  any entity issuing securities under the plan, any entity acquiring property under the plan,  and any creditor, equity security holder,  or general partner in the debtor,  whether or not the claim or interest of such creditor,  equity security holder,  or general partner is impaired under the plan and whether or not such creditor, equity security holder,  or general partner has accepted the plan.

A brief overview of the interplay between notions of res judicata and the binding effect of a confirmed plan  is contained in Collier on  Bankruptcy  and provides a good background for this review of applicable case law.  Collier states in pertinent part:

> "Section 1141(a) of the Code has the same effect as Sections 224(1),
> 367(1) and 473(1) of the Bankruptcy Act in that a  plan  is binding
> upon all parties once it is confirmed and all questions which could
> have been raised pertaining to such plan are res judicata....  a
> confirmed plan of reorganization is binding upon every entity that
> holds a claim or interest even though a holder of a claim or interest is
> not scheduled,  has not filed a claim,  does not receive a distribution
> under the plan, or is not entitled to retain an interest under such plan.

Same in ***American Surety Co. of New York v. Coral Gables First National Bank (Matter of Constructors of Florida, Inc.),* 349 F.2d 595 (5th Cir.1965)**  held:  "where a plan of reorganization determined the disposition of a bank's lien,  and the bank did not timely object to the plan within 10 days of it's confirmation,   the bank was bound by the terms of the plan.  *Id.* at 601      Thus, the Fifth Circuit has determined as early as 1965 that the doctrine of res judicata applies to all claims dealt with in a confirmed plan of reorganization. *See also NCL Corp. v. Lone Star Building Centers (Eastern) Inc.,* 144 B.R. 170 (S.D.Fla.1992); *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.),* 127 B.R. 903 (Bankr.S.D.Fla.1991).   See also In ***Republic Supply Co. v. Shoaf,* 815 F.2d 1046 (5th Cir.1987)** (The contents of a plan of reorganization may not be challenged absent an appeal.  *Laing v. Johnson (In re Laing),* 31 F.3d 1050 (10th Cir.1994) . *Howe v. Vaughn (In re Howe),* 913 F.2d 1138 (5th Cir.1990)  Followed **In re Cano, Case No. 02-70359 (Bankr. S.D. Tex. 8/10/2009) (Bankr. S.D. Tex., 2009) (**Once Plaintiffs' chapter 13 plan was confirmed,   GMAC's mortgage rights no longer arose  from their pre-petition contracts. Their rights arose from the confirmed plan.  Section 1327(a) provides:

> The provisions of a confirmed plan bind the debtor and each creditor,
> whether or not the claim of such creditor is provided for by the plan,
> and whether or not such creditor has objected to,  has accepted, or
> has rejected the plan.  A confirmed plan  constitutes a judgment by
> which all creditors and parties in interest are bound.  In re Stratford of
> Tex., Inc., 635 F.2d 365, 368 (5th Cir. 1981)[3]; In re Dow Coming, Corp.,
> 456 F.3d 668, 676 (6th Cir. 2006).  Hillis Motors, Inc. v. Haw. Auto.
> Dealers' Ass'n, 997 F.2d 581, 588 (9th Cir. 1993)).

121.    Even though LILLY knew that LUNDAHL had filed a confirmed plan,  LILLY did not appeal the confirmed plan or order.  51    As a consequence thereof,      LUNDAHL's confirmed plan became unassailable and impervious to collateral attack under the bankruptcy codes.

122.    When the bankruptcy court confirmed LUNDAHL's plan and nullified LILLY's LAHA's and the IRS' void debts,   these persons combined with a new bankruptcy judge to acquire corrupt jurisdiction over LUNDAHL's bankruptcy case for the purpose of obstructing the removed claims and LUNDAHL's new claims.    Los Angeles Homeowners Aid retained the lawfirm of Mckay Burton and Thurman to intervene on LUNDAHL's confirmed bankruptcy case.    After this lawfirm was retained,   LUNDAHL's case was transferred to Bankruptcy Judge William Thurman who had  1/3 part ownership in the lawfirm of McKay, Burton and Thurman.

123.    After  the  unilateral transfer was effected for illicit purposes,   LILLY,  LAHA and the  IRS  conspired  with William Thurman to use Thurman's judicial bankruptcy office as an investigatory executive office to  obtain evidence of new crimes against LUNDAHL.

124.    On or about November 3, 2003,   Bankruptcy Judge William Thurman ordered LUNDAHL to appear at a criminal contempt hearing before his court to try LILLY's charges advanced for the 6th time over a period of 8 years, to wit:  that LUNDAHL had forged the   10/1/1993 criminal dismissal judgment and the 10/17/1994 Settlement Conference Order.   The trial  started on  12/11/2003.   At trial LUNDAHL objected arguing that bankruptcy courts had no jurisdiction to conduct criminal contempt trials on felony charges.  52

_____

51.    "A claim  exists  whether  or not a proof of claim is filed.   Filing is required only to permit creditor's participation in the case.   *Grynberg v. United States (In re Grynberg)*, 986 F.2d 367, 371 (10th Cir. 1993).   The claimant bears the ultimate burden of establishing a valid claim by a preponderance of the evidence. *In re South Motor Co.*, 161 B.R. 532, 547 (Bankr. S.D. Fla. 1993).

52.    See  **In re TByrd Enterprises, L.L.C., Case No. 06-30078-H1-11, 4-5 (Bankr. S.D. Tex. 11/30/2007) (Bankr. S.D. Tex., 2007)** ( citing  *U.S. v. Hassell,* 128 Fed. Appx. 411 (5th Cir. 2005)  and *United States v. Landerman,* 109 F.3d 1053, 1068 (5th Cir.),  bankruptcy courts do not have the authority to hold criminal contempt  proceedings.   "Criminal  contempt  is  a

125.   The bankruptcy judge conducted the hearing anyway  and after the hearing termed,   Thurman declared that he was merely investigating into the charges.   In fact THURMAN's  12/11/2003 transcripts  were presented to the 2006 grand jury  as the sole support for the perjury charges alleged in counts 6 and 7 of the indictment.   Accordingly on 12/11/2003 William Thurman was not acting in the capacity of a bankruptcy judge but was instead acting in  the capacity of  an investigator – gathering evidence of crimes.   Thurman's evidence gathering was a breach under the  Constitution and entitles Thurman to a qualified immunity defense only if his actions were not fraudulent or malicious in nature.

126.   During  the criminal contempt  hearing,   LUNDAHL  testified that the same forgery charges alleged by LILLY had been propounded against LUNDAHL at:  (1)  a criminal contempt hearing in 1995 in California,   (2) a 1998  appeal in LUNDAHL's case against LILLY in California;  (3)  a 2000 grand jury proceeding in Utah, and  (3)  a 2001 grand jury proceeding in Utah.   Given Thurman should have known with his legal background  that LUNDAHL could not be re-prosecuted for the perjury crimes under the double jeopardy clause and the ex post facto clause,   THURMAN'S actions were a  fraud upon the court's processes; 53   Thurman is

_____

crime in the ordinary sense" and "in every fundamental respect";   likewise, "convictions for criminal contempt  are indistinguishable from ordinary criminal convictions".  "Criminal contempt proceedings are  criminal  in their nature as has been constantly affirmed.'"  *Id.* 88 S.Ct.  at 1481-82 & n. 3.   A defendant charged with criminal comtempt  enjoys the presumption of innocence,   must be proved guilty beyond a reasonable doubt;   cannot be compelled to testify against himself,  *Gompers,* 31 S.Ct. at 499,   has the right to counsel. *Bloom,* 88 S.Ct. At 1484, and  if the charge is one which if convicted could result in a maximum imprisonment period exceeding  six months,   there is a Sixth Amendment right to trial by jury. *Frank v. United States,* 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969); *Codispoti v. Pennsylvania,* 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974).  *See also Gompers,* 31 S.Ct. at 499-502 ("Proceedings for criminal contempt  are between the public and the defendant, and are not part of the original cause." Id. at 499); *Michaelson v. United States,* 266 U.S. 42, 45 S.Ct. 18, 19, 69 L.Ed. 162 (1924);  *Leman v. Krentler-Arnold Hinge Last Co.,* 284 U.S. 448, 52 S.Ct. 238, 240, 76 L.Ed. 389 (1932); *United States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947).   Where a bankruptcy court elects to address a criminal contempt matter, he must refer the matter to the US Attorneys office who is responsible for initiating criminal prosecutions under the Separation of Powers Doctrine.

53.   See Kupferman v. Consol. Research & Mfg. Corp., 459 F.2d 1072 (2d Cir.  1972) (institution  of an action by  a court  officer who  knew that  there  was a complete defense to

liable to LUNDAHL under BIVENS for a violation of  LUNDAHL's first, fourth, fifth and sixth amendment rights and;  Thurman has subjected the United States to liability under LUNDAHL's abuse of process, malicious prosecution and intentional infliction of emotional distress claims.

127.    LUNDAHL  withdrew her removed adversary proceedings against LILLY to the US district court as USDC -Utah case no. 2:2004-cv-088.   The case was assigned to judge Paul Cassell.     Subsequent to these withdrawels  taken under bankruptcy code 28 USC sections 158(b)(5),(d), and (e),   THURMAN issued a final order on January 9, 2004 dismissing LUNDAHL's main bankruptcy case with prejudice.    Thurman also recommended the dismissal of all of LUNDAHL's adversary proceedings without prejudice on the grounds of a lack of residual subject matter jurisdiction.     LUNDAHL filed a mandamus writ against THURMAN requesting that Thurman's dismissal orders be declared void as LUNDAHL did not give Thurman consent to opine, try,  adjudicate or enter final orders on  LUNDAHL's personal injury tort/ federal civil rights/ RICO and FTCA cases  bearing jury demands.

128.    On September 1,  2004,   Judge  Paul  Cassell sitting both as a trial judge and an appellate judge to Bankruptcy judge Thurmans' void dismissal order,    entered  a  final order in LUNDAHL's removed cases against LILLY and LILLY's insurers, i.e. case no. 2:2004-cv-0088,  dismissing that action without prejudice for lack of residual subject matter jurisdiction based on the dismissal of LUNDAHL's main bankruptcy case.     When Judge Paul Cassell entered this final judgment,   he **mooted** all interlocutory orders entered in the removed California federal cases including the October 17, 1994 Settlement Conference Order and the October 7, 1998 Default Judgment,  the latter which had already been mooted by Bankruptcy

---

to the action constitutes fraud upon the court); <u>Great Coastal Express, Inc., v. Int'l Brotherhood of Teamsters</u>, 675 F.2d 1349, 1357 (4th Cir. 1982) ("[I]nvolvement of an attorney, or other officer of the court, in a scheme to suborn perjury would certainly be considered fraud on the court."); <u>Rozier v. Ford Motor Co.</u>, 573 F.2d 1332 (5th Cir. 1978) (fabrication of evidence where attorney or officer of the court is implicated is fraud upon the court); <u>Dixon v. Comm'n of Internal Revenue</u>, 2003 WL 1216290 (9th Cir. 2003) (fraud on the court occurred where attorneys entered into secret settlement agreements with taxpayers in exchange for false testimony); <u>Synanon Found., Inc., v. Bernstein</u>, 503 A.2d 1254 (D.C. 1986) (attorney subornation of perjury and false statements to trial court constitute fraud upon the court); <u>see</u> 12 James Wm. Moore et al., <u>Moore's Federal Practice</u> ¶ 60-21[4][b] (3d ed. 2002).

Judge Judith Boulden.    US District Judge Paul Cassell's final dismissal judgment  stripped the 10/17/1994   Settlement  Conference  Order  and  the  10/8/1998  Default  Judgment  of  their required Corpus  Delicti  foundation needed to prosecute any crimes with respect to these judgments.   54    (See ADD. "30" for dismissal judgment).     Simply put,   the challenged 10/17/1994 order no longer represented a live injury to LILLY,   and the challenged 10/7/1998 default judgment  was once again stripped of it's injurious effect  to LUNDAHL.

_____

54.    **It is a well established constitutional principal that in order to have standing to prosecute a crime,  the government must be able to prove corpus delicti.**      See **Com. v. Ruddock,  520  N.E.2d  501,  25  Mass.  App.  Ct.  508  (Mass.  App.  Ct.,  1988)** (Criminal responsibility is imposed on the basis of the intentional doing of a criminal act with the end result of a concrete injury.  Citing to <u>Commonwealth v. Byard, 200 Mass. at 177-178, 86 N.E. 285</u>; <u>Commonwealth v. Welansky, 316 Mass. At 399, 55 N.E.2d 902</u>; <u>Commonwealth v. Godin, 374  Mass.  120,  130,  371  N.E.2d  438  (1977),</u>   cert. denied, 436 U.S. 917, 98 S.Ct. 2263, 56 L.Ed.2d 758 (1978)).

"To have standing in any capacity criminal or civil,  a litigant must show that the challenged  action has caused a person concrete and actual  injury."   <u>Perella v. Massachusetts Turpike Auth</u>., 772 N.E.2d 70.

The corpus delicti  is related to standing and  must  be proven in every criminal prosecution.   Corpus Delicti  has two  elements:

(1)   proof  of the injury or loss or harm to a victim,  and   (2)  the existence of a criminal agency.    There must be sufficient proof of both elements of the corpus delicti -  beyond a reasonable doubt."   <u>29A American Jurisprudence Second Ed</u>., Evidence § 1476. <u>State v. Hill</u>, 221 A.2d 725, 728 (NJ) 7  Wigmore on Evidence, [section] 2072.  ""Corpus delicti" consists of occurrence of  a of loss or injury embraced  in  the  crime  charged.    <u>State  v.  Vuilleumer</u>,  210  A.2d  673,  674,  3 Conn.Cir. 223. (C.T.) .    "It has long been fundamental to criminal jurisprudence that a necessary predicate to any conviction is proof of the corpus delicti,  i.e., the occurrence of any injury or loss and someone's criminality as the source of this injury or loss.     See <u>Commonwealth v. Burns</u>, 490  Pa. 619,  627, 187 A.2d 552, 556-557 (1963); <u>Commonwealth v. Turza</u>, 340 Pa. 128, 133, 16 A.2d 401, 404 (1940)."   <u>Commonwealth v. Maybee</u>, 239 A.2d 332, 333. (P.A.)

"In every criminal trial,   the prosecution must prove the corpus delicti,   or the body of the crime itself – i.e.,  the fact of injury,  loss or harm,   and the existence of a criminal agency as its cause."    <u>People v. Sapp</u>,  73 P.3d 433, 467 (Cal. 2003)  [quoting <u>People v. Alvarez</u>, (2002) 27 Cal.4th 1161, 1168-1169,  119 Cal.Rptr.2d 903,  46 P.3d 372.].

"As a general principal,   standing to invoke the judicial process requires an actual justiciable  controversy  as to which the complainant  has  a  real interest  in  the  ultimate adjudication because he or she has either suffered or is about to suffer an injury."  <u>People v.</u>

Footnote 54 continued.....

_____

Superior Court, 126 Cal. Rptr. 2d 793.     "An analysis of standing begins with a determination of whether the party seeking relief has sustained a present concrete injury.   (see Society of Plastics Indus. v. County of Suffolk, 77 N.Y.2d 761, 772-773, 570 N.Y.S.2d 778,  573 N.E.2d 1043 [1991])."  Mahoney v. Pataki, 772 N.E.2d 1118, 1122 (N.Y. 2002).   Without injury there is no corpus delicti  and hence no crime.

        "Component parts of every crime  are the occurrence of a specific kind of injury or loss,  somebody's criminality as source of the loss,   and the  accused's  identity  as the doer of the crime;   the first two elements are what constitutes the concept of "corpus delicti."   **U.S. v. Shunk, 881 F.2d 917, 919  (C.A. 10  (Utah1990)**.    Followed in U.S. v. Chimal, 976 F.2d 608 (C.A.10 (N.M.), 1992.   Corpus delicti is a common law concept literally translated as "the body of the crime."   Black's Law Dictionary 310 (5th ed. 1979).   Every crime has three component parts--(1) the occurrence of the specific kind of injury or loss (e.g., homicide, a dead person;  larceny,  property missing),   (2)  criminality as the source of the loss,  and  (3) the accused's identity as the perpetrator.  United States v. Shunk, 881 F.2d 917, 918 (10th Cir.1989).     Moreover,  the injured person or victim must show that he is presently or in the future  will  suffer  injury  as  a  result  of  putatively  illegal  conduct   of  the  defendant."  Appollomedia Corp. v. Reno, 19 F Supp.2d @ 1086 (N.D. Cal. 1998).    The controversy in a charge must presently exist for jurisdiction to attach,   otherwise the charge is moot and incapable of adjudication under article III.     **Ashcroft v. Mattis,  431 US 171, 52 L Ed.2d 219, 97 S Ct 1739 (1977).**   A violation of law is moot and cannot be prosecuted when:   interim events have completely and irrevocably eradicated  the effect of the alleged violation and the event is such that the violation cannot continue to recur.  **County of Los Angeles v. Davis, 440 US 625, 59 L Ed 2d 642, 99 S Ct 1379 (1978).**

         If  the  accused   can  prove  that  anyone of  the three elements is not met in the criminal charge,     the court must conclude that it lacks jurisdiction and dismiss the criminal action.      "Standing represents a jurisdictional requirement...  National Organization for Women, Inc., v. Scheidler, 510 US 249.    As with standing,   the foundation of the court's jurisdiction is article III of the Constitution which empowers courts to adjudicate "live" [emphasis added]  controversies:

            "A criminal case is moot when the corpus delicti  for a crime
            cannot be established."   Sibron v. New York,  392 U.S.  40,  57
            (1968). The federal courts  will  not  decide  criminal  cases which
            are moot.   Sample v. Johnson,  771  F.2d  1335, 1338   (9th
            Cir.1985),  cert. denied, 475 U.S. 1019 (1986).   A case  is moot
            when "the issues are no longer live or  the parties lack a legally
            cognizable interest in the outcome" of  the charge.  Id. at 1338-
            39. Sibron v. New York,  392 U.S. 40, 57 (1968).     See also
            Hirabayashi v. United States, 828 F.2d 591, 605 (9th Cir.1987).

See also People v. Wright, 677 N.E.2d 494, 286 Ill.App.3d 456 (Ill. App. 1 Dist., 1996): **Corpus delicti** has two components:  **proof** of the occurrence of the injury or loss, and causation by

129.    LUNDAHL timely challenged Judge Cassell's dismissal order by a rule 59 motion asserting procedural due process error because her cases stated federal claims outside of the bankruptcy code.   Judge Cassell summarily denied LUNDAHL's motion on November 3, 2004 for lack of prejudice in the dismissal judgment because LUNDAHL could reopen her original claims under Utah's Savings statute within 1 year of an appellate court affirming the judgment of dismissal by Judge Cassell's court.

130.    LUNDAHL  filed a timely appeal with the 10th Circuit court on November 8, 2004 as case no. 04-4263.     Neither LILLY or LILLY's insurers ever objected to the dismissal judgment nor did  LILLY file a cross appeal to protect her interests in the 10/7/1998 default judgment or  LILLY's challenge to the competency of the 10/17/1994 Settlement Conference Order.    It is alleged that LILLY did not cross appeal because LILLY knew that the default judgment had been  declared void and unenforceable by  Bankruptcy Judge Judith Boulden almost 1 ½ years earlier and that the prior judge had sound reasons for executing the Settlement Conference order in LUNDAHL's favor.     LILLY's actions of pursuing the underlying criminal charges in October of 2006 on these mooted orders definitively established an ongoing conspiracy to retaliate against and maliciously prosecute LUNDAHL on fabricated crimes.

131.    The 10th circuit  in  appeal  case no. 04-4263  affirmed  District  Court Judge Paul Cassells'  dismissal without  prejudice judgment on  November 17, 2005.    Under Utah's savings statute LUNDAHL had until November 17, 2006 to refile her claims against ELI LILLY,  et al.

### R.    THE PRIVATE PARTY DEFENDANTS USED JUDICIAL OFFICERS TO BLOCK LUNDAHL'S ACCESS TO THE COURTS THROUGH ENTRY OF FALSE AND VOID ABUSIVE LITIGANT ORDERS

---

criminal conduct.    People v. Furby, 138 Ill.2d 434, 150 Ill.Dec. 534, 563 N.E.2d 421 (1990).   Proof of corpus delicti may not rest exclusively on a defendant's extrajudicial confession, admission, or other statement.    The defendant's statement must be corroborated with evidence independent of the confession and which proves the corpus delicti of a crime.   People v. Hamilton, B203256 (Cal. App. 10/21/2008) (Cal. App., 2008)

132.     During LUNDAHL's 2003 bankruptcy, the Utah Supreme Court Justice Christine Durham entered a civil contempt judgment against LUNDAHL (a) in violation of the automatic stay of the bankruptcy code, (b) on matter which had been mooted well over I½ months before the contempt judgment had been entered, (c) without notice to Lundahl that the court was considering contempt sanctions against LUNDAHL and (d) on a case which had been removed from the Utah supreme court to the bankruptcy court under the bankruptcy removal statutes.   55    (See ADD. "31" for a brief showing the jurisdictional defects in the Utah Supreme Court contempt judgment.)   This contempt judgment has been used against plaintiff to deny plaintiff access to the courts, in spite of it's facial invalidity.   This judgment would again be used by all court officers including the judge - in LUNDAHL's 2006 prosecution framed by the corrupt indictment at ADD. "1",    to keep LUNDAHL in jail for more than 2 ½ years in violation of the bail reform act …. because according to the prosecutor "LUNDAHL's litigious nature represented a serious danger to the community at large."    This contempt/ pre-filing order is prima facie void and represents a continuing harm to LUNDAHL. Accordingly LUNDAHL seeks a declaration decreeing the judgment void as a matter of law and enjoining all further enforcement of this void judgment.   56

_____

55.     See **Borkowski v. Abood, 861 N.E.2d 872, 169 Ohio App.3d 31, 2006 Ohio 4913 (Ohio App., 2006)** (where a judge acts on a case which has been removed to the federal court and the judge knows that he lacks jurisdiction under the removal statute, the judge acts in a clear absence of jurisdiction and, as a result, the judge's judicial immunity is lost. See *Rankin v. Howard* (C.A.9, 1980), 633 F.2d 844, 849.   Here, at the time appellant filed his removal petition, the applicable law expressly deprived the appellee judge of jurisdiction. We are constrained to find that the appellee judge acted in the clear absence of jurisdiction.

56.     The Utah Supreme Court civil contempt judgment is in fact a criminal contempt judgment because it is based on the ex parte accusation that LUNDAHL was practicing law without a license when initially aiding her sister in the prosecution of a collection case before the case was assigned to plaintiff altogether.   The federal courts decided an identical charge in McCormick v. City of Lawrence, Kansas, 253 F.Supp.2d 1156 (D. Kan., 2003) and held that the City, the attorney General and assistant prosecutor as the complaining witnesses were liable to plaintiff for charges of practicing law without a license pursuant to  NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)  which held that First Amendment protection is afforded to activities involving the assistance of litigation aimed at vindicating civil rights. Id. At 1379).

133.     Sometime in April or May of 2004,     LILLY's and LILLY's insurers' counsels engaged in ex parte contacts with Utah Judge Dee Benson to unlawfully extract a pre-filing order against LUNDAHL that would preclude LUNDAHL from prosecuting her meritorious federal claims in the Utah court systems.

134.     The record  shows  that sometime in May of 2004,  Judge Dee  Benson purported to enter an OSC re an abusive litigant order against LUNDAHL which  falsely claimed that judges in more than 14 adversary proceedings brought in the bankruptcy court and assigned district court case numbers after withdrawel,  had determined that LUNDAHL's cases were  frivolous, harassing, abusive and wholly without merit.   THIS  WAS  A  BLATENT  LIE! All of LUNDAHL'S cases withdrawn during the years 2003-2004 under LUNDAHL's chapter 13 bankruptcy,     WERE ALL DISMISSED WITHOUT PREJUDICE FOR LACK OF RESIDUAL SUBJECT MATTER JURISDICTION or general subject matter jurisdiction;   therefore the judges never reached the merits of LUNDAHL's claims and certainly did not issue rulings that LUNDAHL's cases were frivolous,  abusive or lacking in merit.     Moreover,   the cases cited by Judge Benson pre-2002 were either admittedly dismissed as MOOT or 2 cases were obstructed through blatent fraud upon the courts by the tort defendants attorneys and  which LUNDAHL now seeks backwards access claims on these  cases.

135.     Aside  from the  factual  incompetency  of Judge Benson's abusive litigant order,   the order suffered from serious article III defects which rendered Benson's order void, to wit:     At the time Judge Benson entered his order,  Judge Benson did not have subject matter jurisdiction over any case filed by LUNDAHL;   rather  Judge Benson purported to enter the contempt judgment against LUNDAHL solely under the All Writs Act.   The Supreme Court in re SYNGENTA CROP PROTECTION, INC., ET AL. v. HENSON,  537 U.S. 28 (1997) held that a federal court lacked subject matter jurisdiction over a case which presented a sole question under the  All Writs Act;   that  another federal question must be presented in the case for a federal court to exercise jurisdiction.   In spite of this serious jurisdictional defect,  Judge Benson entered an abusive litigant order against LUNDAHL ex parte on July 8, 2004.   Eight months later,  Judge Benson fabricated a lawsuit in LUNDAHL's name for the sole purpose of

filing the abusive litigant order.  Of interest is the complete absence of any OSC in the case filed by Judge Benson.  LUNDAHL contends that no OSC was issued much less served upon LUNDAHL.  LUNDAHL subsequently filed an attack on Judge Benson's order which Benson refused to file and address.  (See ADD. "32" for LUNDAHL's challenge to the legal defects in Benson's order making the order void.)  LUNDAHL's attack follows Texas law. 57

136.  On October 20, 2006, the prosecutor in the underlying criminal case presented judge Benson's contempt order to the district court as grounds to deny LUNDAHL pre-trial detention.  The prosecutor argued that LUNDAHL's abusive litigation tactics frightened witnesses and made LUNDAHL a danger to the community.  LUNDAHL filed her attack on Benson's order with the criminal court. Like LUNDAHL's attack on the Utah Supreme Court order and Judge Tallman's order,  LUNDAHL's attack against Judge Benson's order was criminally grafted from the court record and LUNDAHL's court appointed counsel refused to address this criminal misconduct.  58

### S.  TENTH CIRCUIT APPEAL CASE NO. 03-4219 WAS FRAUDULENTLY OBSTRUCTED BY LILLY AND LILLY'S INSURERS AND THE IRS

137.  During LUNDAHL's bankruptcy case,  the IRS and SOURCE ONE moved to dismiss LUNDAHL's tort case NO. 2:97 cv 951,   fraudulently claiming that this action was not

---

57.  In **Ex Parte Acevedo, No. 13-05-725-CR (Tex. App. 11/9/2006) (Tex. App., 2006),** the Texas appellate courts held that the most recent contempt order issued against Acevedo was void because Acevedo was not personally served with the show cause citation and therefore not afforded adequate due process.  The deputy in this case testified that the show cause notice was served on one of Acevedo's staff members and not personally served on Acevedo.  It is settled that constructive notice is inadequate when dealing with contempt matters.  Notice must be served on the alleged contemnor personally. *Gonzalez v. State*, 187 S.W.3d 166 (Tex. App.-Waco 2006, no pet.) (declining to adopt a rule that constructive notice of contempt charges are appropriate).

58.  US v. Russell, 221 F.3d 210, 228 (2nd Cir. 2001)(counsels failure to argue to invalidity of 2 judgments placed at issue in the criminal proceedings and which impacted a right of the defendant was ineffective assistance);  Also see US v. Askew, 88 F.3d 1065, 1073 (DC Cir. 1996)(failure to argue prior charges had been adjudicated in defendants favor was ineffective assistance).

stayed by the automatic stay of the bankruptcy code.   The  IRS  in fact originally filed a notice of claim against LUNDAHL for  $126,000 in February of 2003.   The filing of a claim in LUNDAHL's bankruptcy by the IRS established prima facie proof that LUNDAHL's non-bankruptcy  tort case (which sought  an  injunction  against  the  IRS' collection of  the  void $126,000 tax assessment)  was stayed by the automatic stay of the bankruptcy code.   In addition Source One filed a perjurious affidavit claiming that the  Judge had dismissed LUNDAHL's claims against SOURCE ONE with prejudice on December 16, 1998.  However, Judge Campbell did not reach LUNDAHL's claim against SOURCE ONE in her December 16, 1998 order.   Campbell granted the IRS' and Source One's motion to dismiss the tort case with prejudice for failure to prosecute sometime in August of 2003 while LUNDAHL's bankruptcy case was pending.   LUNDAHL timely appealed the dismissal order and all underlying orders to the 10th Circuit court as appeal case no. 03-4219.

138.   LUNDAHL briefed the jurisdictional errors of the trial court largely attacking the rulings as a product of a fraud upon the court committed by the tort defendants in denying the existence of offices in the state of Utah which subjected the tort defendants to 14th and 5th amendment contacts.   59      LUNDAHL also attacked the manifest violations of due process by the trial court in:   (1)  dismissing LUNDAHL's claims with prejudice (emphasis added) for lack of subject matter and personal jurisdiction in violation of FRCP rules 12(b)(1), (b)(2) and 41(b),   (2)  refusing to recuse herself in violation of 28 USC section 455(b) in light of her $1.2 million stock interests in the corporate defendants companies, and;      (3)   finally disposing of the case during the pendency of LUNDAHL's bankruptcy in violation of the automatic stay of the bankruptcy code.

_____

59.   Great Coastal Express, Inc., v. Int'l Brotherhood of Teamsters, 675 F.2d 1349, 1357 (4th Cir. 1982) ("[I]nvolvement of an attorney in a scheme to suborn perjury in order to prevail in an action is  fraud on the court.");  Rozier v. Ford Motor Co., 573 F.2d 1332 (5th Cir. 1978) (concealment of evidence where attorney or officer of the court is implicated is fraud upon the court);  Dixon v. Comm'n of Internal Revenue, 2003 WL 1216290 (9th Cir. 2003) (fraud on the court occurred where attorneys  entered into secret settlement agreements with plaintiffs in exchange for false testimony that would bar other lawsuits.).  Moore's Federal Practice ¶ 60-21[4][b] (3d ed. 2002).

139.   To obstruct the appeal,   **LILLY and LILLY's insurers admittedly spent more than $1 million dollars on appeal  by submitting  more than 300 filings** with the 10th Circuit court which asserted that LUNDAHL had committed a fraud upon the court by falsely representing that she was physically injured in the 1995 altercations with IRS and HCA mental hospital employees and by also presenting forged orders dated 10/1/1993 and 10/17/1994 as the motive for the 1995 assaults upon LUNDAHL.   In support of these accusations,   LILLY provided the 10th circuit court with an altered  6/28/1996 trial transcript in the IRS assault trial case no. 95 CR 0114 AAH.    LILLY had altered  one page of the trial transcript wherein Judge Andrew Hauk found that the IRS officers had committed a wholesale violation of  LUNDAHL's constitutional rights,  and changed the page to reflect that the judge had found that the IRS officers had not violated LUNDAHL's constitutional rights.   LILLY then accused LUNDAHL of altering the page to reflect a positive ruling in her favor like LUNDAHL had allegedly forged two court  orders  in her favor.

140.   The corporate defendants moved the 10th circuit court to adjudge LUNDAHL guilty of felony misconduct.   On November 9, 2004,   the 10th circuit issued a criminal OSC directing LUNDAHL to respond  to the felony charges.   In summary,   LUNDAHL denied the charges and then asserted that the  10th circuit lacked jurisdiction over the charges under many fronts,  to wit:  (a)  the absence of corpus delicti with respect to the 10/17/1994 Settlement conference order as set forth in footnote 54 supra;   (b)  the 10/1/1993 criminal dismissal order was unquestionably valid and it's validity was subject to collateral estoppel enforcement by the prior 1995 contempt judgment   60;  (c)  the court lacked jurisdiction to

_____

60.   Typeright  Keyboard Corp. v. Microsoft Corp., 374 F.3d 1151, 1156-1158(Fed. Cir. 2004) (A judgment previously determining matter moots all collateral or pendent issues on the same matter citing Ashcroft v. Mattis,  431 US 171, 52 L Ed.2d 219, 97 S Ct 1739 (1977)**;** States v. Difrancesco, 449 U.S. 117, 132-33 (1980)(**"**[a] judgment of acquittal,   whether based on a jury verdict of not guilty or on a ruling by the court that the evidence is insufficient to convict" bars future prosecution on the same charge or related offense.);   Also see Menna v. New York, 423 U.S. 61, 62-63, 96 S.Ct. 241, 242, 46 L.Ed.2d 195 (1975) (per curiam)(where the government  has previously decided the charge directed at the defendant,  no government officer may  thereafter  hale  a defendant into court on the same charge under collateral

indict   LUNDAHL with   disputed felony crimes  61;    (d)  the court could not prosecute a

constructive   contempt   crime   without   according   LUNDAHL  the  full  panoply  of  procedures

accorded criminal defendants  62,  and;   (e)  the court was  committing  structural  error by

_____

estoppel  doctrine  embodied  in  the  5th  amendment.)     Jurisdiction requires that three
essentials must be present: authority over the subject matter, authority over the person,   and
the power to proceed to judgment.    See Fairfield, 610 S.W.2d at 779;  Emery v. State, 57
Tex.Crim. 423, 123 S.W. 133, 134 (1909). If the court lacks any of the essential elements of
jurisdiction,   any judgment by it is void and unenforceable. See Emery, 123 S.W. at 134.
Compare Skillern v. State, 890 S.W.2d 849, 859 (Tex.App. 1994)

        61.    The Fifth Amendment guarantees,   "(n)o person shall be held to  answer for
a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand
Jury".      This provision   was designed "to provide a fair method for instituting criminal
proceedings," Costello v. United States, 1956, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed.
397, 402. " U.S. v. Cosby, 601 F.2d 754 (C.A.5 (Ga.), 1979).   "A defendant is only required to
answer for an infamous crime pursuant to an indictment or by information of the prosecutor.
TEX. CONST. art. V, § 12(b).   **Duron v. State, 956 S.W.2d 547, 549 (Tex.Crim.App.1997)**; (
National Life Co. v. Rice, 140 Tex. 315, 167 S.W.2d 1021, 1024-25 (1943).

        62.    **Ex Parte  Acevedo,  No. 13-05-725-CR  (Tex. App. 11/9/2006)  (Tex. App.,
2006)** (constructive contempt occurs outside of the court's presence.    .*In re Johnson,* 996
S.W.2d 430, 433 (Tex. App.-Beaumont 1999, no pet.). Constructive contempt  refers to acts
that require testimony or the production of evidence to establish their existence. *Ex parte
Daniels,* 722 S.W.2d 707, 709 (Tex. Crim. App. 1987).   *Ex parte Edgerly,* 441 S.W.2d 514, 516
(Tex. 1969)) ("Due process of law demands that before a Court can punish for a contempt  not
committed in its presence,    the accused must be accorded the full panaoply of rights
accorded a normal criminal trial.)   "Criminal contempt proceedings are  criminal  in their
nature as has been constantly affirmed.'" *Id.* 88 S.Ct.  at 1481-82 & n. 3.  A defendant charged
with criminal contempt  enjoys the presumption of innocence,  must be proved guilty beyond
a reasonable doubt;   cannot be compelled to testify against himself,  *Gompers,* 31 S.Ct. at
499,  has the right to counsel. *Bloom,* 88 S.Ct. At 1484, and  if the charge is one which if
convicted could result in a maximum imprisonment period exceeding  six months,   there is a
Sixth Amendment right to trial by jury.  *Frank v. United States,* 395 U.S. 147, 89 S.Ct. 1503, 23
L.Ed.2d 162 (1969); *Codispoti v. Pennsylvania,* 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912
(1974).   *See also Gompers,* 31 S.Ct. at 499-502 ("Proceedings for criminal contempt  are
between the public and the defendant, and are not part of the original cause." Id. at 499);
*Michaelson v. United States,* 266 U.S. 42, 45 S.Ct. 18, 19, 69 L.Ed. 162 (1924);  *Leman v.
Krentler-Arnold Hinge Last Co.,* 284 U.S. 448, 52 S.Ct. 238, 240, 76 L.Ed. 389 (1932); *United
States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947);
followed in In re TByrd Enterprises, L.L.C., Case No. 06-30078-H1-11, 4-5 (Bankr. S.D. Tex.
11/30/2007) (Bankr. S.D. Tex., 2007).

seeking to adjudicate trial facts at an appellate level.  63

      141.   Furthermore,  Tenth Circuit Judge Stephanie Seymour sat as the chief judge on LUNDAHL's appeal.    She alone owned $1.4 million dollars stock interests in the tort defendant's companies appearing in appeal case no. 03-4219.    Judge Seymour had a mandatory duty to recuse from the appeal.    Instead, Judge Seymour in retaliation entered a void contempt order against LUNDAHL when she  could not  constitutionally charge or convict LUNDAHL of crimes vigorously disputed by LUNDAHL.  64   Judge Seymour's order is void as a matter of law for gross due process violations.  Finally,  the order corruptly bars LUNDAHL of access to the courts  and  inherently denied LUNDAHL  to an impartial  appellate tribunal.  65

_____

    63.   ELLIS E. NEDER, *Jr. v.* UNITED STATES,  U.S. Sup. Ct. case No. 97-1985(1999) (per curiam) (appellate courts not permitted to make factual determinations especially in criminal matters).  Same in Schneider v. Friedman, Collard, Poswall & Virga, 283 Cal.Rptr. 882, 232 Cal.App.3d 1276 (Cal.App. 4 Dist., 1991) (appellate court cannot make factual findings without committing structural error)

    64.   Mdcm Holdings v. Credit Suisse First Boston Corp., 205 F. Supp.2d 158 (S.D.N.Y., 2002) ("Even where the facts do not suffice for recusal  under § 455(b), those same facts may be examined as part of an inquiry into whether recusal is mandated under § 455(a)." Section 455(a) requires a judge to disqualify herself if her partiality "might reasonably be questioned." 28 U.S.C. § 455(a).  "Litigants ought not have to face a judge where there is a reasonable question of impartiality. *Id.* (quoting S.Rep. No. 93-419, at 5 (1973);  H.R.Rep. No. 93-1453 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6351, 6355));   See also Khulumani v. Barclay Nat. Bank Ltd, 504 F.3d 254 (2nd Cir. 2007) (Supreme Court in August 2008 recused off of an Apartheid case because 5 justices owned  stock interests in the corporate defendants in the case.);   *United States v. Will,* 449 U.S. 200, 217, 101 S.Ct. 471, 481, 66 L.Ed.2d 392 (1980) (forum must provide a judge having no interest in the litigation to avoid the statutory disqualification statute);   Republican Party of Minn. v. White, case no. 99-404 (8th Cir. 2005) (Criminal civil rights violation when judge has a pecuniary interest at stake in the litigation and continues to preside over the case following Tumey v. Ohio, 273 US 510, 523 (1927)):  Chase Manhatten Bank v. Affiliation F.M. Ins. Co., 343 F.3d 120, 128 (2nd Cir. 2003)(judge required to recuse because he owned $250,000 stock interests in Chase Manhatten Bank,   though ignorant of the holding at the time he ruled).

    65. Judge Seymour's vexatious litigant order left no appellate tribunal to address her unlawful order because judge Seymour's clerk Doug Cressler had contacted the Supreme court and procured them to reject jurisdiction over Judge Seymour's unconstitutional ruling. See Wolffe,  377 F.3d 322, 328 (3rd Cir. 2004)(due process violation when judge sits as an appellate judge on a case in which a party attacks the constitutionality of that judge's decision).

142.    When LILLY and her insurers failed to obtain a criminal contempt conviction against LUNDAHL  from the 10th circuit court,     these persons intervened on an unrelated federal case pending in idaho and procured that  judge to convict LUNDAHL of forging the 10/1/1993 criminal dismissal judgment and the 10/17/1994 settlement conference order in re Idaho  federal  case  no.  05-cv-127.    The  federal  court  allowed  this  intervention  and  then purported to act as an investigator,  prosecutor,  jury and  judge on these  felony charges. Again LUNDAHL attacked the court's jurisdiction and conduct as violating LUNDAHL's  First, Fourth, Fifth and Sixth Amendment rights.   See ADD.  "33"  for LUNDAHL's attack on Judge Tallman's  criminal  contempt  charges.      Judge Tallman subsequently  cloaked his criminal contempt order as a civil contempt judgment to avoid  attack.   LUNDAHL timely appealed this order to the 9th circuit court  but  LUNDAHL's  appeal was obstructed by LUNDAHL's seizure on the underlying criminal charges predicated upon the indictment found at  ADD. "1"  and which charged LUNDAHL for the 9th time over a period of 13 years of  forging the 10/1/1993 criminal dismissal judgment and the 10/17/1994 settlement conference order.

## S.   THE PROSECUTION OF USDC-UTAH CRIMINAL CASE NO.  2:06 CR 693

143.    On October 16, 2006,  LUNDAHL was arrested at her home in Malad City Idaho on the charges set forth in the 10/4/2006  indictment (ADD. "1"),  to wit:

**Count 1**:    Perjury for failing to record LILLY  as a creditor to LUNDAHL via the ACS default judgment dated October 7, 1998 in  LUNDAHL's  2003 bankruptcy;

**Count 2**:    Perjury  for  concealing  and  failing  to  report  on her financial assets report 10 lawsuits in LUNDAHL's  2003 bankruptcy case;

**Count 3**:    Forgery  of  a  filing  stamp  on a motion to dismiss filed in the Utah Supreme Court on a mooted writ action;

**Court 4**:    Forgery of the 10/1/1993 state criminal dismissal order in re County of Riverside, Superior Court of California, case no. CR44162;

**Count 5**:    Forgery of the 10/17/1994 Settlement Conference Order in re USDC-California case no. 94-CV-045;

**Count 6**:    Perjury for denying the forgery of the 10/1/1993 criminal dismissal

judgment;

**Count 7**:    Perjury for denying the forgery of the 10/17/1994 Settlement

Conference Order.

144.    As an initial matter the prosecutor committed prosecutorial misconduct in

charging LUNDAHL under a more general statute instead of a specific statute as to counts 3-5

for the sole purpose of increasing LUNDAHL's imprisonment penalty by 45 years and using this

penalty increase as an extortion tool against LUNDAHL.    Specifically,  LUNDAHL was charged

with forging court process in counts 3-5.    In the prior 8 times that LILLY charged LUNDAHL

with forging this court process over the past 13 years,   LUNDAHL was charged under 18 USC

section 505 which carries  a maximum imprisonment penalty of 5 years for a count  of forgery.

In the 2006 indictment,     LUNDAHL was charged under a forgery statute created in 2001 in

response to the Enron scandel, i.e. 18 USC section 1519.    Aside from the fact that the Ex Post

Facto clause prevented the prosecutor from using this statute to prosecute LUNDAHL given

this statute did not exist at the time the alleged forgeries took place in 1993 and 1994,   the

new charging statute increased the imprisonment period for a crime of general forgery to 20

years   versus the five years   under the more specific statute outlawing forgery of court

process.    The law prohibited the prosecutor from charging LUNDAHL under the statute

selected by the prosecutor.    66

---

66.    It is well settled law that  if  a  specific  statutory  provision  controls over a
general one. *Bulova Watch Co. v. United States,* 365 U.S. 753, 757, 81 S.Ct. 864, 6 L.Ed.2d 72
(1961).  *Franklin v. United States,* 992 F.2d 1492, 1502 (10th Cir.1993).   Simpson v. United
States, 435 U.S. 6, 15, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978); Neary v. Padilla (In re Padilla), 222
F.3d 1184, 1192 (9th Cir.2000) (It is also now clear that when a prosecutor is faced with an
alleged offense which violates more than one statute with one being specifically tailored to
the alleged offense involved,  the prosecutor has no discretion to charge a defendant under
any other statute other than the specifically tailored one.)  *Busic v. United States,* 446 U.S.
398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980);  Simpson v. United States, 435 U.S. 6, 15, 98 S.Ct.
909, 55 L.Ed.2d 70 (1978); Neary v. Padilla (In re Padilla), 222 F.3d 1184, 1192 (9th Cir.2000)
("Statutory construction canons require that `[w]here both a specific and a general statute
address the same subject matter,  the  specific  one  takes  precedence  regardless  of  the

145.    The prosecutor was also guilty of stacking criminal charges in order to increase LUNDAHL's criminal penalties.   It is undisputed that a perjury prosecution is identical to a prosecution for a substantive crime,   if both prosecutions are based upon identical facts relative to the same offense.    When a prosecutor charges multiple counts for what is construed as a single crime,    he is guilty of stacking charges in violation of the double jeopardy clause. 67    Here,  the prosecutor stacked charges in  counts  4 – 7 in violation of the double jeopardy clause.

146.    On October  16, 2006,   the  defendants  in conspiracy with one another violated  LUNDAHL's  Fourth  Amendment  right  to  be  free  of search and seizure without

_____

sequence of the enactment, and must be applied first.'") U.S. v. Cuellar, 478 F.3d 282 (5th. Cir., 2007) (The rule of lenity  also supports the conclusion that a court should prosecute under a less harsh statute.)

67.   "Where the fact to which a defendant testifies in a previous trial forms the basis of a  new perjury charge and that fact was necessarily decided in the previous action, acquittal of the first but different offense bars a subsequent perjury prosecution." Ehrlich v. United States, 145 F.2d 693 (5th Cir.1944). Following  Ashe v. Swenson,  an acquittal  in the first prosecution bars subsequent prosecution for a separate offense where the government has lost an earlier prosecution involving the same facts (emphasis in original) 509 U.S. 688, ----, 113 S.Ct. 2849, 2860.  United States v. Williams, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951); United States v. Haines, 485 F.2d 564 (7th Cir.1973), cert. denied, 417 U.S. 977, 94 S.Ct. 3184, 41 L.Ed.2d 1147 (1974); State v. Conway, 661 P.2d 1355 (Okla.Crim.App.1983).  "There is an apprehension that allowing a prosecution  for perjury will give the state a "second shot" at defendant for the same wrong, or allow an overzealous prosecutor to use the perjury  trial to retry issues already determined in defendant's favor."    Adams v. United States, 287 F.2d 701, 703 (5th Cir.1961);   As a result thereof,  prosecutors have often been forced to chose between a prosecution under  the perjury statute  or the substantive offense.   See United States v. Edmondson, 410 F.2d 670 (5th Cir., 1969)(a prosecution for perjury is another way of prosecuting a fabrication of evidence charge.  Here Edmondson fabricated two letters to buttress the image and sales of his business.  The letters were forgeries and therefore Edmondson was properly convicted for the crime of perjury.).   This is because perjury prosecutions are based on the same facts as the substantive offense.  See Blackledge v. Perry, 417 U.S. 21, 30, 94 S.Ct. 2098, 2103, 40 L.Ed.2d 628 (1974) citing to United States v. Dixon, 509 U.S. at 705("Double jeopardy  prevents multiple prosecutions for the `same offense' or a `separate offense where the government has lost an earlier prosecution involving the same facts') .   Stacking charges occurs when the government uses multiple charging statutes to prosecute what is in reality one crime.

probable cause  by:   **(1)**  securing an indictment against LUNDAHL based on knowingly false and perjured testimony;  **(2)**  intentionally withholding the exculpitory evidence contained in the supporting Addendum  filed under separate cover herewith; **(3)**  presenting fabricated evidence in order to frame LUNDAHL for crimes,  and;  **(4)**  pursuing charges that the defendants knew were barred from prosecution as a matter of law on the grounds of:   **(A) failed  corpus delicti in counts 1, 3, 5 and 7;    (B)   the doubly jeopardy clause via it's  (a) corollary doctrine of  collateral estoppel  in counts 4 and 5;    (C) the double jeopardy clause via the multiplicity doctrine as applied to counts 4 and 6 and 5 and 7;   (D) the Ex Post Facto clause as applied to counts 4 and 6;   (E)  Vindictive Prosecution as applied to the entire 10/4/06 indictment ;  (F)  profound prosecutorial misconduct** by:   (a)  **violations of the US attorneys manual code** sections 9-11.120, 9-11.231, 9-11.233,  9-11.141 and 9-11.120;  68

---

68.   The US Attorney's Manual prohibits the following conduct:   (i) 9-11.120 : once a grand jury returns a no-bill or otherwise acts on the merits in declining to return an indictment,   the same matter ( i.e., the same transaction or event and the same putative defendant) should not be presented to another grand jury or resubmitted to the same grand jury;    (ii)  9-11.231: the prosecutor cannot knowingly present incompetent  evidence to a grand jury which he knows violates the accused's  constitutional rights.   Here the prosecutor knowingly presented  evidence  derived from a bankruptcy transcript dated  12/11/2003 as his sole support for the perjury charges in counts 6 and 7 knowing that this evidence was fabricated pursuant to a criminal conspiracy between the complaining witnesses and a biased bankruptcy  judge  for the sole purpose of  reviving  a time barred prosecution in violation of the Ex Post Facto clause;   (iii)  9-11.233 by violating  the policy of the Department of Justice regarding exculpitory evidence  which provides  that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation,  the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person.   While a failure to follow the Department's policy should not result in dismissal of an indictment,  violations may be referred to the Office of Professional Responsibility for review.   One such exculpitory evidence that the prosecutor could have presented to the grand jury under USAM section 9-11.141 is LUNDAHL's credit report showing that LILLY never reported the October 7, 1998 default judgment against LUNDAHL's credit report because LILLY knew the judgment was obtained by ex parte fraud and that it was void and unenforceable,  AND (iv) 9-11.120 abuse of the grand jury function  by using the grand jury  pre-trial discovery or trial preparation in a civil case.   *United States v. Star*, 470 F.2d 1214 (9th Cir. 1972).   This suit will show that  the prosecutor also used this criminal prosecution to obtain civil discovery and taint this evidence.

(b) pursuing the  criminal prosecution in order to **wrongfully invoke use of the  mental competency statute through a biased tribunal** and thereby deprive LUNDAHL of a jury hearing and deciding LUNDAHL's competence to stand trial and attack the criminal charges; (c)  stacking criminal charges;   (d)   propounding  criminal charges under general statutes which substantially increased the penalties for the crimes charged for the sole purpose of further extorting LUNDAHL, and; (e) knowingly presenting perjured testimony to the grand jury.

147.    On October 4, 2006,  two complaining  witnesses admittedly also acting as investigators for the government,    i.e. LILLY's attorney Micheal Johnson and FBI officer Sonja Sorenson: (1)   knowingly tendered false,  perjured and/ or deceptive testimony before the 10/4/06 grand jury;  (2) corruptly withheld exculpitory evidence,  and (3)  corruptly concealed from the  grand jury relevant constitutional laws,  which tainted the grand jury proceedings and caused an incompetent indictment to issue against LUNDAHL.   69

148.    On October 18, 2006,   FBI officer Sonja Sorenson extradicted LUNDAHL from Idaho to Utah.    While in the car,    LUNDAHL complained that someone,  likely LILLY,   had recently accessed Lundahl's business bank accounts and procured the banks to shut down and convert LUNDAHL's bank  accounts without cause.   FBI officer Sorenson informed LUNDAHL

_____

69.   Fraudulent conduct that results in issuance of an indictment is not protected under the FTCA or the Constitution.  *See Muniz-Rivera,* 326 F.3d at 15.  There can be no doubt that suborning perjury and fabricating evidence violate the constitution. *See, e.g.,* Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *Pyle v. Kansas,* 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942).   It is equally clear that law enforcement officers have a constitutional duty to disclose exculpatory evidence to prosecutors. *See, e.g.,* Brady v. Maryland, 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Brady v. Dill,* 187 F.3d 104, 114 (1st Cir.1999) ("[C]onstitutional wrong results from the officer's failure to deliver material information to competent authorities."); *Chandler v. United States,* 875 F.Supp. 1250, 1266 (N.D.Tex.1994))(holding that allegations based on bringing charges without probable cause and withholding of material information from prosecutors and grand jury are not barred by discretionary function exception of the FTCA); *Crow v. United States,* 659 F.Supp. 556, 569 (D.Kan.1987) (concluding that discretionary function exception did not bar claim where inspector's memorandum and testimony submitted to the grand jury contained inaccuracies and falsehoods.)

that she knew about the bank's actions because of pending bank fraud charges against LUNDAHL.  Sorenson would not further explicate on the alleged bank fraud charges except to say that LUNDAHL would be fully advised at her plea hearing.

149.   On October 20, 2006,  LUNDAHL was brought before the Magistrate.  The Magistrate first addressed the issue of LUNDAHL's representation before taking LUNDAHL's pleas.   The magistrate entered into a colloquy with LUNDAHL about finances  knowing prior hand that the banks had accessed and shut down LUNDAHL's business and personal bank accounts.     LUNDAHL indicated that she was self employed, that she made a substantial income,  that she developed interstate diet offices throughout the states of Nevada, Idaho, Utah, and Montana,   that she presently had 5 freeway bordered offices that she was developing,   that she presently provided services  through one operational diet facility and that she sold dietary products and supplies.   The Magistrate informed LUNDAHL that she was aware that complaining banks had  seized LUNDAHL's bank accounts and wanted to know how LUNDAHL planned to fund counsel. 70    LUNDAHL demanded to represent herself.   The Magistrate refused noting that LUNDAHL's charges were very serious and if convicted LUNDAHL could do  80 years in prison.     LUNDAHL retorted that the charges were bogus, false and lacking in jurisdiction and that the court had no right to refuse LUNDAHL her right to self-representation  without having  government funded counsel forced upon her which

_____

70.   See  U.S. v. Kaley, 579 F.3d 1246 (11th Cir., 2009)  Citing to United States v. Bissell, 866 F.2d 1343 (11th Cir.1989  (a defendant whose assets  are restrained,    thus rendering him unable to afford counsel of choice,  is denied his sixth amendment right when the assets seized are not related to the charges.);     Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972);     Bissell, 866 F.2d at 1352 (quoting $8,850, 461 U.S. at 564, 103 S.Ct. 2005).   Indeed, our law is clear and unambiguous that depriving a defendant of the counsel of his choice by wrongfully freezing his assets,  is a serious and significant impediment to his ability to effectively navigate our nation's criminal procedures and protections.   See Gonzalez-Lopez, 548 U.S. at 146, 126 S.Ct. 2557 ("[T]here  is a Sixth Amendment right to counsel of choice by the accused to be defended by the counsel he believes to be best.");   Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) ("the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment").

LUNDAHL believed were in league with the complaining witnesses based upon the charges. 71
The Magistrate subsequently informed LUNDAHL that LUNDAHL was going to be detained
pending trial of the charges, that LUNDAHL would not be able to adequately represent herself
from jail and that LUNDAHL would need counsel.   LUNDAHL strenuously objected stating that
her businesses would fold if LUNDAHL was detained pending trial, that there was no
justifiable reason to detain LUNDAHL pending trial as LUNDAHL did not have a criminal record
or flight record and that it was prejudicial error for a judge to pre-determine detention issues
without a hearing from witnesses or presentation of evidence on the issue of detention.   72
The Magistrate informed LUNDAHL that LUNDAHL should have thought of the potential
consequences before LUNDAHL committed the charged crimes.    The magistrate then
appointed LUNDAHL a public defender and proceeded to take testimony and evidence on the
detention issue as a pretext of affording LUNDAHL a fair hearing - even though an agreement
had already been consummated between all court officers to detain LUNDAHL pending trial,
in violation of all provisions of the Bail Reform Act.   73

      150.   On October 20, 2006, FBI officer Sonja Sorenson testified that she had
contacted LUNDAHL's banks, to include those in Malad City Idaho, pursuant to charges by
the complaining witnesses:   LILLY and LILLY's insurers, the latter which included three banks

_____

71.    See  US v. Akers, 215 F.3d 1089, 1096 (10th Cir. 2000)(denial of right to self
representation violates due process);  US v. Arlt,  41 F.3d 516, 524 (9th Cir. 1994); US v. Harbin,
250 F.3d 532, 543 (7th Cir. 2001) ;  See also US v. Romero, 849 F.2d 812, 820 (3rd Cir. 1988)
(structural error because court forced appointed counsel over defendant's objection after
revoking defendant's right to pro se representation.)

72.    International Harvestor Co. v. Industrial Commission, 147 N.W. 53, 56 (1914,
Wisconsin Supreme Court)(Constitutional error when court pre-decides matter without
hearing or considering relevant evidence or argument).

73.    See US v. Moss, 887 F.2d 333 (1st Cir. 1989) (Where the defendant does not
have a criminal record, the Court is required to look for guidance in United States v. Salerno,
481 U.S. 739, 752, 107 S.Ct. 2095, 2104, 95 L.Ed.2d 697 (1987) which requires that the
magistrate consider any condition or combination of conditions that would reasonably assure
the defendants appearance without pre-trial incarceration. Failure to do so renders the
detention order voidable.)

i.e. Wells Fargo,  Washington Mutual and US Bank,  which complained  that  LUNDAHL was committing bank fraud.   Sorenson testified that she supported the bank's decisions to shut down LUNDAHL's business and personal bank accounts on the basis that LUNDAHL's  alleged forgery of bank notaries on several declarations LUNDAHL filed in an Idaho federal court, constituted bank fraud.    The prosecutor then called LUNDAHL to the stand and accused LUNDAHL of forging bank notary stamps on hers, Behle's and Keddington's declarations submitted to an Idaho federal court.    When LUNDAHL flatly denied the charges,   the prosecutor informed the court that he would be bringing perjury charges against LUNDAHL with respect to each declaration that LUNDAHL forged a bank notary on.   74      LUNDAHL immediately proffered rebuttal testimony without being asked by the public defender (who provided no adversarial  contest to the prosecutors charging allegations) 75  which strenuously attested that the bank notary forgery charges had already been determined in LUNDAHL's favor 3 months earlier in a criminal contempt trial conducted in the context of a state civil lawsuit in American Fork, Utah.    Accordingly,  LUNDAHL argued  that the federal court was barred from hearing the prosecutor's fraudulent argument of forging bank notaries under the double jeopardy clause.  76   The  Magistrate  immediately shut down LUNDAHL's  testimony

_____

74.    Thigpen v. Roberts, 468 US 27, 31-32 (1984) (presumption  of vindictiveness if separate subsequent related indictments filed).   "Vindictive prosecution is prohibited under the Due Process Clause and states a First Amendment retaliation claim."   US v. Montague, 45 F.3d 1286,  1299 (9th Cir. 1995)(the filing of an indictment in bad faith is evidence of vindictive prosecution.)

75.    **Valencia  v. Texas  Department  of  Family and Protective Services, No. 01-08-00345-CV (Tex. App. 12/22/2009) (Tex. App., 2009)** ("a constructive denial of counsel  occurs when a criminal defendant must navigate a critical stage of the proceedings against him without the aid of an effective attorney dedicated to the protection of his client's rights under our adversarial system of justice," or when counsel  abandons  the defense of his client at a critical stage of the . . . proceedings." Gochicoa v. Johnson, 238 F.3d 278, 284-85 (5th Cir. 2000)(prejudice presumed where defense counsel  repeatedly slept in trial while evidence was being introduced against the defendant.)

76.    **U.S. v.  Yeager,  446 F.Supp.2d 719  (S.D. Tex., 2006)** ("Facts so established in the first trial are barred from use  in the second trial as evidentiary facts,   under the Double Jeopardy Clause ." *United States v. Mock,* 604 F.2d 341, 343 (5th Cir.1979)).

and struck it  from the court's transcript.  77    The Magistrate then recessed for the weekend and  ordered LUNDAHL's continued detention until the following Monday at which time the court would hear the remainder of the  detention issues.

151.    Over the weekend,  the public defender made no effort to:  (a)  contact LUNDAHL personally,  (b) investigate into the detention issues,  (c) obtain witnesses or evidence opposing the detention issues;  or  (d) prepare any motions or argument opposing detention;  in spite of contacts made to him through LUNDAHL's sister Marti Telford requiring that he present Marti's and other third person's testimonies opposing detention and attacking the new forgery charges advanced at the detention hearing.  78

152.    LUNDAHL was incarcerated at the adult detention center in Salt Lake City Utah and  placed  in a maximum security pod.  Irrespective that  LUNDAHL never had a history

_____

77.    A judge 'who willfully or corruptly refuses or neglects to  consider an application,  action,   motion or testimony in support of release,   is guilty of malfeasance in office.'  M.C.L.A.  600.4313,  M.S.A. 27A.4313.  See also  Salt Lake City v. Grotepas, 909 P.2d 890 (Utah 1995)(The Sixth Amendment will be adjudged to have been violated by all court officers if "it is shown that some responsible state official connected with the criminal proceeding... could have remedied the conduct of ineffective assistance of counsel [and] failed in his duty to accord justice to the accused in this respect."  Gandy v. Alabama, 569 F.2d 1318, 1321 (5th Cir. 1978)(quoting Fitzgerald v. Estelle, 505 F.2d 1334, 1337 (5th Cir.)(en banc) cert. Denied, 422 US 1011, 95 S.Ct. 2636,  45 L.Ed.2d 675 (1975)

78.    Roe v. Flores-Ortega, 528 US 470, 483-84 (2000) (ineffective assistance when counsel fails to consult with defendant);   Hunt v. Mitchell, 261 F.3d 575, 583 (6th Cir. 2001) (ineffective assistance when counsel does not consult with defendant ,  investigate facts or obtain discovery requested by defendant);   Kimmelman v. Morrison, 477 US 365, 385 (1986) (counsel's failure to conduct pretrial discovery and file timely motions to dismiss is ineffective assistance) ; Grosclose v. Bell, 130 F.3d 1161, 1170 (6th Cir. 1997)(counsel's failure to interview witnesses, conduct legal research, obtain and review records and communicate with client is ineffective assistance);  Jones v. Wood, 207 F.3d 557, 563 (9th Cir. 2000) (counsel's failure to conduct pre-trial investigation and obtain exculpitory evidence violated Sixth Amendment); Betts v. Litscher, 241 F.3d  594, 597 (7th Cir. 2001) (counsel abandoned the defendant's case in violation of Sixth Amendment);  Chronic v. US, 466 US at 659 (Sixth Amendment violation stated when counsel fails to subject the prosecutor's case to a meaningful  adversarial testing.);   Young v. Sirmons, 551 F.3d 942 (10th Cir., 2008) (counsel failed  in his obligation to conduct a thorough investigation of the case as required under Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

or an associated history  with a violent crime or drug crime,  and therefore reasonable suspicion was absent that LUNDAHL would be concealing weapons or drugs,  LUNDAHL was repeatedly subject to demeaning, humiliating, embarassing, repulsive and degrading strip searches in violation of her constitutional rights for over 2 ½ years.  79

153.    LUNDAHL was  placed in punitive lockdown status  without justification  for the sole purpose of punishing LUNDAHL for seeking redress for  her grievances against LILLY and government officials and to prevent LUNDAHL from communicating with others.  80

154.    LUNDAHL was  taken  back to  the  federal court on Monday,  October 23, 2006 to complete her detention hearing.   In spite of instructions conveyed to the public defender from LUNDAHL's sister,  the public defender prepared absolutely no defense to the detention matter in violation of LUNDAHL's sixth amendment right to effective assistance of counsel.

155.    Before the hearing started,  the Magistrate instructed LUNDAHL that LUNDAHL could only speak through  the public defender or all other future hearings involving LUNDAHL would take place via one way video-conferencing where LUNDAHL would not have access to a microphone to speak during the hearings.   This statement and the Magistrate's later discovered financial interest in the complaining witnesses would result,  albiet too late, in the Magistrate being removed from LUNDAHL's criminal case.  Nevertheless,  the hearing proceeded with this incompetent judge.  81

_____

79.    "... strip searches involving visual inspection of the genital areas are "demeaning,  dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive,  signifying degradation and submission...."  Id. at 1272. "Strip searches are only authorized when reasonable suspicion exists that arrestee is concealing weapons or contraband on his person." Giles v. Ackerman, 746 F.2d 614, 617 (9th Cir.1984), cert. denied, 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985).

80.    Ortiz v. McBride,  380 F.3d 649 (2nd Cir. 2004) (constitutional violation to retaliate against prisoner through prison's punitive lockdowns without a legitimate penalogical reason to effect punitive measures.  Shows retaliatory animus).

81.    US v. King, 257 F.3d 1013, 1029 n. 5 (9th Cir. 2001)(refusal to provide criminal defendant with an impartial judge is structural error of constitutional dimension and violates defendant's fifth amendment right to a fair trial by an impartial judge);  "A judge who has a

156.   The prosecutor ambushed the proceedings by presenting the most novel  and abusive argument to secure LUNDAHL's pre-trial detention.   Specifically, the prosecutor filed into the criminal record   4  [void]  abusive litigant orders which decreed LUNDAHL an abusive litigant  and argued that LUNDAHL was a danger to the community and society at large because of her alleged abusive litigation activities.   The prosecutor admitted that LUNDAHL had no criminal record and no flight history,   but that the abusive litigant orders by Utah Supreme Court justice Christine Durham,   Utah federal judge Dee Benson,   Idaho federal judge Richard Tallman and 10th Circuit judge Stephanie Seymour,   strongly suggested that LUNDAHL would witness tamper with the government's witnesses and compel the witnesses not to testify against LUNDAHL through threats of suit.   The prosecutor proclaimed that the orders established that LUNDAHL was sufficiently "dangerousness" to not only mandate LUNDAHL's pre-trial detention,   but to mandate LUNDAHL be placed in security lockdown so that LUNDAHL would have no capacity to communicate with anyone but her attorneys and their agents.

157.   Lundahl informed the public defender STEELE  that all 4 orders were prima facially void and that she had briefed the invalidity of the orders to the Idaho federal court in re case no. 05-CV-127 in July of 2006.   LUNDAHL demanded that STEELE argue that the orders were void as a matter of law and seek a continuance to obtain LUNDAHL's briefs attacking the validity of the foregoing abusive litigant orders,  for fling into the court record.   STEELE  did not adversarily  oppose the prosecutor's motion in any manner.  82

158.   In spite of the Magistrate's  warning  to  LUNDAHL  not  to  say  anything, LUNDAHL  intervened and demanded that the court fire the public defender.   Again LUNDAHL

_____

pecuniary interest in an action in violation of the disqualification statute,   violates the constitution and renders the prosecution void."   US v. B.H. Dist. Corp., 375 F.Supp. 136 (1974).

82.   *Collins v. Kegans,* 802 S.W.2d 702, 705 (Tex. Crim. App. 1991)(counsel's failure to attack void orders was ineffective assistance);   Counsel had a duty to attack process in criminal proceedings where the contempt order was not the product of due process and was  therefore void.  *Ex parte Gordon,* 584 S.W.2d 686, 688 (Tex. 1979).   "An order is void if it deprives the applicant of liberty without due process of law."   *Ex parte Swate,* 922 S.W.2d 122, 124 (Tex. 1996).

insisted on representing herself.      The Magistrate entered an oral ruling from the bench denying   LUNDAHL's  motion to terminate STEELE as LUNDAHL's  court appointed attorney and detaining LUNDAHL pending trial.    The Magistrate supported her oral ruling  with attacks upon LUNDAHL's character,   finding LUNDAHL deceitful,   dishonest and fraudulent;   thus bolstering  the  prosecutor's  unopposed attack against LUNDAHL and acting  as a  second prosecutor.  83

159.    At the  close of the hearing,  LUNDAHL asked the Magistrate to produce her financial disclosure report so  that LUNDAHL could verify any conflict with this Magistrate outside the judicial process.    The Magistrate got up and exited the door located  behind her bench without responding to LUNDAHL.   84

160.    LUNDAHL  then entered into a discussion with her attorney about appealing the court's order.      STEELE indicated that he needed to obtain the videotape of the hearing and turn the videotape over to a court reporter to be transcribed,   before an appeal could be arranged.   LUNDAHL specifically asked STEELE what court reporter would be transcribing the videotape - to which STEELE responded that "he did not know".   THERE WAS NO COURT REPORTER  IN  ATTENDANCE  AT  THIS  HEARING.

161.    LUNDAHL was returned back to the jail.  Immediately thereafter,  LUNDAHL contacted her sister Marti and procured MARTI to obtain a copy of LUNDAHL's challenges to the void abusive litigant orders- which were recorded over PACER with the Idaho federal court.

_____

83.    U.S. v. Filani, 74 F.3d 378, 387 (2nd Cir. 1996)(Due process violation when judge acts as advocate for the prosecution.);   US v. King, 257 F.3d 1013, 1029 n/ 5 (9th Cir. 2001) (refusal to provide criminal defendant with an impartial judge is structural error of constitutional dimension and violates defendant's fifth amendment right to a fair trial by an impartial judge);   Accord In re US, 158 F.3d 26, 30-31 (1st Cir. 1998).  Oses v. Mass. 961 F.2d 985, 986-87 (1st Cir. 1992)(defendants right to due process was violated when the judge commented sarcastically about the defendant's case and failed to curb misconduct of the prosecutor.).

84.    LUNDAHL would later learn by her own accord and without the aid of counsel that the judge owned upwards of $250,000 stock interests in the complaining witnesses' companies.  This would result in the Magistrate's recusal from the remainder of the criminal proceedings in 2007.

Marti successfully obtained several copies of this record and served one copy upon STEELE. LUNDAHL then telephonically contacted STEELE from jail and informed STEELE that if he did not file LUNDAHL's attack briefs into the criminal record and move to declare the orders void, LUNDAHL's sister would file these documents into the record and LUNDAHL would file a complaint with the DOJ.

162. STEELE did file LUNDAHL's attacks into the record and the prosecutor filed an objection. However before the appeal reached the district court, LUNDAHL's attack briefs were GRAFTED from the record without authorization - in order to prejudice their consideration on appeal. When LUNDAHL complained to STEELE, STEELE refused to raise issue with the record tampering, so LUNDAHL did. 85

163. Next, LUNDAHL received a copy of the 10/23/2006 hearing transcript while in jail. LUNDAHL immediately noted that the transcript had been corrupted, altered and even fabricated in several material places. LUNDAHL immediately challenged the competency of the transcript and demanded a copy of the 10/23/2006 hearing videotape to corroborate LUNDAHL's challenges to the fraudulently altered transcript. LUNDAHL was never provided with the videotape because many months later the prosecutor would admit that the "security" videotape had been inadvertently destroyed after LUNDAHL had demanded a copy of this videotape. (LUNDAHL will accordingly seek a presumption instruction on this record.)

164. Part of the material and blatant transcript tampering occurred on the certification page and the last two pages of the hearing transcript. Specifically, the court's official court reporter perjuriously certified on the transcript that she was physically present at the hearing on October 23, 2006, that she took shorthand notes at the hearing and that the transcript she was producing was a verbatim record of the proceedings on October 23, 2006. In fact, no court reporter was present at the hearing on October 23 2006; the record was transcribed from the hearing videotape and later was preserved to a materially altered CD intentionally voiding any visual component - to hinder LUNDAHL's obstruction challenges.

_____

85. Record tampering is a serious offense proscribed under 18 USC section 1512 and calls for a maximum 20 year prison sentence.

On the last two pages of the transcript,  the reporter  perjuriously asserted that LUNDAHL became violent,  yelled multiple profanities at the judge,  and threatened the safety of the judge and everyone else in the hearing room such that LUNDAHL had to be taken down by US Marshals.   The Magistrate would later fabricate a written order supporting the altered transcript.

Numerous  witnesses  including  plaintiff,    later wrote statements to the court, the FMC in Carswell, Texas and to the US DOJ, PIN section,  attesting that LUNDAHL never yelled  profanities  at  the  judge  or  anyone  else  in  the  courtroom,   that  LUNDAHL  never threatened anyone and that no US marshal forceably seized or took LUNDAHL down in the hearing room on October 23, 2006.    Furthermore,  these affiants attested that the judge immediately left the hearing room upon LUNDAHL asking the judge for a copy of her financial disclosure report,  and that LUNDAHL,  LUNDAHL's attorney,  two marshals, and 5 courtroom observers  stayed  in  the  hearing  room  another  15  minutes  during  LUNDAHL's  public conversation with her attorney about her appeal.   After the conversation (which was heard by everyone),    LUNDAHL  was  peaceably  escorted  to  the  court's  cell  block  in  the  federal courthouse.   Interestingly,   the prosecutor was present in the courtroom during this time.

165.    Again  LUNDAHL  demanded  that  STEELE  challenge  the  tampering  of the official  court reporter's transcript.   STEELE  ...AGAIN....did  nothing.

166.    A private attorney appeared at the jail in late October 2005 and claimed he had heard of LUNDAHL's case from Fox news who was interested in reporting LUNDAHL's 18 year plight with ELI LILLY.    This attorney asked if he could represent LUNDAHL for an $18,000 fee and promised that he would expose LUNDAHL's controversy with LILLY  to FOX news. LUNDAHL's family retained this attorney by the name of Bruce Oliver.    LUNDAHL's case would never be exposed to FOX news.

167.    After  OLIVER was retained,   LUNDAHL repeatedly demanded that  both STEELE and OLIVER present  LUNDAHL's jurisdictional defenses of:  Double Jeopardy,  Ex Post Facto,   Failed Corpus Delicti and Vindictive prosecution to the court to obtain a summary dismissal of her criminal case.    These attorneys refused to do so until after LUNDAHL's

detention order was resolved;  in violation of LUNDAHL's sixth amendment rights. 86

168.    On December 8, 2006, the trial court appointed to LUNDAHL's case, Judge Wiliam Downes,   opened LUNDAHL's appeal hearing by instructing LUNDAHL that if "LUNDAHL opened her mouth once in his courtroom,   LUNDAHL  would be signing her own death warrant".    LUNDAHL maintains that this comment showed personal bias against LUNDAHL and should have resulted in disqualification of this judge.   LUNDAHL's counsel refused to move for disqualification.

169.    At the 12/8/06 hearing,  the Judge allowed OLIVER to  appear as co-counsel with lead counsel to be STEELE.    The prosecutor against moved the court for detention based on the abusive litigant orders.    LUNDAHL repeatedly demanded her attorneys raise issue with the fact that someone had "GRAFTED" her attacks from the court record,  that this tampering act should permit  LUNDAHL to submit another copy of her attacks found at ADD. "31-33"  to the court,   and further,   allow the court to hear LUNDAHL's challenges to the abusive litigant orders  de novo.    Both  OLIVER and STEELE refused to provide any adversarial contest to the prosecutor's detention motion based upon the abusive litigant orders;  thereby acting as second prosecutors.   Furthermore,  LUNDAHL's attorneys subsequently  bolstered the prosecutor's motion to have LUNDAHL mentally examined as suffering from a mental disease;  a condition LUNDAHL vigorously disputed. 87    As a consequence,  the court adopted the detention order of the magistrate and ordered LUNDAHL

_____

86.   Kimmelman v. Morrison, 477 US 365, 385 (1986)( counsel's failure to conduct pretrial discovery and file dispositive  motions in defendant's favor was ineffective assistance); Roe v. Flores-Ortega, 528 US 470, 483-84 (2000) (ineffective assistance when counsel fails to consult with defendant); Zeigler v. Crosby, 345 F.3d 1300, 1308 (11th Cir. 2003)(counsel's failure to move for dismissal of indictment based on false testimony given before the grand jury is ineffective assistance);   US v. Hansel, 70 F.3d 618 (2nd Cir. 1995)(counsel's failure to inform the court that charges were time barred was ineffective assistance or counsel and a due process violation).

87.   **Weeks v. Jones,  26 F.3d 1030 (C.A.11  (Ala.), 1994)** ( An insanity defense assumes a criminal defendant was guilty,   but was not responsible for his actions.);   Cargle v. Mullin, 317 F.3d 1196, 1211 (10th Cir. 2003) (counsel's impeachment of own client warranted presumption of prejudice);

mentally examined.

170.    LUNDAHL demanded that both OLIVER and STEELE appeal the judge's detention and examination order.   STEELE deferred the matter to OLIVER and OLIVER went on vacation to mexico.   Neither attorney filed a timely appeal,  again denying LUNDAHL effective assistance of counsel.   LUNDAHL fired OLIVER and demanded her money back  on December 28, 2006.   OLIVER never returned LUNDAHL's retainer.   LUNDAHL complained to the court and the court refused to sanction OLIVER for keeping LUNDAHL's money  so that LUNDAHL could  retain another private attorney.  88

171.    All  conspiring parties,  next decided to use the prison system to torture LUNDAHL  into submission.    LUNDAHL suffers from permanent disabilities from the 1995 assault above referenced.    Some of these disabilities include:   (a) malignant severe hypertension,  (b)  atrial fibrillation;  (c)  severe acid regurgitation from a formerly perforated stomach;  (d) osteoarthritis of the spine and  (e)  moderate to severe blindness.   LUNDAHL's disabilities make her particularly vulnerable when exposed to certain diseases.   The BOP defendants  knew that LUNDAHL was susceptible  to certain  jailhouse diseases and in November of 2006,  jail officials deliberately placed an inmate in LUNDAHL's cell who was severely infected with MRSA.    LUNDAHL caught MRSA from this inmate.   The inmate was transferred to the hospital and quarantined,  while LUNDAHL was left untreated in the cell. LUNDAHL repeatedly pled with BOP officials to transfer her to the hospital to be treated.  Jail officials deliberately ignored  LUNDAHL's pleas  irrespective that LUNDAHL's left hand and arm was visibly infected, had red streaks ascending up the arm,  was swollen and puss infested with  blue spots.    LUNDAHL also  called the Public defender to complain that she was not getting treated for sepsis and blood poisoning from the MRSA.    Again STEELE did nothing. LUNDAHL had some other "private" legal assistants  visit her at the jail.   LUNDAHL  showed these persons her infection  and asked them to intervene.   These persons contacted the Utah

_____

88.   Gadda v. Ashcroft, 377 F.3d 934 (9th Cir. 2004)( federal courts have complete disciplinary control over attorneys appearing before their bar and may sanction attorneys for misconduct before their bar and initiate disciplinary proceedings.)

Attorney General and filed a criminal complaint against the jail for criminal medical neglect. The next day, LUNDAHL was transferred to a surgical unit where emergency surgery was immediately performed on LUNDAHL's left extremity. Another 12 hours, LUNDAHL would have been dead from systemic sepsis and blood poisoning. 89

172.   As a result of the criminal complaint filed with the AG's office, BOP officials in collaboration with Aramark, vindictively assaulted LUNDAHL 3 weeks after LUNDAHL's surgery; resulting in a broken dental plate and 8 fractured teeth either fully or partially fractured to LUNDAHL's jawbone.

173.   A complaint was filed with the court and the court issued an order directing the FMC in Carswell Texas to repair LUNDAHL's dental plate and teeth.

174.   LUNDAHL was transferred to the FMC in Carswell Texas for both a mental and physical examination. LUNDAHL later learned that the prosecutor obtained an order ex parte from the court to have LUNDAHL physically examined for the injuries LUNDAHL allegedly sustained from the 1995 assaults by IRS officers and HCA mental hospital employees; thus establishing one of the purposes for procuring the criminal prosecution, to wit: to falsify medical and mental health records against LUNDAHL and thereby obstruct LUNDAHL's civil actions. 90

175.   LUNDAHL was at the FMC in Carswell Texas for 4 months and underwent numerous physical and mental examinations. The FMC confirmed the existence of numerous trauma injuries to LUNDAHL as sustained from the 1995 assault. A Dr. Baldwin confirmed that LUNDAHL had: malignant hypertension; osteoarthritis of the spine and back in conjunction with significant back, hip and leg scarring secondary to major spinal surgery; severe and chronic acid regurgitation secondary to a perforated stomach which was surgically repaired; Atrial Fibrillation; Bilatteral mastectomy from remitted Breast Cancer; excisional pubic scarring from cancerous skin lesions; was unable to have periods from signicant

_____

89.   See Shannon, 892 S.W.2d at 765 (officials held liable where they employed physical or psychological coercion against the defendant tantamounting to torture).

90.   In re Grand jury proceedings, 651 F.2d 850 (6th Cir. 1988) (illegal use of the grand jury to obstruct civil proceedings.)

scarring to the abdominal wall secondary trauma, and;  legally blind.  (See ADD. "37" for medical report).

176.    A  full  mental  and  psychological  evaluation revealed that LUNDAHL was competent to waive counsel, represent herself and to stand trial.  The psychological examiner further indicated that LUNDAHL's MMPI test results were very favorable to a remarkably stable and controlled person, but  in light of the prosecutors claims that LUNDAHL was paranoid and delusional,  the examiner remarked that LUNDAHL might have taken the examination defensively to put herself in a positive light.

177.    The FMC never fixed LUNDAHL's dental plate and teeth in spite of LUNDAHL's numerous complaints to due so;  thus allowing LUNDAHL to suffer ongoing pain.

178.    Unlike  the  Utah  jails,  the  FMC  had  a fully equipped criminal law library opened reasonable hours for inmates.  The law library also provided free typewriters and paper for  the inmates,  but the inmates would have to provide their own typewriter ribbon. LUNDAHL spent a a considerable amount of time in the law library when she was not undergoing examination or testing.   LUNDAHL prepared the following  habeas  corpus writs requiring dismissal of the criminal charges and LUNDAHL's immediate release.

# Habeas Corpus Petitions

## I.  As To Count 1 Micheal Johnson Proffered The Following  False And Perjured Testimony:

**(1)**    LUNDAHL committed perjury on  12/11/ 2003  at a  hearing  conducted in the bankruptcy court,    when LUNDAHL    testified that ELI LILLY was not a valid creditor to LUNDAHL based on the October 7, 1998 default judgment.

### LUNDAHL's Habeas Corpus challenge to count 1 of the 10/4/2006 Indictment:

#### A.    The Controversy in Count 1 Was Mooted Long Before the 12/11/2003

#### Hearing ;  Therefore LILLY  Failed To State A Criminal Offense Against LUNDAHL

**Uncontroverted Facts**:   (i) JOHNSON knew that LUNDAHL had been disputing the validity of the 1998 default judgment in various courts since 1998;   (ii) Johnson represented LILLY in 3 non-bankruptcy lawsuits where LUNDAHL had challenged

the validity of the 1998 default judgment and   LUNDAHL's challenges were continually obstructed by LILLY's false  personal jurisdiction arguments;   AND (iii) JOHNSON knew that in June of 2003,    well after LILLY had made an appearance in LUNDAHL's bankruptcy action,   Bankruptcy judge Judith Boulden had determined that LILLY's default judgment was void and unenforceable and disallowed this claim for distribution in LUNDAHL's amended chapter 13 plan.

**Conclusions of Law:**   By the time the 12/11/2003 hearing came around and LUNDAHL testified that LILLY was not a creditor to LUNDAHL,    LUNDAHL's testimony had already been adjudicated to be legally and factually true by Bankruptcy Judge Judith Boulden.  Judge Boulden's decisions became law of the case when LILLY failed to appeal.  See  US v. Phipps, 368 F.3d 505 (5th Cir. 2004) (Law of the case doctrine precludes a co-ordinate court from re-examining a judgment).   To prosecute a crime for perjury,  the prosecutor must prove that the testimony proffered by the defendant was in fact willfully false.   See US  v. Strand, 617 F.2d 571 (10 Cir. Utah 1980) (citing to United States v. Haynes, 573 F.2d 236 (5th Cir. 1978), cert. denied, 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978) (prosecutor must prove that the defendant willfully and falsely testified about substantive matter subject of the perjury charge).   Here,  neither  LILLY as the prosecutor in the December 11, 2003 criminal contempt trial in the bankruptcy court,  nor the 2006 prosecutor for the underlying 10/4/2006 indictment,   could prove all of the  elements of a perjury crime about LILLY's creditor status against LUNDAHL at the time  the charges were before the respective tribunals.   The prosecutors in both proceedings therefore failed to state a criminal offense against LUNDAHL as to count 1 of the 10/4/2006 indictment.

> **B.**    **The Utah US District Court  IN Re USDC-Utah Case NO. 2:04 -CV- 088**
>
> **Stripped The 1998 Default Judgment Of It's Corpus Delicti Effect on**
>
> **September 1,  2004**

**Uncontroverted Facts:**  (i)  all of LUNDAHL's California lawsuits  against LILLY et al. were removed to the bankruptcy court in 2003 as adversary proceeding no. 03-2402;    (ii)  LUNDAHL moved to withdraw the removed lawsuits to the district court pursuant to 28 USC sections 157(b)5, (d) and (e) as raising contingent federal civil rights, FTCA,   RICO and Diversity claims bearing a jury demand;     (iii) Lundahl's removal petition  (ADD. "34") expressly prohibited the bankruptcy court from issuing final rulings in LUNDAHL's removed cases;   (iv) the bankruptcy judge had a duty under Utah District Court local rule 83-7, to sua sponte remove the adversary proceeding to the district court as stating a personal injury tort case bearing a jury demand;     (v)  just prior to removal to the bankruptcy court in 2003,  the 9th circuit had decisioned that no final judgment had been entered in the california federal case thus establishing that the case was still contingent and

that the 10/7/1998 default judgment was an interlocutory order  (See ADD. "22");
(vi)  after the case was withdrawn to Utah District Court Judge Paul Cassell's court,
this judge dismissed the entire action without prejudice for lack of residual subject
matter jurisdiction subsequent to the bankruptcy court dismissing LUNDAHL's
main bankruptcy case. (See relevant part of order as ADD. "35");   (vii) LUNDAHL
challenged the dismissal order in a rule 59 motion as prejudicial.   In October
2004, the district court judge denied LUNDAHL's rule 59 motion asserting
harmless error because LUNDAHL could refile the action  under the Utah Savings
statute; and   (viii)   LUNDAHL appealed the dismissal to the 10th Circuit who
affirmed the dismissal judgment entered by Judge Paul Cassell on November 17,
2005.

**Conclusions of Law:**   LUNDAHL adopts her footnote 54 supra @ pages 69-71
discussing the principal of corpus delicti as if fully set forth herein and asserts that
on October 4, 2006, when LILLY's attorney testified before the grand jury,   LILLY's
attorney knew that the  corpus delicti as to count 1  (perjury as to LILLY's creditor
status),  could not be established as a matter of law  because LILLY as the alleged
victim of LUNDAHL's perjury,   on October 4, 2006 could not prove either a
present or future injury derived from LUNDAHL's testimony that LILLY was not a
creditor to LUNDAHL -   given the US District Court judge mooted the controversy
concerning the  1998 default judgment on September 1, 2004 thereby stripping
the judgment of any injurious effect upon LILLY or LUNDAHL.  (LUNDAHL could
have petitioned the US attorney to commence criminal proceedings against LILLY
for criminal obstruction of justice for engaging in ex party communications with a
federal judge.  See one such official proceeding brought against a judge by FBI
officials for engaging in ex parte contacts to obstruct justice as ADD. "36".)


C.     **The Bankruptcy Court's Determination Disallowing LILLY's  1998  Default**

       **Judgment As  Void And Unenforceable And Confirming Lundahl's**

       **Amended Chapter 13 Plan Barred The Prosecution Of Count 1**

       **Of the 10/4/2006 Indictment Under the Doctrine Of Collateral Estoppel**

**Uncontroverted Facts:**  (i)   LUNDAHL noticed LILLY that she had filed chapter 13
bankruptcy  in USDC-Utah case no. 2:01-CV-751 and that she would not be
reporting LILLY as a creditor  as she construed LILLY's default judgment as void an
unenforceable;   (ii)  On May 5, 2003,   LILLY made a general appearance in
LUNDAHL's chapter 13 case.   See ADD. "28" ; (iii)   LILLY never filed a proof of
claim against LUNDAHL because LILLY knew the default judgment was void as a
matter of law;      (iv)    the responsibility to schedule disputed  creditor claims
belongs to the creditor;   (v)  LILLY  claimed to be a creditor of LUNDAHL's in her
general appearance  notice filed on May 5, 2003;    thus giving notice to the
bankruptcy judge; (vi) another creditors meeting was held on May of 2003 after

LILLY filed notice that she was a creditor;   (vi)  Subsequent to the creditor's meeting the bankruptcy judge conducted a confirmation hearing as required under §§ 1324 and 1325;  (vii)  At the  confirmation hearing conducted on  June 11, 2003, the bankruptcy  judge specifically asked about LILLY's alleged creditor status.   LUNDAHL showed the court how LILLY's default judgment was void.  (viii) Bankruptcy Judge Judith Boulden subsequently ruled that LILLY's default judgment was void and unenforceable and disallowed the claim in LUNDAHL's  confirmed Amended Chapter 13 plan, And;  (ix)  LILLY did not appeal  the  confirmed plan.

**Conclusions of law:**    When LILLY failed to appeal the confirmed plan,  LILLY lost all opportunity to collaterally challenge the final decision of Bankruptcy Judge Judith Boulden ruling that LILLY's default judgment was void as a matter of law. ***Republic Supply Co. v. Shoaf,*** 815 F.2d 1046 (5th Cir.1987) (The contents of a plan of reorganization may not be challenged absent an appeal. *Laing v. Johnson (In re Laing),* 31 F.3d 1050 (10th Cir.1994) . *Howe v. Vaughn (In re Howe),* 913 F.2d 1138 (5th Cir.1990).    The court's confirmation ruling is collateral estoppel and res judicata to any subsequent action brought upon the judgment.   See **In re Cano, Case No. 02-70359 (Bankr. S.D. Tex. 8/10/2009) (Bankr. S.D. Tex., 2009) (**Section 1327(a) provides: The provisions of a confirmed plan bind the debtor and each creditor and whether or not the claim of such creditor is provided for by the plan, whether or not such creditor has objected to,  has accepted, or has rejected the plan.  A confirmed plan  constitutes a judgment by which all creditors and parties in interest are bound by the doctrines of collateral estoppel and res judicata.  In re Stratford of Tex., Inc., 635 F.2d 365, 368 (5th Cir. 1981)

Based on the forgoing,  **County 1 of the 10/4/2006 Indictment could not be prosecuted as a matter of law based on the defenses of:  (1)  failure to state a criminal defense;   (2)  absence of  corpus delicti;  and (3)  collateral estoppel which decided the matter in LUNDAHL's favor.**

## II.  As To Count 2 Micheal Johnson Proffered The Following  False And Perjured Testimony:

**(2)**   JOHNSON perjuriously testified that LUNDAHL did not amend her schedules to include 10 lawsuits in her bankruptcy estate until after LILLY filed for contempt proceedings in September of 2003 asserting a  fraud upon the bankruptcy court by Holli Lundahl for concealing assets from LILLY.

### LUNDAHL's Habeas Corpus challenge to count 2  of the 10/4/2006 Indictment:

### A.  Count 2 Was Barred From Prosecution Under The Collateral Estoppel  Doctrine

**Uncontroverted Facts:**    (i)  The Bankruptcy record shows that LUNDAHL  filed

amended schedules on April 10, 2003 listing the 10 lawsuits that LILLY claimed LUNDAHL did not file until after September 2003 when LILLY filed a contempt action against LUNDAHL for fraud upon the court    (See ADD. "27" for the recorded amendment showing a filing date of April 10, 2003.);  (ii)  LILLY and the new bankruptcy judge Thurman were informed during the 12/11/2003 contempt hearing that LUNDAHL had filed an amended report listing the 10 lawsuits in April of 2003 as soon as LUNDAHL was advised of the filing error by the chapter 13 trustee;  (iii)  The amended filing showing LUNDAHL's "lawsuit assets" was made before LUNDAHL's 2nd creditors meeting and well before the confirmation hearing was conducted on June 11, 2003;    (iv)  Bankruptcy Judge Judith Boulden found at LUNDAHL's confirmation hearing that LUNDAHL never attempted to defraud creditor's by omission of her lawsuits in her original schedules,   and that LUNDAHL's omission was error;  And  (v) Bankruptcy Judge Judith Boulden also found  that LUNDAHL's Amended Chapter 13 plan was filed in good faith in that it planned to pay all of LUNDAHL's allowed creditors their full debts with 6% interest.

**Conclusions of law:**    The Texas Courts hold that a debtor's failure to list lawsuits in their financial schedules is "inadvertent " and not done with fraudulent if the debtor has no motive to conceal the  lawsuits.    See   ***Coastal Plains,* 179 F.3d 197,   210(5th Cir. (Tex) 1999)**("[T]he debtor's failure to satisfy its statutory disclosure duty in reporting pre-petition lawsuits is `inadvertent' when ...the debtor has no motive for their concealment.")   See also Johnson Serv. Co. v. Transamerica Ins. Co., 485 F.2d 164, 175 (5th Cir.1973) ("the rule looks toward cold manipulation and not an unthinking or confused blunder" when reporting assets in a bankruptcy case.).    Moreover,  the duty of disclosure in a bankruptcy proceeding is a continuing one, and a debtor who amends his schedules upon notice of an error,   acts in good faith to comply with the bankruptcy rules.  Youngblood Group v. Lufkin Fed. Sav. & Loan Ass'n, 932 F.Supp. 859, 867 (E.D.Tex.1996). "   Finally,  see ***Republic Supply Co. v. Shoaf,*  815 F.2d 1046 (5th Cir.1987)** (Collateral estoppel applies to rulings made by bankruptcy judges during the coarse of a bankruptcy proceedings, and if  not appealed and reversed,  are subject to res judicata and collateral estoppel effect.)

### B.  Count  2  Was  Barred Based On Failure to State A Criminal Offense

**Uncontroverted Facts:**  (I)    The record shows that the testimony of  LILLY's attorney Micheal Johnson was blatently false as to the time LUNDAHL filed her amended schedules which reported the pending 10 lawsuits;  (ii) JOHNSON was advised of LUNDAHL's defense to this charge as inadvertent error  during the Contempt hearing LILLY procured on December 11, 2003;  (iii) LILLY proffered no evidence at the 12/11/2003 criminal contempt hearing  that  LUNDAHL's failure to report the 10 lawsuits was not the product of error and inadvertence,  And; (iv)  LILLY had no standing to raise this error before the bankruptcy court in

September of 2003 because LILLY was finally adjudicated not to be a creditor to LUNDAHL 3 months earlier.

**Conclusions of law:**     The perjury statute requires that LUNDAHL's actions in concealing assets be willful and malicious and not the product of inadvertence or error.     See   US v. Warren,   361 F.3d 1055 (8th Cir. 2004)(To sustain a perjury conviction,  the prosecutor must prove that the defendants actions were not the product of error or inadvertence but rather were willful and taken with fraudulent intent).   Because the Bankruptcy Judge had already decided that Lundahl's failure to report the 10 lawsuits in the original filing of LUNDAHL's schedules was the product of error and inadvertence and not an effort to hide assets from LUNDAHL's allowed creditors,   the bankruptcy courts decision became law of the case as to this issue and the prosecutor three years later in the 10/4/2006 grand jury proceedings could not prove the required element of fraudulent intent to hide assets as a matter of law.   Therefore, the prosecutor knowingly presented a criminal charge to the 10/4/2006 grand jury which the prosecutor knew failed to state a criminal offense against LUNDAHL.   Moreover, the prosecutor had in his possession at the time of the 10/4/2006 grand jury proceeding,   the amended schedule LUNDAHL had filed on April 10, 2006 reporting these 10 lawsuits.   So the prosecutor had personal knowledge that Micheal Johnson's testimony to the 10/4/2006 grand jury that LUNDAHL had not reported these 10 lawsuits  until after LILLY had filed criminal contempt charges against LUNDAHL in September of 2003,   was perjured.     The prosecutor therefore knowingly suborned perjured testimony.

Based on the foregoing,   **Count 2  could not be re-prosecuted as a matter of law based on the defenses of collateral estoppel and failure to state a criminal offense.**

## III. As To Count 3 Micheal Johnson Proffered The Following  False And Perjured Testimony:

**(3)**     LILLY's Attorney Micheal Johnson perjuriously testified before the October 4, 2006 Grand Jury that  LUNDAHL had forged the filing stamp on the March 28, 2003 Motion To Dismiss filed in Utah Supreme Court Case no. 20030062 and which declared that action moot and also notified the Utah Supreme Court that LUNDAHL  was in chapter 13 bankruptcy.

**(4)**     LILLY's attorney also perjuriously testified during the 10/4/2006 grand jury proceeding that  (a)  he examined the Utah Supreme Court file in August of 2003,  (b)  that LUNDAHL's motion to dismiss was nowhere in the file,   (c) that LUNDAHL presented a conformed original  stamped copy of her motion to dismiss to the bankruptcy court on

December 11, 2003 during the contempt hearing to verify that she had filed the document, (d)  that the bankrupcty court took custody of  LUNDAHL's original stamped copy and turned the original over to LILLY's attorney for investigation into a forgery charge,   (e)  that Micheal Johnson took LUNDAHL's original stamped copy of LUNDAHL's motion to dismiss to the Utah Supreme Court,  spoke to the clerk of the court Pat Bartholomew and inquired into how LUNDAHL had obtained an original filing stamp on her motion to dismiss,      (f)  that Pat Bartholomew told JOHNSON that LUNDAHL had come into the Supreme Court,  impliedly jumped the hightop security counter to access the secured area,  stole the electronic metal filing stamp from the secured area,  passed through xray security when exiting the Courthouse with this sizeable electronic metal filing stamp, and stamped her motion to dismiss from LUNDAHL's place of abode.

### LUNDAHL's Habeas Corpus challenge to count  3  of the 10/4/2006 Indictment:

A.   **The Prosecutor Could Not Prove The Corpus Delicti For The  Crime Of Forging A Court Stamp On The March 28, 2003 Motion To Dismiss On The Grounds of  Lack Of Any Injury In Fact To Any Victim - When The Writ  Proceeding Case no. 20030062  Had Been Rendered Moot  1 ½ Months Earlier And Therefore Could Not Have Any Impact On Any Matter**

**Uncontroverted Facts:**   (i)  After waiting 8 months for a trial judge to address LUNDAHL's notices to submit for decision numerous dispositive motions filed by LUNDAHL,  Lundahl filed a writ action in the Utah Supreme Court on January 9, 2003 requesting an order directing the trial court to act upon LUNDAHL's notices to submit for decision;   (ii)  On February 13, 2003,  the trial court finally addressed LUNDAHL's Notices to Submit and ruled on LUNDAHL's dispositive motions thereby mooting the writ petition;    (iii)  The trial judge as the respondent in the writ petition subsequently   notified the Utah Supreme Court that the controversy presented by the  Writ petition had been mooted; (iv)   When the Utah Supreme Court failed to dismiss the Writ action,   LUNDAHL filed a motion to dismiss the writ action as moot  on March 28, 2003 and simultaneously noticed  the court that she was in chapter 13 bankruptcy;  thereby stripping the court of jurisdiction over any matter in the collection case and ancillary proceedings;    (v)  After LUNDAHL filed her motion to dismiss with the

Utah Supreme Court,   LUNDAHL removed the trial action and all ancillary proceedings including the writ proceeding to the bankrupcty court;   (vi)  The following month in April of 2003,  the Utah Supreme Court   (a)  ignored LUNDAHL's motion declaring the Utah Supreme Court writ proceeding moot,  (b)  ignored the jurisdictional  defects with the case in light of  applications of the automatic stay of the bankruptcy code and the bankruptcy removal statute; and (c)  proceeded to enter a civil contempt judgment against LUNDAHL,  without notice,  without subject matter jurisdiction,  without personal jurisdiction,  and in violation of due process  (See ADD. "31" for the legal attack on the Utah Supreme Court contempt judgment);   (vii)   In the removed action before the bankruptcy court,   Lundahl filed an injunction  petition to declare void and vacate the civil contempt  judgment entered  against her illegally by chief justice of the  Utah Supreme Court Christine Durham in violation of the automatic stay of the bankruptcy code, in violation of the mootness doctrine and in violation of the bankruptcy removal statute;   (viii)   LUNDAHL's equity petition was never heard by the federal  court because the court dismissed LUNDAHL's  removed action without prejudice for lack of residual subject matter jurisdiction based on the dismissal of LUNDAHL's main bankruptcy case;  (ix)   According to LILLY's attorney JOHNSON,   the Utah Supreme Court clerk Pat Bartholomew  falsely accused LUNDAHL of  felony theft in stealing the Utah Supreme Court stamp on or about March 28, 2003;   (x)   after the grand jury transcript was received,   LUNDAHL's privately retained counsel for I month obtained confirmation from local police authorities that no felony or misdemeanor theft report was ever filed by the Utah Supreme Court regarding a missing filing stamp from March 1, 2003 to the date of LUNDAHL's indictment on October 4, 2006;   thus strongly suggesting that LILLY's attorney colluded with the clerk of the Utah Supreme court to frame LUNDAHL for a crime,  or  that  LILLY's attorney's perjury injured not only injured LUNDAHL but also  Utah Supreme Court clerk to whom JOHNSON attributed his fabricated theft story;   (xi)   witnesses were with LUNDAHL on March 28, 2003 when LUNDAHL filed her motion to dismiss with the Utah Supreme Court and verified under the criminal process that LUNDAHL did file the motion, that LUNDAHL obtained a conformed  original  stamped copy of her motion to dismiss from a Supreme Court clerk (not Pat Bartholomew), that LUNDAHL  did not steal any filing stamp, and that LUNDAHL left with the 2 witnesses from the Utah Supreme Court building  on March 28, 2003 without incident.

**Conclusions of Law:**    In **Salazar v. Texas,  Case NO. 0045-01 (Tex. Crim. App. 2001),** the Texas Criminal court of Appeals affirmed the elements required to prove a crime - properly referred to as corpus deliciti:  "Every crime reveals three component parts, *first*, the existence  of an injury or loss; *secondly*, somebody's criminal intent  (in contrast, e.g., to accident) as the source of the injury or loss; and *thirdly*,  the accused's *identity* as the doer of this crime.    In Texas,  the *corpus delicti* rule requires some corroboration of the first two elements-an injury

or loss and  criminal intent or agency.    Its purpose is to ensure that a person is not convicted of a crime that never occurred and  the act was performed with criminal intent.)    Accord in    **U.S. v. Shunk,  881 F.2d 917, 919  (C.A. 10 (Utah1990);**    Followed in    U.S. v. Chimal, 976 F.2d 608 (C.A.10 (N.M.), 1992. Moreover  in the context of the injury requirement,  the injured person or victim must show that he  presently or in the future will suffer injury as a result of putatively illegal conduct  of the defendant."    **Appollomedia Corp. v. Reno, 19 F Supp.2d @ 1086 (N.D. Cal. 1998).**    The controversy in a charge must presently exist for jurisdiction to attach,  otherwise the charge is moot and incapable of adjudication under article III.    **Ashcroft v. Mattis,  431 US 171, 52 L Ed.2d 219, 97 S Ct 1739 (1977).**   A violation of law is moot and cannot be prosecuted when: interim events have completely and irrevocably eradicated   the effect of the alleged violation and the event is such that the violation cannot continue to recur. **County of Los Angeles v. Davis, 440 US 625, 59 L Ed 2d 642, 99 S Ct 1379 (1978).**

In the case at bar,    the prosecutor at the time the grand jury convened on October 4, 2006,  could not prove any of the elements required to establish the corpus deliciti of the crime charged in count 3 of the indictment;  hence no crime was committed.   Specifically:   (1)   the prosecutor could not establish either a victim or a perpetrator of any crime.   LILLY's Attorneys'  claim that LUNDAHL stole the  Supreme  Court  filing  stamp    was  not  corroborated  by  any  form  of independent evidence;  in fact LILLY's attorney's theft story  was negated from the lack of any independent  evidence to prove any theft occurred on March 28, 2003 by:   (a)  the complete absence of any police report documenting the felony theft of the Supreme Court's filing stamp,  and (b)  the attestations of two witnesses that accompanied LUNDAHL to the Supreme Court on March 28, 2003 and denied any such theft took place, and on the contrary,   affirmed that the motion to dismiss was in fact filed with the Court on March 28, 2003.      With this uncontroverted evidence,     which  was  made  available  to  JOHNSON  at  the 12/11/03 criminal contempt hearing,  the more likely story is that LILLY's attorney JOHNSON appeared before the Utah Supreme Court in August of 2003,  obtained the  court  file,    **grafted the motion to dismiss out of the court's file,** subsequently noticed the Supreme Court clerk that the document was missing from the court's file, and then fraudulently represented to the clerk that the docket had a  filing error in it and should be corrected to remove the docket entry. Nevertheless, the failure of independent corroboration proving that LUNDAHL perpetrated the crime of theft to access the Utah Supreme Court filing stamp,  is and was fatal to establishing the corpus delicti of count 3 of the indictment.

In addition,   the prosecutor could not prove the existence of any present or future injury in fact to any victim.  Neither the filing or the non-filing of the motion to dismiss prejudiced any person,  because by  operation of law  once the Utah Supreme Court case had been mooted on February 13, 2003 by intervening actions of the trial court in disposing LUNDAHL's claims,  the Utah Supreme Court

lost any and all power to do anything but simply dismiss the writ action.    See **County of Los Angeles v. Davis, 440 US 625, 59 L Ed 2d 642, 99 S Ct 1379 (1978)** (A violation of law is moot and cannot be prosecuted when:  interim events have completely and irrevocably eradicated  the effect of the alleged violation and the event is such that the violation cannot continue to recur.)   Because no present or future injury in fact could be shown toward  any alleged victim by the filing or non-filing  of the motion to dismiss, the prosecutor could not establish the first element to the corpus delicti.

Finally,  the prosecutor could not establish the second element of corpus delicti to wit: criminal intent to engage in a crime.     The motion to dismiss simply noticed the court that the writ proceeding had been mooted by the trial courts' February 13, 2003 order disposing of LUNDAHL's claims in the lawsuit.   By operation of law, the Utah Supreme Court was under a duty to dismiss the writ action sua sponte as moot  without LUNDAHL's gratuitous filing made on March 28, 2003.   Because LUNDAHL did not have to make the March 28, 2003 filing,    criminal intent to commit a crime beyond reasonable doubt cannot be established.


   **B.  Count 3 Of The 10/4/2006 Indictment Failed To State A Criminal Offense**

**Uncontroverted Facts:**  LUNDAHL adopts the facts set forth under subsection A of this count supra as if fully set forth herein to support her legal defense of failure to state a crime as to Count 3 of the 10/4/2006 indictment.

**Conclusions of Law:**  A prosecutor has a duty to make sure that a crime can be stated from evidence submitted to a grand jury.     See Attorneys Manual section 9-11.233 .  While a prosecutor has latitude to express reasonable inferences form the evidence, "a prosecutor may not make statements that are unsupported by the record and prejudice the defendant." State v. Jones, 71 Wn. App. 798, 808, 863 P.2d 85 (1993) (citing State v. Rav, 116 Wn.2d 53 1, 550, 806 P.2d 1220 (1991)), review denied, 124 Wn.2d 1018 (1994).    It is improper for the state, which bears the burden of proof, to argue facts that are not in evidence. Belgarde, 1 10 Wn.2d at 506-5 10.   It is patently clear that Lilly's attorney's story about theft of the filing stamp without a police report on record was highly suspect.   The prosecutor had a duty at that point to inform the grand jury that no theft report existed,  that no other corroboratory evidence existed to establish the theft,     and that two witnesses who accompanied LUNDAHL to the Utah Supreme Court attested that no theft took place and that LUNDAHL had indeed made the March 28, 2003 filing. Court 3 simply failed to state a criminal offense because of a lack of any element of corpus delicti.

Based on the foregoing,   **County 3 was barred from prosecution for failure to prove the corpus delicti of a crime and failure to state a criminal offense.**

## IV.   As To Counts  4 and 5,   Micheal Johnson Proffered The Following  False And Perjured Testimony:

**(5)**   LILLY's Attorney Micheal Johnson on October 4, 2006 perjuriously and maliciously testified for the 9th time over a period of 13 years as an agent of ELI LILLY, a complaining witness for ELI LILLY and as an admitted investigator for the government that LUNDAHL forged the 10/1/1993 state criminal dismissal judgment and the 10/17/1994 Settlement Conference Order  - in spite of his personal knowledge that:  (1) LUNDAHL had irrefutable defenses to these forgery charges which defeated the 2006 criminal prosecution as a matter of law under (a) the Double Jeopardy clause vis-a-vis the doctrine of collateral estoppel;  (2) The Ex Post Facto Clause;  and (3) Failed Corpus Deliciti to prove a crime;  and (2)  LILLY  had  contractually agreed to a judgment in LUNDAHL's favor in 1993.

## LUNDAHL's Habeas Corpus challenge to counts  4 and 5  of the 10/4/2006 Indictment:

A.   **Counts  4 and 5 Alleging Forgery of  The 10/1/ 1993 Criminal Dismissal Judgment  And the Resultant 10/17/1994  Mandatory  Settlement Conference Order Were  Barred From  Re-Litigation  Under  The  Double Jeopardy Clause  vis-a-vis it's Corollary Doctrine of  Collateral Estoppel.**

**Uncontroverted  Facts:**   (i)   On 10/1/1993,  Judge Ronald Huemann signed a written statement of decision dismissing LUNDAHL's criminal prosecution on the grounds of: (a) lack of any material witness,  (b) insufficient evidence,  and  (c)  in the interest of justice.   At the same time Judge Huemann  recommended that LUNDAHL  file a complaint with the state attorney general's office regarding the perjury LILLY principals committed to secure the malicious prosecution of LUNDAHL.   (See ADD. "10" for copy of court order);   (ii)   At the 10/1/1993 hearing where the challenged order was issued,  Judge Ronald Huemann arranged to have the proceeding  recorded by the court's official court reporter.   The Court's  10/1/1993 hearing transcript exactly paralleled the dispositions made in Judge Ronald Huemann's     10/1/1993  minute order dismissing the criminal action;     (iii)     Under California law,  transcripts are used to clerify a court's

dispositive rulings ;   (iv)  The 10/1/1993 hearing transcript and the 10/1/1993
dismissal order state exactly the same thing;   (v)  The 10/1/1993 dismissal order
was predicated on a lettered motion to dismiss filed by the prosecutor Micheal
Stock on 7/19/1993.   This letter is found at Add. "8".   The letter states essentially
the same grounds for dismissal of the criminal action as is stated in the 10/1/1993
dismissal order and the 10/1/1993 hearing transcript;   (vi)  On 10/1/1993 Judge
Ronald Huemman also made an official record that someone had destroyed the
complete criminal record in re the People of the State of California v. Holli Lundahl.
Case no. CR44162 and that LUNDAHL should be given all presumptions in her favor
regarding any matter concerning the state criminal prosecution;   (vii) The
10/1/1993 hearing transcript and prosecutor Stock's 7/19/1993 letter have always
been officials records that were preserved from destruction because copies of
these records were contained in files independant of those kept by Riverside
county superior court;   (viii)  A third party by the name of Heatland Trust funded
LUNDAHL's 1991-1993 criminal prosecution.   Heatland Trust recorded a certified
copy of the 10/1/1993 dismissal judgment as an attachment to a consent
judgment between Holli Lundahl and Lorinda Bracken as Heatland Trust's then
trustee,  which  Heatland Trust  liened against LUNDAHL's civil tort suit against
LILLY, et al pending before the Riverside Superior Court state of California as case
no.  219124  on January 21, 1994.    (See ADD. "11" for court docket showing a
status conference ruling for 1/21/94 and imaging  Bracken's consent judgment and
the 10/1/1993 dismissal order. );   (ix)  Riverside County Superior Court of the
state of California has had the 10/1/1993 judgment recorded on their official
website in re case no. 219124,  LUNDAHL v. LILLY, et al., for the last 16 years;   (x)
Until July of 2009,  the court  records for Riverside County have been free to the
public.   In July of 2009,  Riverside County changed their free public records policy
to a paid record policy;   (xi)   Over the past 16 years,  at least 40 people known to
LUNDAHL and hundreds of people unknown to LUNDAHL have pulled down the
10/1/1993 dismissal judgment from Riverside County's official website set forth on
the docket record found at ADD.  "11";   (xii)  any person having personal
knowledge of execution of  the 10/1/1993 dismissal judgment has attested to the
authenticity of the 10/1/1993 dismissal judgment; (xiii) No one from LILLY's camp
was present at the 10/1/1993 hearing where the judge signed the written
statement of decision pursuant to CCP section 632;   (xiv)  LILLY agreed to be
bound by the judgments entered in the criminal case (See ADD. "7"); (xv)  When
LILLY learned of the final criminal judgment,    to avoid enforcement on their
stipulation agreeing to be bound by the final criminal judgment,    LILLY conspired
with officials to destroy the entire criminal file; (xvi) the prosecutor in the criminal
case made a record admitting that LILLY had committed wholesale perjury and
filed false reports to secure LUNDAHL's criminal prosecution; (xvii) LUNDAHL filed
a federal civil rights action against LILLY in January of 1994;   (xviii)   On August 22,
1994,   the trial judge instructed the parties to prepare mandatory settlement

statements in accordance with local rules for the Central District of California to be submitted to the court before a Mandatory Settlement Conference scheduled for October 17, 1994;  (xix)  LUNDAHL prepared the mandatory settlement statement presented at pages 37-43 supra in support of  summary judgments in her favor on her malicious prosecution, fiduciary fraud, bad faith breach of contracts,  RICO claims for mail and wire fraud, abuse of process and false imprisonment claims upon the legal basis that determination of her 1991 criminal prosecution under a lower standard of proof barred relitigation of the same issues in a subsequent civil action.  See *Dowling v. United States,* 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (the determination of a criminal issue decided at a lower standard of proof bars relitigation of that issue in a subsequent civil trial);  (xx)  On October 17, 1994, the federal judge concurred with LUNDAHL's settlement statement  and granted partial summary judgments in LUNDAHL's favor;   (xxi)  To avoid the effects of the 10/1/1993 criminal dismissal judgment and the 10/17/1994 mandatory settlement conference order,  LILLY charged LUNDAHL with forgery of these orders and other abusive litigation tactics  on March 16, 1995 in re USDC-California case no. 94-CV-021 RJT,  LUNDAHL v. LILLY, et al. ;   (xxii)  On June 13, 1995,  the trial court found LUNDAHL not guilty and denied LILLY's petition to criminally decree LUNDAHL an abusive litigant - under the lower standard of proof;   (xxiii)  LILLY prosecuted the 1995 criminal contempt action and therefore was in privity with the 2006 US prosecutor;  and (xxiv)  LILLY did not appeal the final criminal contempt judgment entered June 13, 1995.

**Conclusions of Law:** "It is well established that a ruling terminating a criminal prosecution whether by a judge or jury,  bars a subsequent action under the double jeopardy clause."  **Sanabria v. US, 437 US 54, 57 L Ed 2d 43, 98 S Ct 2170(1998).**  Followed in  Stephens v. State, 806 S.W.2d 812 (Tex. Crim. App., 1990);  **US v. Kraemer,  289 F.2d 909 (10th Cir. 1961)** (Double jeopardy bars subsequent action under its corollary doctrine of collateral estoppel when the same evidence is used to support a conviction in the second trial as was used in the first trial). Vargas v. Quarterman, 589 F.Supp.2d 805 (W.D. Tex., 2008) (In a criminal case,  collateral estoppel bars a subsequent prosecution where  particular facts were necessarily established in a prior proceeding.).  Followed in  U.S. v. Yeager, 446 F.Supp.2d 719 (S.D. Tex., 2006) ("Facts so established in the first trial may not be used in the second trial either as ultimate or as evidentiary facts." *United States v. Mock,* 604 F.2d 341, 343 (5th Cir.1979)).  **In *United States v. Dixon,* 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993),  the Supreme Court held that double jeopardy  barred a defendant from being tried in a subsequent criminal trial  for the same conduct that resulted in the district court earlier instituting criminal contempt proceedings  against the defendant** citing to the analysis implemented in United States v. United States Gypsum Co., 404 F.Supp. 619 (D.D.C.1975)(**where a court order which forms the basis for a criminal contempt prosecution includes a prohibition against committing a substantive offense,**

**successive prosecutions for both criminal contempt  and for the substantive offense violate the double jeopardy clause.)**;  See also  **Ladner v. Smith, 740 F.Supp. 1254, hn 1 (E.D. Tex. 1990)** (violates the double jeopardy clause to relitigate ultimate facts in a second  action  which were  determined adversely to prosecution in first case  following **Harris v. Washington, 404 US 55,  30 L.Ed.2d 212, 92 S.Ct. 183 (1971))**.   US v. Kraemer,  289 F.2d 909 (10th Cir. 1961) (Double jeopardy bars subsequent action under its corollary doctrine of collateral estoppel when the same evidence is used to support a conviction in the second trial as was used in the first trial).

It is undisputed that a prior federal court issued a criminal OSC against LUNDAHL on 3/16/1995 for abusive litigation tactics based on charging allegations by LILLY's attorneys that LUNDAHL forged court process to include the 1993  state criminal dismissal judgment and the 10/17/1994  Settlement Conference Order.   It is undisputed that the federal trial court found LUNDAHL not guilty of abusive litigation tactics as  charged by LILLY  and refused to adjudicate LUNDAHL an abusive litigant on June 13, 1995.    It is undisputed that criminal contempt judgments   are final orders subject to immediate appeal and to collateral estoppel effect if not appealed. *United States v. Dixon,* 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993).   It is undisputed that LILLY's attorneys instead of a US attorney   prosecuted the prior criminal contempt proceedings in 1995,  even though  the duty to prosecute belonged to the US attorneys office.     LILLY's supposition of the role of de facto  US attorney in 1995 meets the same party rule as the prosecutor in the underlying 2006 indictment and criminal prosecution.   Based on the foregoing,  it is established  as a matter of law that :  (a)  identical issues were prosecuted in the 1995 criminal contempt proceedings as charged in courts 4 and 5 of the 10/4/2006 indictment;   (b)   LUNDAHL was found not guilty of the charges;    (c)    both parties had a fair and full opportunity to litigate all issues  of LUNDAHL's alleged abusive litigation tactics which allegedly included forgery of court process up to the date of March 16, 1995;   (d)   the judgment determining this criminal matter became final and conclusive on July 13, 1995 when LILLY did not appeal the final judgment, and;   (e)   LILLY was in privity with the US prosecutor in the 2006 criminal prosecutor because LILLY cloaked herself as the US prosecutor in the 1995 criminal contempt action.   **Under the double jeopardy clause as expounded in** United States v. United States Gypsum Co., 404 F.Supp. 619 (D.D.C.1975)(**where a court order which forms the basis for a criminal contempt prosecution includes a prohibition against committing a substantive offense,   successive prosecutions for both criminal contempt  and for the substantive offense violate the double jeopardy clause),   LILLY was barred from re-litigating the forgery charges alleged in  counts 4 and 5 of the 10/4/2006 indictment as a matter of law.**

**B.**   **Counts 4 And 5 of the 10/4/2006 Indictment Alleging Forgery of the**

**10/1/1993  Criminal Dismissal Judgment  And The 10/17/1994**

**Settlement Conference Order  Were Barred From Prosecution**

**Under Two Grounds of the Ex Post Facto Clause**

**Uncontroverted Facts:**   (i)  On October 1, 1993,  numerous people supporting LUNDAHL's defense to the 1991-1993 criminal prosecution were at the 10/1/1993 hearing convened to commit 1385 grounds for the dismissal of the 1991 criminal action to a written statement of decision;   (ii)  This hearing was recorded by a state of California official court reporter;   (iii)    Heatland Trust who funded LUNDAHL's 1991-1993 criminal action obtained a certified copy of the  10/1/1993 written dismissal  order and attached this order to their consent judgment which Heatland Trust recorded and liened against LUNDAHL's civil tort lawsuit against LILLU in re Riverside County Superior Court case no. 219124, LUNDAHL  v. LILLY, et al.,  on January 21, 1994.   See ADD. "11" for docket record of this recorded consent judgment during a status conference hearing;   (iv)  LILLY in conspiracy with Riverside County officials destroyed the entire criminal file,  consequently Heatland Trust's recording of the 10/1/1993 judgment was the only preserved recording of that judgment in  the Riverside County Superior Court;  (v) over the past 17 years,  hundreds of people have pulled down this recorded judgment from Riverside County's official website;  hence the existence of the 10/1/1993 criminal dismissal judgment from at least the date of 1/21/1994,  is undisputed as a matter of law;   (vi)   On October 17, 1994,  a federal judge executed the 10/17/1994  Settlement Conference Order;   (vii)   Several days later,  the case was transferred to a new judge;   (viii)   After the transfer,    LILLY's attorneys grafted the 10/17/1994 Settlement Conference Order from the court's file and then procured the clerk of the court to alter the court docket to reflect that a single scheduling order had been entered on 10/17/1994.   (ix)    On the basis of this bate and switch by LILLY,     five months later LILLY would attach the 10/17/1994  Settlement Conference order to a March 16, 1995 contempt citation by LILLY,  and charge LUNDAHL for the first time with forging this order and the 10/1/1993 criminal dismissal judgment.    (x)  The existence of the  10/17/1994 order therefore became  public record at the very latest  in March of 1995.  (Eight years later,  after the file was returned from the 9th circuit court in late 2002,  the 10th circuit court would direct the US clerk of the court for  the Central District of California,  Sheri Clark,  to locate the 10/17/1994 Settlement Conference Order in the court's file.   Clerk Sheri Clark would confirm via letter that she located the questioned order among a contempt petition filed by LILLY in March of 1995. );   (xi)  LILLY challenged the 10/1/1993 and 10/17/1994 orders for the third time at the hearing to dismiss LILLY's First Amended Counterclaim conducted  on May 8,

1998 in re USDC-CA case no. 94-CV-021 RJT;   (xii)   LILLY attacked both orders again for the fourth time  on appeal before the 9th circuit court in re case no. 98-56850;  (xiii)   LILLY attacked both orders for the fifth time  during a Utah federal felony indictment proceeding  in re Grand Jury No. C699 who returned  no bill on March 5, 2000;    (xiv)  LILLY attacked both orders again for the sixth time in a subsequent Utah federal felony indictment proceeding in re Grand Jury No. C101 who returned a no bill on September 19, 2001;  (xv) On July 30, 2002, Congress passed 18 USC section 1519;  the charging statute used in Counts 4-5 of the 10/4/2006 indictment.  (Refer back to ADD. "1");     (xvi)  In April of 2003 the US Supreme Court decided a seminole case under the Ex Post Facto Clause via Stogner v. Calif021nai, 539 U.S. 607, 632-33, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003) which held that the Ex Post Facto clause prohibited time barred prosecutions, And;  (xvii)  when the prosecutor,   LILLY's attorney,  Sorenson,  Edwards And Thurman obtained the 2006  criminal prosecution against LUNDAHL,   these defendants and complaining witnesses knew that the prosecution was prohibited under two grounds of the Ex post Facto clause to wit:   (a) the criminal prosecution was time barred by 7 years, and;  (b)  the charged crimes were committed 9 and 10 years before the charging statute was enacted.

**Conclusions of Law:**   See  **U.S. v. Seale, 542 F.3d 1033 (5th. Cir., 2008)**   citing **Stogner v. California,  539 U.S. 607, 632-33,  123 S.Ct. 2446,  156 L.Ed.2d 544 (2003),**  the Supreme Court held that the Ex Post Facto Clause applying to state governments,   U.S. CONST. art. I, § 10, cl. 1,   prohibits application of a statutory amendment that has the effect of reviving a  time barred criminal prosecution. See 539 U.S. 607, 632-33, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003).  In striking down the law, the Supreme Court concluded that "a law enacted after expiration of a previously applicable limitations period violates the Ex Post Facto Clause when it is applied to revive a previously time-barred prosecution." Id. at 632-33, 123 S.Ct. 2446.   Moreover,  Article I, section 10 of the United States Constitution prohibits states from enacting "any ... ex post facto law." "[O]ur best knowledge of the original understanding of the Ex Post Facto Clause [is that] Legislatures [127 Cal.App.4th 1358] may not ...retroactively alter the definition of crimes,  or increase the punishment for crimes after committed, or prosecute acts as crimes before enactment of criminal statutes proscribing the acts as crimes." (Collins v. Youngblood (1990),497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30.)

**The record shows that the defendants knowingly prosecuted LUNDAHL under a charging statute that did not exist until 9 years after the alleged crimes occurred and knowingly prosecuted LUNDAHL for crimes that the defendants knew were time barred under 18 USC section 3282 by 7 years in violation of the EX Post Facto Clause.**

**C.    The Government Could Not Prove The Required Corpus Deliciti In**

**Counts 4 And 5 of the 10/4/2006 Indictment In Order To Prosecute**

**These Charges As Crimes**

**1.    No Proof of corpus delicti in the 1993 dismissal judgment**

**Uncontroverted Facts:**  (i)  At no time in the last 19 years has ELI LILLY or  LILLY's insurers  ever  produced  corroborative  or  independent  evidence  that  the 10/1/1993 criminal dismissal judgment was forged;    (ii)   The forgery charge re the  10/1/1993  criminal  dismissal  judgment  was  prosecuted  in  9  prior proceedings which LILLY procured  against LUNDAHL over the past 17 years and in none of those proceedings did the state judge Ronald Huemann deny that he had executed the 10/1/1993 state criminal dismissal judgment;  of coarse any denial would have been suspect because transcripts and other court records confirmed the  entry  of  the  10/1/1993  state  criminal  dismissal  judgment;     (iii)  on  the contrary,   LILLY  waited  almost  15  years,   until  Judge  Ronald  Huemann mysteriously died from a fall at his home in 2005,  before LILLY decided to again prosecute LUNDAHL for forgery of Judge Ronald Huemman's dismissal judgment; and (iv)  the lack of any  corroborative evidence to prove that corpus delicti of the crime of forgery was fatal in the 2006 prosecution and resulted in a not guilty verdict in LUNDAHL's favor in the 1995 criminal contempt prosecution.

**Conclusions of Law:**  A prosecutor has a duty to make sure that a crime can be stated from evidence submitted to a grand jury.    See Attorneys Manual section 9-11.233 .   In **Salazar v. Texas,  Case NO. 0045-01 (Tex. Crim. App. 2001) (**In Texas,   the *corpus delicti* rule requires some corroboration of the first two elements -an injury or loss and  criminal intent or agency.   Its purpose is to ensure that a person is not convicted of a crime that never occurred and  the act was performed with criminal intent.)   As stated supra,  a complete absence of any corroborative evidence to prove that LUNDAHL forged the 10/1/1993 state criminal dismissal judgment was another ground requiring dismissal of count 4 of the indictment.

**2.    The Government Could Not Prove The Corpus Deliciti to Count 5**

**Of  The  10/4/2006  Indictment As Count 5  Had Been Rendered**

**Moot By Federal Judge Paul Cassell's Ruling Dismissing The Entire**

**Action Wherein The 10/17/1994 Settlement Conference Order**

**Was  Created Thereby Stripping This Order Of Its Injurious Effect**

**Uncontroverted  Facts:**      (i)   LUNDAHL adopts  the  facts  set  forth  under subsection "1." supra as if fully set forth herein;    (ii)  On October 17, 1994,  a

federal judge entered an  order summarily  adjudicating some of LUNDAHL's claims in LUNDAHL's favor which LUNDAHL was entitled to as a matter of law; (iii)  LUNDAHL had never collected any damages on the interlocutory judgment at the time another federal judge mooted the October 17, 1994 interlocutory order  on September 1, 2004 by dismissing the action wherein the October 17, 1994 order was entered without prejudice;     (iv)  The judge's dismissal order effectively sent the case back to base 1 to be retried under Utah's savings statute;   (v)  The final dismissal order without prejudice stripped the October 17, 1994 judgment of it's claimed injurious effect to LILLY based on LILLY's claim that the judgment was a forgery and  of its  claimed injurious effect to LUNDAHL based on LUNDAHL's claims that LILLY grafted the order and then procured a clerk to alter  the docket record to reflect an absence of the order;     (vi) dismissing the original federal tort action as a whole was not injurious because the action was subject to refiling  under the Utah Savings statute which would have preserved all of the original claims and provided for recording security under PACER;   (vi)  the dismissal without prejudice order was affirmed by the 10th Circuit court on November 17, 2005;     and  (vii)   The because the final dismissal judgment without prejudice was never reversed;  any  injuries from the dismissed October 17 1994 judgment cannot recur.

**Conclusions of Law:**    In **Salazar v. Texas,  Case NO. 0045-01 (Tex. Crim. App. 2001),**   the Texas Criminal court of Appeals affirmed the elements required to prove a crime - properly referred to as corpus deliciti:  "Every crime reveals three component parts, *first*, the existence  of an injury or loss; *secondly*, somebody's criminal intent  (in contrast, e.g., to accident) as the source of the injury or loss; and *thirdly*,  the accused's *identity* as the doer of this crime.  **U.S. v. Shunk, 881 F.2d 917, 919 (C.A. 10 (Utah1990);**     Followed in U.S. v. Chimal, 976 F.2d 608 (C.A.10 (N.M.), 1992.     Moreover **in the context of the injury requirement,** the injured person or victim must show that he  presently or in the future will suffer  injury  as  a  result  of  putatively illegal conduct   of the defendant." **Appollomedia Corp. v. Reno, 19 F. Supp.2d @ 1086 (N.D. Cal. 1998).**     The controversy in a charge must presently exist for jurisdiction to attach,  otherwise the charge is moot and incapable of adjudication under article III.   **Ashcroft v. Mattis, 431 US 171, 52 L Ed.2d 219, 97 S Ct 1739 (1977).**  Finally,  even though a crime may have been committed at first glance,   the crime can be irrevocably mooted by acts of the accused or another that strip the crime of its criminal character.  For example,  if A is the son of B and takes B's car  without B's consent,  A has just committed the crime of theft,  the injury would be loss of the car without consent.  However, if A returns the car to B,  pays B for its use, and B accepts payment,   acceptance of payment translates to consent and moots the crime of theft because A has not suffered an injury from temporary loss of the car when A has accepted payment for the car's temporary use.     See **County of Los Angeles v. Davis, 440 US 625, 59 L Ed 2d 642, 99 S Ct 1379 (1978)**

(A violation of law is moot and cannot be prosecuted when:   interim events have completely and irrevocably eradicated  the effect of the alleged violation and the event is such that the violation cannot continue to recur.).     Here,  the analogy is no different as explained supra.     The judge's dismissal of the case wherein the interlocutory order was entered,   without prejudice,  conclusively resolved LILLY's charge that the order was a forgery and LUNDAHL's charge that LILLY grafted the order from the file   and then conspired with a clerk to manipulate the court docket to hide entry of the order.     Having no injurious effect on anyone,  the prosecutor lost standing to prosecute the charge because of inability to prove all the elements of corpus delicti.

Based on the foregoing,  **the prosecutor could not prove with any corroborative evidence that any forgery occurred as to count 4 of the indictment and therefore could not show a crime had been committed.     As to count 5,  the prosecutor could not prove the most important element of the corpus delicti of the crime, to wit:  that any present or future injury was presented by the October 17, 1994 Settlement Conference Order,  forged or not,  because the injury impact of the 10/17/1994 order had been irrevocably mooted such that the injury could not recur by District Court Judge Paul Cassell's final  dismissal without prejudice order.**


**V.     As To Counts  6 and 7,   Micheal Johnson Proffered The Following  False And Perjured Testimony:**

**(6 )**    LUNDAHL gave perjured testimony during the criminal contempt trial conducted during her chapter 13 bankruptcy case on 12/11/2003 when LUNDAHL testified that the October 1. 1993 state criminal dismissal judgment and the 10/17/1994 Settlement Conference Order were authentic and not forged documents.   In support of these forgery charges LILLY presented the fabricated hearing transcripts of the criminal contempt hearing created the collusion and conspiracy with the bankruptcy judge William Thurman who later admitted he had no jurisdiction to conduct a criminal trial but instead was performing an investigatory function on behalf of the government.

**LUNDAHL's Habeas Corpus challenge to counts  6 and 7  of the 10/4/2006 Indictment**:

**A.       Counts 6 And 7 of the 10/4/2006 Indictment Alleging Perjury of**

**The 10/1/1993  Criminal Dismissal Judgment  And  Perjury Of The**

**10/17/1994  Settlement Conference Order Were Multiplicious  To**

**Counts 4 And 5  In Violation Of  The Double Jeopardy Clause**

**Uncontroverted Facts:**    (i)   In September of 2003,  LILLY accused LUNDAHL of forging court process and requested that the Bankruptcy Court conduct a criminal contempt trial on LUNDAHL's felony conduct;   (ii)  In November of 2003,  the transferee    bankruptcy judge ordered   LUNDAHL to appear for a criminal contempt trial on LILLY's forgery allegations to be conducted on December 11, 2003;    (iii)    At the  criminal contempt hearing,    LUNDAHL objected  to the Bankruptcy Judge's jurisdiction to conduct a criminal contempt trial.   See I**n re TByrd Enterprises, L.L.C., Case No. 06-30078-H1-11, 4-5 (Bankr. S.D. Tex. 11/30/2007) (Bankr. S.D. Tex., 2007)** ( citing  _U.S. v. Hassell,_ 128 Fed. Appx. 411 (5th Cir. 2005)  and _United States v. Landerman,_ 109 F.3d 1053, 1068 (5th Cir.), bankruptcy courts  do  not  have  the  authority  to  hold  criminal  contempt proceedings);   (iv)  Bankruptcy Judge Thurman told  LUNDAHL that if  LUNDAHL did not  testify,   LUNDAHL would be held in contempt of  court and put in jail;   (v)    LILLY's attorneys acted as the prosecutors during this hearing just like they did during the Criminal contempt trial conducted in the Federal Court in California in 1995;    (vi)   the gravamen of this "trial" was to prove that LUNDAHL forged the  10/1/1993  California  Dismissal  judgment  and  the  October  17,  1994 Settlement Conference order;   (vii)  LUNDAHL was forced to take the stand and testify in her behalf at the threat of contempt sanctions and incarceration;    (viii)  In her testimony,  LUNDAHL testified to the many times that LILLY had attempted to prosecute LUNDAHL for the same forgery crimes respecting these two orders, citing to the most recent attempts before the March 2000 and September 2001 Utah federal grand juries;       (ix)   LUNDAHL testified that all of the prior prosecutions termed in her favor,  including the grand jury prosecutions when the grand juries refused  to  return  an  indictment  against  LUNDAHL finding no reasonable belief that LUNDAHL committed any crime of forgery;  (x)   Before the criminal contempt hearing ended,  LUNDAHL informed the bankruptcy court that she was going to file an administrative complaint with the Criminal Division of the Dept. of Justice,  Public Integrity Section because LUNDAHL felt she was being railroaded into criminal convictions without complying with criminal procedures, including the right to a jury  deciding any felony crimes against LUNDAHL.;    (xi)  At the close of the criminal contempt hearing,   the bankruptcy judge Thurman informed LUNDAHL that he was acting in an investigatory capacity and had no intention  of entering judgments regarding the criminal contempt charges of felony forgery;       (xii)   Thurman then directed a court reporter at these proceedings to prepare transcripts of the proceedings for undisclosed  later  use;   (xiii)   Low and behold,  Thurman acting as a complaining witness three years later,  submitted the evidence he caused to be  created under coercion,  i.e.  the

hearing transcripts,   to the 2006 grand jury for purposes of providing the sole support for the perjury charges in counts 6 and 7 of the 10/4/2006 indictment.

**Conclusions of Law:**   It is well established that all offenses relating to a single criminal episode or directed at a single object are required to be tried in one criminal trial or the non-included offenses will be nullified in a second trial under the double jeopardy clause.  See Brown v. Ohio, 432 US 161 (1978) ("All offenses related in a single episode are required to be tried in one trial").   Multiplicity occurs when different offenses in different counts of an indictment describe the same criminal act or episode.   The following cases have adjudicated instances where multiplicity was present in the indictment and resulted in the striking of different offenses describing the same criminal act.   Lucero v. Kerby 133 F.3d 1299 (10th Cir. 1998)(Offenses are the same for double jeopardy purposes if the acts are directed at a single object).  US v. Podell, 869 F.2d 328, 332 (7th Cir. 1989) (separate convictions for unlawfully removing and tampering with motor vehicles license plate and unlawfully altering  vehicle identification number multiplicious because series of criminal acts were directed at the same object,  the automobile.)  US v. Hebeka,  89 F.3d 279, 284 (6th Cir. 1996) (prosecution for illegally obtained food stamp license and fraud in obtaining the license prosecuted under two separate statutes was a single scheme of food stamp fraud and required to be prosecuted as a single crime.);  US v. Handakas, 286 F.3d 92, 98 (2nd Cir. 2002)(indictment charging two counts of tax evasion under the same statute and involving the same fraudulent tax return scheme was multiplicious);  US v. Corona, 108 F.3d 565, 573-74 (5th Cir. 1997)(indictment charging arson, conspiracy to arson and using fire to arson a single building was multiplicious as criminally directed toward one object and based on the same set of facts.);   US v. Colton, 231 F.3d 890, 909-10 (4th Cir. 2000) (indictment charging separate counts of bank fraud based upon submission of numerous forged checks on one account was multiplicious because single scheme to commit larceny against one account); U.S. v. Jewell, 827 F.2d 586 (C.A.9 (Nev.), 1987) (Jewell, was charged with 13 counts of illegal interest in a single government contract.  The defendant's various actions regarding a contract were part of his participation in that contract, not separate "participations" bringing separate liability.  Matter should be prosecuted as a single charge of an illegal interest in a single contract.)    See United States v. Gorman, 807 F.2d 1299 (6th Cir.1986),   petition for cert. filed, April 2, 1987 (Assistant U.S. Attorney charged with one count of participating extensively in the case in which he had financial interest);   Thomas v. Kerby, 44 F.3d 884, 887-89 (10th Cir. 1995) (multiple check forgeries against same account is a single scheme of larceny and only one offense);    US v. Roy, 408 F.3d 484 (8th Cir. 2005)(multiple offenses arising out of a single transaction or object and requiring proof of same facts are multiplicious);   US v. Brown, 996 F.2d 1049, 1053 (10th Cir. 1993) (multiplicious to charge for theft and possession of stolen goods as two separate

counts).

The 2006 indictment was inherently multiplicious  because a perjury count which uses the same facts to describe a substantive offense set forth in another count, is alleging the same criminal act.   See US v. Richard, 892 F.2d 761, 763 (9th Cir.1989)( In the context of a perjury charge,  where  the issues of fact central to the perjury prosecution would necessarily decide issues of fact in another substantive offense,  the charges are multiplicious and barred by the double jeopardy clause as an  attempt to inflict multiple punishments for one crime.) Counts 6 and 7 therefore,  must be stricken as multiplicious of counts 4 and  5.

> **B.     Counts 6 And 7 Are Barred by the Double Jeopardy Clause As An Attempt To Re-litigate A Substantial Crime Previously Litigated**

**Uncontroverted Facts:**  (i)  In March of 1995,  LUNDAHL was charged with forgery of court process including the 10/1/1993 criminal dismissal judgment and the 10/17/1994 Settlement Conference Order;    (ii)   These forgery charges were advanced as a single offense under 18 USC section 505;    (iii)   LUNDAHL was acquitted of the forgery offenses on June 13, 1995 when the Court refused to decree LUNDAHL an abusive litigant;   (iv)  the facts set forth in counts 6 and 7 of the 2006 indictment describe the facts of the 1995 prosecution for the substantive offense of forgery,  and (v)  prosecuting the 2006 perjury charges will require the same evidentiary proof and argument previously established in LUNDAHL's favor.

**Conclusions of Law:**    Federal courts have long held that when the substance of the perjury prosecution tries the facts underlying a substantive offense previously prosecuted,  the perjury prosecution is barred under the double jeopardy clause. See **United States v. United States Gypsum Co., 404 F.Supp. 619 (D.D.C.1975) (where second prosecution is an attempt to relitigate a prior substantive offense,  the second prosecution is barred under the double jeopardy clause),** US v. Richard, 892 F.2d 761, 763 (9th Cir.1989)( In the context of a perjury indictment relating to testimony given at a former trial on a substantive charge, courts have held that the doctrine of collateral estoppel will bar a perjury prosecution where  the issues of fact central to the perjury prosecution were necessarily determined in the former trial. United States v. Williams, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951); United States v. Haines, 485 F.2d 564 (7th Cir.1973), cert. denied, 417 U.S. 977, 94S.Ct. 3184, 41 L.Ed.2d 1147 (1974); State v. Conway, 661 P.2d 1355 (Okla.Crim.App.1983).  For more see  United States v. Hernandez, 572 F.2d 218, 220 (9th Cir. 1978)(second prosecution for perjury based on the testimony offered at the first trial is barred by the double jeopardy clause); Accord, United States v. Dipp, 581 F.2d 1323, 1325 (9th Cir. 1978), Cert.

denied, --- U.S. ----, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979);   Affirmed in US v. Castillo-Basa, 478 F.3d 1025 (9th Cir. 2007) (when fact finder passes on veracity of defendants testimony in first trial,  facts of testimony may not be retried in second prosecution.)

In this case,  **the perjury counts at 6 and 7 of the 10/4/2006 indictment,  are a clear attempt to re-litigate the identical facts of the forgery prosecution in 1995,** therefore counts 6 and 7 are barred by the double jeopardy clause given LUNDAHL's previous acquittal on the forgery charges.

***********

179.   Lundahl prepared the foregoing writs and submitted them for transfer to a prospective attorney LUNDAHL was looking to hire, ie. Gary Brown in California  (upon return of her retainer from OLIVER)  via the email system available at the FMC.   LUNDAHL's email account was scrutinized more than other inmates accounts because LUNDAHL was doing legal correspondence and the prosecutor had requested that all of LUNDAHL's legal correspondence be monitored.    Two days before LUNDAHL was scheduled to be transferred back to Utah where there was absolutely no law libraries or legal assets whatsoever, LUNDAHL attempted to send the foregoing Habeas Corpus text to Gary Brown via email knowing that her papers and legal work would be confiscated and misplaced once she was picked up by the US marshals.   After LUNDHAL pushed the send button,  the security IT team at the FMC analyzed LUNDAHL's email and rejected sending the habeas corpus text. LUNDAHL complained to defendant  Supervisor ROERDAN and ROERDAN threw LUNDAHL into the hole for complaining.   There was no penalogical reason to throw LUNDAHL into the hole other than to retaliate against LUNDAHL for filing a grievance and intentionally interfere with LUNDAHL's access to an attorney that could help LUNDAHL get her writs before the court.

180.   LUNDAHL's  papers were never received by Attorney Gary Brown and were never forwarded to LUNDAHL at cache county jail in Utah,   where LUNDAHL would spend the

---

91.   Scott v. Chandler, 377 f.3d 565 (6th Cir. 2004)(charge filed against inmate after inmate filed grievance strongly suggests retaliation sufficient to deny qualified immunity.)

1 year in maximum security lockdown.   Moreover,  after receiving the positive competency and medical reports from the FMC,   the Utah court officers in collusion with the complaining witnesses and cache county jail officials,  would scheme to manipulate LUNDAHL's health and treatment records to reflect that LUNDAHL suffered from no physical disabilities;  ultimately resulting in LUNDAHL suffering a stroke in September 2007 with the additional mental stress created by CORPORON's schemed failure to present LUNDAHL's jurisdictional defenses to the court for conclusion of the criminal case,   followed by untreated pnuemonia.   Thereafter jail officials would cause  LUNDAHL to fear the food served on LUNDAHL while in lockdown - after tainting LUNDAHL's food with shigella and  nearly causing LUNDAHL to suffer from another heart attack through severe matabolite imbalance; thus resulting in LUNDAHL's essential starvation by the time LUNDAHL was emergency flighted back to the FMC one year later. Numerous inmates noticed LUNDAHL's blatant mistreatment and reported it to family members as physical and mental torture being punitively exacted against LUNDAHL.  92

     181.   On or about April 24, 2007,  OLIVER filed a motion to dismiss the indictment with the court even though he had been terminated by LUNDAHL 4 months earlier.    The gravamen of the motion to dismiss was prejudicial delay in the indictment in that Judge Ronald Huemann was dead.   OLIVER falsely stated in his unauthorized motion,  that the witnesses testifying before the grand jury,   i.e.  LILLY's attorney Micheal Johnson and FBI officer Sonja Sorenson,  other complaining witnesses  as well as the prosecutor,   initiated the prosecution  in good faith because they were unaware of a fatally defective letter by the 1991 Prosecutor Micheal stock which impeached the entire 2006 prosecution.    Blah, Blah, Blah. While LUNDAHL admitted to the authenticity of Stocks'  7/19/1993 letter,   LUNDAHL denied that the complaining witnesses were unaware of the letter which had been published over

_____

     92.   Private attorneys and parties are amenable to suit under § 1983 and Bivens when it is shown that they were willful participants  in joint action with the Sovereign  or its agents,   *Pete v. Metcalfe,*  8 F.3d at 216, citing  449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980),  and the record shows that "there was corruption of judicial power by the  private litigants."  *McCartney v. First City Bank,* 970 F.2d 45, 47 (5th Cir.1992); and  *Earnest v. Lowentritt,* 690  F.2d 1198, 1200 (5th Cir.1982).   See  Izen v. Catalina, 398 F.3d 363, 367 n. 3 (5th Cir.2005);

numerous official court websites for more than 16 years.     LUNDAHL also denied that the complaining witnesses proceeded in good faith.   LUNDAHL contended that the entire fabric of the 2006 grand jury was tainted with perjury,  corruption,  deception and malice.   LUNDAHL requested that  the court strike OLIVER's motion to dismiss as  violative of LUNDAHL's Sixth Amendment rights  to plea,  to testify in her behalf  and to present a defense.     In closing, LUNDAHL further added  that OLIVER's motion was prima facie proof of a conspiracy between her counsels,  the prosecutor,  and the complaining witnesses;   as the motion to dismiss sought to strip LUNDAHL of  primary causes of action against the defendants for malicious prosecution,  abuse of process and racketeering violations .

182.     On or about April 24, 2007,   the court sua sponte terminated Oliver's representation because OLIVER's law license had been suspended in relation to another unrelated lawsuit.   The Court  also  struck  Oliver's motion to dismiss.

183.     On May 4, 2007,   LUNDAHL appeared before the court for a  Farreta hearing.   The court granted LUNDAHL  the right to pro se representation but with the caveat that LUNDAHL not engage in abusive litigation before the court.     The Court then denied LUNDAHL the right to pre-trial release as mandated under the bail reform act -  so as to constitutionally impede  LUNDAHL's ability to  prepare an adequate defense and render LUNDAHL's right to self representation an empty  pretextual right.   93    The judge  appointed Mary Corporon as LUNDAHL's standby counsel  to  assist  LUNDAHL  in  light of the fact that Utah jails had no law library or other legal assets.   LUNDAHL demanded that all of her future hearings be videotaped in order to prevent further tampering with the court records.

184.     Subsequent to the detention ruling,   LUNDAHL  made yet another demand that the government serve her at the jail   with it's 6,100 page discovery,   all hearing

_____

94.   Tate v. Wood,  963 F.2d 20, 26 (2nd Cir. 1992)(due process violated when pro se defendant was confined in administrative segregation for entire period of criminal proceedings because defendant was prevented from any opportunity to prepare own defense.); Milton v. Morris, 767 F.2d 1443 (9th Cir. 1985)(right to proceed pro se violated when prison authorities denied defendant meaningful access to the telephone, visits,  law library,  research materials, or writing materials to present defense).  Accord in People v. Lamon, F051924 (Cal. App. 2009).

transcripts, the grand jury transcripts and Jenkins and Brady materials so that LUNDAHL could prepare her case. The government refused to serve LUNDAHL with these materials in violation of due process.   94

185.   Immediately after CORPORON appointment as LUNDAHL'S stand by counsel. CORPORON sabatouged LUNDAHL's access to CORPORON by placing a block on her phone regarding any calls, collect or pre-paid,  received from Cache County jail by LUNDAHL. Specifically, LUNDAHL and other inmates on LUNDAHL's behalf, made numerous attempts to call CORPORON in aid of preparing LUNDAHL's case.   With exception of one initial ten minute conversation in May of 2007,   CORPORON  blocked all of LUNDAHL's subsequent phone calls to her office - effectively nullifying any communication between LUNDAHL and CORPORON.   95

187.   LUNDAHL without the aid of specified authorities to file independent habeas corpus petitions in Utah because CORPORON would not produce these authorities to LUNDAHL, because the FMC had obstructed the transmission of LUNDHAL's Habeas Corpus writs to attorney Gary Brown,  and because the US Marshal's office lost LUNDAHL'S legal papers which contained LUNDAHL's legal authorities supporting LUNDAHL's  habeas corpus petitions,  filed mandamus writs with the trial court (without these authorities) and which

_____

94.   See Us v. Grintjes,  237 F.3d 876,881 (7th Cir. 2001)(witholding of defendant's discovery documents during trial constitutes automatic prejudice and violates defendants' sixth amendment right to put on a defense);   US v. Alvarez, 358 F.3d 1194, 1209 (9th Cir. 2004) (Brady violation because judge failed to conduct inquiry into defendant's demand that certain inculpitory evidence against the government be produced that would contain relevant impeachment material);   US v. Payne, 63 F.3d 1200, 1209-11 (2nd Cir. 1995)(government had duty to disclose transcripts notwithstanding availability in court file) Banks v. Reynolds, 54 F.3d 1508, 1515-16 (10th Cir. 1995) (failure to provide exculpitory material to the court was ineffective assistance).

95.   See _Holloway v. Arkansas_, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (conflict of interest in representation throughout entire proceeding); _Chapman, supra,_ 386 U.S., at 23, n. 8, 87 S.Ct, at 828, n. 8 (citing _Gideon v. Wainwright,_ 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)_ (total deprivation of counsel throughout entire proceeding)); _White v. Maryland,_  373 U.S. 59,  83 S.Ct. 1050,  10 L.Ed.2d 193  (1963)_ (where counsel fails to assert defenses – ineffective assistance of counsel);  _Hamilton v. Alabama,_ 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961).

sought orders:  (a)  removing CORPORON as LUNDAHL's stand-by counsel and (b)  dismissing

the indictment with prejudice based on her "stated"  defenses of Double Jeopardy,  Collateral

Estoppel,  Failed Corpus Deliciti,  Ex Post Facto and Vindictive Prosecution.  96    In  filing  her

writs,  LUNDAHL presented the same factual predicates  presented in the Habeas Corpus

petitions presented herein @ pages 96-118 supra  and  which detailed  LUNDAHL's  16 year

litigation history with ELI LILLY.    The chronicling of this history was mandatory in order to

provide  the  foundation  for  LUNDAHL's  jurisdictional  defenses  to  five  (5)   counts  of  the

10/4/2006 indictment (ADD."1);   all of  which  reached back into time when the challenged

orders were created.

187.    The  prosecutor subsequently fraudulently moved to strike  LUNDAHL's  writ

papers asserting that LUNDAHL was underhandedly attempting to re-litigate her past cases

against ELI LILLY;    the very foundation of the 4 abusive litigants orders against LUNDAHL and

which mandated  LUNDAHL's pretrial detention.   97

_____

96.    See Moore v. Hartman, 388  F.3d  871  (D.C. Cir., 2004)  (quoting _Wilson v.
Thompson,  593 F.2d 1375, 1387  (5th Cir. 1979)_ (footnote omitted))  (lack of probable cause is
not an element of a vindictive prosecution claim.  The standard *Haynesworth* articulated is
this:  once a plaintiff shows protected conduct to have been a motivating factor in the
decision to press charges,  a claim is stated.   See Haynesworth:  retaliatory prosecution for
disorderly conduct unconstitutionally impinged on Haynesworth's  right of access to the
courts guaranteed by the First Amendment.   Haynesworth was entitled to a dismissal of the
criminal charge.     See also  Poole v. County of Otero, 271 F.3d 955 (10th Cir. 2001) (Timing is
important  on a retaliatory & vindictive prosecution claim.  If plaintiff establishes that the criminal
charges were filed to interfere  with the filing of a civil case,  vindictive prosecution is established.);
North Carolina v. Pearce, 395 US 711, 23 L Ed.2d 656, 89 S. Ct. 2072 (1968);  US v. Gilbert, 266 F.3d
1180, 1186-87 (9th Cir. 2001)(vindictive prosecution where the record  shows that the prosecutor
charged defendant in retaliation for defendant having sued the IRS);
97.    Where  a court officer does not frankly convey all of the material facts to the
court,  the prosecution is  tainted and is not a basis for immunity."  (*Id.*)(citing_Murray v. Earle,
**405 F.3d 278 (5th Cir.2005)**_).    While a prosecutor has latitude to express reasonable
inferences from the evidence,  "a prosecutor may not make statements that are unsupported
by the record and prejudice the defendant."   State v. Jones,  71 Wn. App. 798, 808,  863 P.2d
85 (1993) (citing State v. Rav, 116 Wn.2d 53 1, 550, 806 P.2d 1220 (1991)), review denied, 124
Wn.2d 1018 (1994).   Belgarde, 1 10 Wn.2d at 506-5 10.    "The prosecutor undoubtedly plays
a "special role" in "the search for truth in criminal trials,"  Strickler, 527 U.S. at 281, 119 S.Ct.
1936,  the  police  also  play  a  unique and significant role  in that process, and thus both  are

188.    On or about June 15, 2007,  the trial  judge improperly and unconstitutionally struck  LUNDAHL's writ papers as frivolous and abusive on the basis that LUNDAHL was attempting to re-litigate her past claims against Eli LILLY which extended over a 16 year history. The court  asserted that he had no intention of considering the merits of LUNDAHL's writ petitions.  98

189.    On or about June 20, 2007,   the Court refused to release LUNDAHL pre-trial based on LUNDAHL's conditional release petition for an ankle monitor.     On June 24, 2007, LUNDAHL prepared a notice of appeal of the detention order and obtained the signatures of 4 other inmates to confirm dispatch into the jail's mailing system.    To make sure the appeal reached the courthouse and was filed,  LUNDAHL also had a third person stamp and drop another notice of appeal in the court's drop box  located on the outside of the courthouse.

190.    On the morning of June 29, 2007,   LUNDAHL was retrieved  from her cell and taken to the federal court for a status conference hearing on her criminal case.    The courtroom was filled to capacity with public members observing the proceeding.    LUNDAHL's trial bench was rigged up with a microphone such that the prosecutor and the judge could hear LUNDAHL's whispered conversations between LUNDAHL and LUNDAHL's stand-by counsel Corporon.    Before the hearing commenced,   LUNDAHL confirmed in the affirmative with Corporon that the proceedings were being videotaped and that her notice of appeal had been filed with the court thereby stripping the trial court of jurisdiction over the criminal matter until  LUNDAHL's  appeal had been  heard by the 10th circuit.    All of a sudden the trial judge came onto the mike via videoconferencing and stated that he was scheduling a jury trial date for late August or early September and directed  the clerk to check his calendar for the most appropriate date.    While the clerk was checking the calendar,    LUNDAHL  whispered to her counsel "if this judge schedules a jury trial while my appeal of the detention order and

_____

bound by the government's constitutional obligation to "ensure that a miscarriage of justice does not occur," Bagley, 473 U.S. at 675, 105 S.Ct. 3375.  Accord in Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842 (4th Cir.1964).

98.    See  Oses v. Mass. 961 F.2d 985, 986-87 (1st Cir. 1992) (Judge violated defendant's due process rights to an impartial tribunal when the judge commented sarcastically about the defendant's defenses and failed to curb misconduct of the prosecutor.)

my defenses  is pending,  that will  'piss me off' and force me  to file a writ against  the  judge in  the 10th circuit."       Not  even  the  audience  sitting directly behind LUNDAHL,   heard LUNDAHL's whispered  communication to her attorney.     Then the judge  got back on the speaker  and  demanded  to  know  if  LUNDAHL  said  the  phrase  "piss me off".       LUNDAHL admitted that she "whispered" (emphasis added)  the phrase to her attorney as part  of  an attorney client  communication and that  the judge had no right to conduct surveillance on her priviledged communications.     LUNDAHL further objected  to the court even convening a status conference hearing while her appeal of the detention order and jurisdictional defenses was pending.

191.   The Judge  went off on LUNDAHL,   removed  LUNDAHL's right to pro se representation, and ordered that CORPORON represent LUNDAHL for all further proceedings. Mustering significant control,  LUNDAHL  objected to the judge's order claiming that the judge had  shown  a  pervasive  bias  against  LUNDAHL  from  the  outset:   (1)  by first threatening LUNDAHL's well being with a "death sentence";    (2) by failing to  enforce his orders directing BOP officials  to treat LUNDAHL's serious dental issues that could cause LUNDAHL to suffer another heart attack;    (3)  by subjecting LUNDAHL to prison conditions and repeated assaults when LUNDAHL did not fit the standards for pre-trial detention;   (4)  by doing nothing about the lack of communication between LUNDAHL and her counsel;     (5)   by scheduling a jury trial on charges that the judge knew as a matter of law were barred by the double jeopardy clause,  collateral estoppel,  the ex post facto clause,  failed corpus deliciti and vindictive prosecution;  and   (6)  by absurdly scheduling a jury trial without requiring the prosecutor to provide LUNDAHL with any of the charging evidence and under detention conditions that the court knew would impede LUNDAHL's right to prepare for a jury trial.    LUNDAHL objections infuriated the judge more and the judge ordered the marshals to remove LUNDAHL.

192.   After the hearing,  the judge falsified an order stating that LUNDAHL went out of control  and had a violent outburst,  when in fact there was nothing violent about LUNDAHL's  objections  in the courtroom on June 29, 2007 whatsoever.     Of coarse the videotape of this hearing conducted in the bankruptcy courtroom,  was destroyed so as not to

impeach the judge's order.

193.    On July 3, 2007,   CORPORON wrote a motion to the court confirming LUNDAHL's repeated requests to fire CORPORON from LUNDAHL's representation.

194.    On July 3, 2007,  the judge refused to discharge CORPORON as LUNDAHL's counsel,  accusing LUNDAHL of attempting to game the legal system by switching counsel.  99 The court ordered CORPORON to file motions concerning LUNDAHL's claimed jurisdictional defenses on or about  August 27, 2007,   the government was to respond on or about September 3, 2007 and a hearing would be conducted  on LUNDAHL's jurisdictional motions on September 13, 2007;  all under the pretext of creating a record that appeared to grant LUNDAHL a fair trial.

195.    On August 22, 2007,  Corporon sent GREGORY,  a Psychologist, to the jail for purposes of impeaching the FMC's mental evaluations of LUNDAHL performed by doctors, "not would be doctors like GREGORY".      LUNDAHL was on the phone in general population with a legal assistant by the name of Lisa Nielsen.      LUNDAHL's  call was interrupted by a deputy shortly after 10:00 a.m.  The deputy transferred LUNDAHL to the programs pod where GREGORY was waiting to conduct a new set of tests on LUNDAHL.   LUNDAHL demanded to know if GREGORY had copies of  CORPORON's  jurisdictional motions to dismiss.  GREGORY told  LUNDAHL that CORPORON was vacationing in Europe and that she did not know anything about any motions.   GREGORY informed LUNDAHL that she was there to re-evaluate LUNDAHL's mental competency.   LUNDAHL  told GREGORY  that  nothing was wrong with her and that she would not allow GREGORY to  re-examine her.   LUNDAHL further asserted that the competency statutes were nothing more than an abusive tool used to protect complaining

_____

99.   Tate v. Wood,  963 F.2d 20, 26 (2nd Cir. 1992)(due process violated when pro se defendant was confined in administrative segregation for entire period of criminal proceedings because defendant was prevented from any opportunity to prepare own defense.); Milton v. Morris, 767 F.2d 1443 (9th Cir. 1985)(right to proceed pro se violated when prison authorities denied defendant meaningful access to the telephone, visits,  law library,  research materials, or writing materials to present defense).   Same in People v. Lamon, F051924 (Cal. App. 1/12/2009) (Cal. App., 2009) (following teachings  in Milton v. Morris:  defendant's meaningful access  denied even though defendant had stand by counsel because cannot pinpoint needs)

witnesses  who bring  bad faith criminal proceedings,  100    because the competency statute
stripped a litigant of  his  right to a jury  decision on the issue of his competency -  similar to
the schemed and secret  unjust  atrocities of the Star Chambers Court.  101    LUNDAHL left
GREGORY and returned to the general population cell  within 15 minutes of departing the cell.
When  LUNDAHL returned,   LUNDAHL shared with a number of inmates,    the attempted
obstruction by psychologist GREGORY.    LUNDAHL then asked the inmates to document the
incident for future reference which several inmates did.

  196. LUNDAHL subsequently wrote CORPORON a letter reprimanding CORPORON

_____

  100. **"**A bad faith prosecution is generally defined as having been brought without a reasonable expectation of obtaining a valid conviction; however, bad faith and harassing prosecutions also encompass those prosecutions that are intended to retaliate for or discourage the exercise of constitutional rights."   PHE, Inc. v. U.S. Dept. of Justice, 743 F.Supp. 15(Utah 1990)(quoting *Kugler v. Helfant*, 421 US 117, 126 n. 6 (1975)). If a showing is made that the prosecution was brought to retaliate for or to discourage the exercise of a constitutional right, an injunction will be issued regardless of whether the state could obtain a valid conviction. *Id.*   See  Poole v. County of Otero, 271 F.3d 955 (10th Cir. 2001) (Timing is important  on a retaliatory & vindictive prosecution claim.  If plaintiff establishes that the criminal charges were filed to interfere  with the filing of a civil case,  vindictive prosecution is established.)  North Carolina v. Pearce, 395 US 711, 23 L Ed.2d 656, 89 S. Ct. 2072 (1968). See also US v. Gilbert, 266 F.3d 1180, 1186-87 (9th Cir. 2001) (vindictive prosecution where the record  shows that the prosecutor charged defendant in retaliation for defendant having sued the IRS);    Whether there is an appearance of vindictiveness is a question of fact reviewed for clear error.  See United States v. Clay, 925 F.2d 299, 302 (9th Cir. 1991).

  100. Frame v. Hudspeth, 10 Cir., 109 F.2d 356 (when a person is adjudicated to be insane, the condition is presumed to continue so long as the judgment is effective.)   A prior adjudication of mental incompetency gives rise to a rebuttable presumption of continued incompetency and  is established by **Ashley v. Pescor, 147 F.2d 318 (8 Cir. 1945)**; **Byrd v. Pescor, 163 F.2d 775 (8 Cir. 1947)**; **Gunther v. United States, 94 U.S.App. D.C. 243, 215F.2d 493 (1954)**; **Kitchens v. United States, 272 F.2d 757 (10 Cir. 1959)**; In Re Judge's Petition (D.C. S.D.Cal.) 148 F.Supp. 80 (1956); and Robinson v. Johnston (D.C.S.D.Cal.) 50 F.Supp. 774 (1943). . See also, **Panico v. United States, 375 U.S. 29, 84 S.Ct. 19, 11 L.Ed. 2d 1 (1963)** (Rebuttable presumption is a rule of evidence.  When such rule is made and rebutted by the plaintiff,  plaintiff is entitled to a jury trial when the ruling prejudiced plaintiffs right to a fair trial.)  **Howard v. United States, 232 F.2d 274 (5 Cir. 1956)**; **Clark v. United States, 104 U.S.App.D.C. 27, 259 F.2d 184 (1958)**.  That such is an issue for the jury and not for the court to decide is affirmed in **<u>McIntosh v. United States, 176 F.2d 514 (8 Cir. 1949)</u>**.

for violating LUNDAHL's rights to summarily dispose of the criminal proceedings.   LUNDAHL informed CORPORON that if CORPORON did not file the requested motions to dismiss under the double jeopardy clause, the ex post facto clause,   failed corpus delicti and vindictive prosecution,   that  LUNDAHL would sue CORPORON for gross malpractice.

197.   On September 13, 2007,   LUNDAHL was brought before the court expecting to hear CORPORON's motions to dismiss.   CORPORON  did  not  prepare  or  file  the requested  motions.   Instead CORPORON,  acting as a second prosecutor,  colluded with LUNDAHL's former court appointed attorneys,   the prosecutor,   the judge and the complaining witnesses to falsify mental process against LUNDAHL through GREGORY and corruptly declare LUNDAHL mentally incompetent -  in order to interfere with LUNDAHL's rights to pursue constitutional claims against all of the conspirators.   The court would not let LUNDAHL speak or testify regarding the misconduct of CORPORON;  thus speaking  to the collusion between the court,  LUNDAHL's court appointed attorneys and the prosecutor.

198.   On  LUNDAHL's return from the hearing,    LUNDAHL was locked down in supermax  status for the remainder of her incarceration at cache county jail.   At about 11:30 p.m.  on September 13,  2007,   LUNDAHL suffered a stroke from the stressful events of the day which elevated LUNDAHL's blood pressure even more.   LUNDAHL  passed out for 5 hours before she came to.    LUNDAHL could not move her left arm in any extension manuever,   the right side of LUNDAHL's face was paralyzed,   LUNDAHL's speech was slurred,   LUNDAHL had burred vision with glasses,    LUNDAHL had a prominent headache and,    LUNDAHL was swollen such that other inmates thought that LUNDAHL had an allergic reaction to something. The jail never treated LUNDAHL for her stroke.    Instead,  the head nurse GIVENS over the next 10 months,   manipulated LUNDAHL's blood pressure readings down to normal to show that LUNDAHL exhibited no signs that LUNDAHL would be  a potential  stroke candidate.   As to LUNDAHL's arm and face,  GIVEN's  accused LUNDAHL of faking these secondary injuries.   As a result of the untreated stroke,    LUNDAHL incurred pneumonia from October of 2007 through January of 2008 as is common for stroke victims.    LUNDAHL's pnuemonia was patently obvious to numerous inmates.    Again,  GIVENS refused to give LUNDAHL any antibiotics for

her pneumonia  or  take a blood test  to rule out the etiology of  LUNDAHL's pnuemonia.
GIVENS repeatedly placed LUNDAHL's health at serious risk.   Later GIVENS would collude with
the court officers and GREGORY to fabricate a medical report against LUNDAHL claiming
LUNDAHL to be a hypochondriac.  101   (See ADD. "38" for blood test taken on LUNDAHL in
January of 2008 showing significantly elevated   white blood cells supporting LUNDAHL's
respiratory infection).   (See EKG showing atrial fibrillation during LUNDAHL's spell with
pneumonia.)

199.   In January of 2008,  cache county fed LUNDAHL a food tray while in Supermax
lockdown which was laced with Shigella bacteria that came from a BOP official's  feces.
LUNDAHL  became extremely ill with  volatile vomiting and diahhrea.    LUNDAHL  lost 12
pounds in the  space of 4 hours.   When LUNDAHL collapsed in her cell from weekness,  the
guards were called and  LUNDAHL demanded to be taken to the hospital.   Instead,  LUNDAHL
was taken to the medical unit where she passed out.    The next morning,  LUNDAHL
demanded again to be taken to the hospital  to test for poisoning.   GIVENS claimed LUNDAHL
was faking the incident and ordered LUNDAHL locked down in a straight jacket.   GIVENS
contacted a psychologist who interviewed LUNDAHL at the jail.  The psychologist asked
LUNDAHL if LUNDAHL though someone had tampered with her food tray to which LUNDAHL
responded in the affirmative.    Blood tests were ordered on LUNDAHL and showed severe
hypokalemia and systemic shock as would be seen in a poison  situation.  (Refer back to  Add.
"38" for blood tests).    The Doctor at the jail immediately ordered that LUNDAHL be
administered 4   IV  "trauma bags" to treat LUNDAHL's shock.  LUNDAHL taken to  GIVENS
office for five hours and administered all of these IV bags.   After this incident,  LUNDHAL
refused to eat a food tray unless an inmate she trusted selected LUNDAHL's tray from the tray
cart.

_____

101.  This  action  does  not  seek  remedies  for  LUNDAHL's  personal  injuries  for
medical malfeasance.  That action was brought in 2008 to avoid a statute of limitations bar.
LUNDAHL's claims against GIVENS here are for fraudulently fabricating a medical report in
June of 2008 which claimed  LUNDAHL to be  a hypochondriac in order to bolster  later
fabricated and false reports  authored  by GREGORY.

200.    In June of 2008,    LUNDAHL was taken to the federal court for another competency hearing.  GREGORY fabricated a false mental evaluation report on LUNDAHL.   In support of that report,   GREGORY fraudulently testified that she had evaluated LUNDAHL on 8/22/2007 for 1 ½ hours.    LUNDAHL demanded the prosecutor and her counsel obtain the security videotapes of the jail to prove that LUNDAHL only met with GREGORY maybe five minutes,   during which time GREGORY and LUNDAHL  discussed whether CORPORON had prepared LUNDAHL's demanded motions to dismiss.  102

201.    GREGORY perjuriously testified that her examination of LUNDAHL revealed that LUNDAHL suffered from serious mental disorders of a psychotic nature, to include: schizophrenia,  paranoia and  hypochondriasis.   To bolster GREGORY's testimony,   all court officers arranged to have Dr. Gregg from the FMC in Texas appear via teleconferencing and commit perjury.     Dr. Gregg testified that LUNDAHL was profoundly unstable and had borderline psychosis'.    LUNDAHL was never examined by a Dr.  Gregg at the FMC.   Hence, the prosecutor and LUNDAHL's attorney knowingly presented false and perjured testimony to a trial court who also knew that the psychological testimony was false and incompetent.

202.    Nurse GITTENS was  also  brought  in  to  testify about her opinion that LUNDAHL was a hypochondriac.    LUNDAHL demanded to testify in rebuttal to all witnesses' testimonies.   The court in violation of LUNDAHL's due process rights would not let LUNDAHL testify.   103     Accordingly,  LUNDAHL intervened in the proceeding and informed the court

_____

102.   See Milstein v. Cooley, 257 F.3d 1004 (9th Cir., 2001)(**shopping for a dubious expert  to fabricate an opinion was abusive** and stripped  that expert of absolute immunity. Buckley, 509 U.S. at 276.)).   *State v. Champagne*, 497 A.2d 1242, 1246 (N.H. 1985) (a state expert's testimony was stricken  by limited contact with the defendant.  The Expert did not have the necessary foundation to testify as to his opinion of the defendant);   See, *e.g.*, *Drope v. Missouri*, 95 S.Ct. 896, 904 (1973) ("...the failure to observe procedures adequate to protect a defendant's competency rights deprives defendant of  his due process right to a fair trial." Galbraith v. County of Santa Clara, 307 F.3d 1119 (9th Cir., 2002)(**Dr. Ozoa never conducted an examination of the corpse as represented.**  His report claimed that the defendant had been strangled.  The defendant was aquitted.  After trial,  the body was exhumed and the hyoid bone was intact.  Dr. Ozoa was held liable for shoody forensic work)

103.   Gellego v. US, 174 F.3d 1196, 1197 (11th Cir. 1999)(Constitutional violation to refuse to  allow defendant to testify on material matter before the court.));

that her blood pressure was at stroke level and that GITTENS was falsifying LUNDAHL's blood pressure readings.       LUNDAHL demanded that the judge pull a wrist blood pressure cuff from the marshals office and take LUNDAHL's blood pressure electronically on the spot to prove LUNDAHL's assertions that LUNDAHL had malignant hypertension within the 165/110 range while ON THE MEDICATIONS THAT GITTENS PLACED LUNDAHL ON.   The judge did not order such a showing but did order GITTENS to forthwith  electronically take LUNDAHL's blood pressure and that both parties were to keep a record of LUNDAHL's electronic readings.

203.   LUNDAHL was returned to the jail.   The next day,  GITTENS  reported to LUNDAHL's cell and took LUNDAHL's blood pressure electronically.   The reading was 170/115. GITTENS took the reading two more times to be sure.   LUNDAHL was immediately transferred to the medical unit and placed in a 24 hour observation unit to make sure that LUNDAHL was not taking any agents that were increasing LUNDAHL's blood pressure.   LUNDAHL's blood pressure was electronically taken once on the morning and once in the evening and recorded by both parties for a week.   LUNDAHL's blood pressure was consistently recorded at 170/110 to 165/110.   At the end of the week,   LUNDAHL was life flighted back to the FMC on a private government leased jet - as a potential stroke inmate.

204.   The judge ordered the FMC to redress LUNDAHL's present health issues specifically:    to bring LUNDAHL's blood pressure down.   The judge also ordered the FMC to correct  LUNDAHL's dental condition which represented a serious harm to LUNDAHL.   Finally, the judge ordered the FMC to conduct in depth mental tests on LUNDAHL to address the knowingly false report of Vicky Gregory.

205.   When LUNDAHL arrived at the FMC,  she was specially greeted by POWERS whom discussed the protocol for LUNDAHL's mental exams.   LUNDAHL expressly requested that all of her mental exams  be video-recorded to preclude any tampering with records. LUNDAHL told POWERS that the GREGORY mental evaluation report was a complete fabrication and that LUNDAHL wanted protection against anymore false reports being executed.   POWERS  falsely stated that the FMC had no video-equipment at the facility.   (In fact, there is and was video-equipment at the FMC because hearings are conducted directly

from the FMC  via video-cameras.).   Nevertheless,  POWERS refused LUNDAHL's request that all examination matters  be committed to a video record.

206.    LUNDAHL  was processed through the mental health ward.  Nurse White processed  LUNDAHL and   stacked LUNDAHL's consent forms upon each other so that LUNDAHL could not read the text of the consent forms.  Nurse White told LUNDAHL that the consent forms were to pull blood tests, urine tests and other tests on LUNDAHL.    LUNDAHL accordingly signed the consent forms  based on these representations.  Nurse WHITE was very nervous which made LUNDAHL suspicious so LUNDAHL began to read the forms she signed.  The last form which was concealed except the signature line,  was a consent form permitting the FMC to administer LUNDAHL psychotropic medications.   LUNDAHL queried WHITE about WHITE's deception.  WHITE told LUNDAHL that if LUNDAHL did not sign the form,  LUNDAHL would go to the hole.  LUNDAHL refused to sign.   WHITE then contacted POWERS who told WHITE to retract the threat.   WHITE did and LUNDAHL remained in the normal mental ward for the next 4 months conducting test after test.   In LUNDAHL's free time which was at night, LUNDAHL visited the law library to redo her habeas corpus petitions.

207.  LUNDAHL's teeth were never fixed in direct violation of the court order.   Xrays were taken however  (See ADD. "39")  and LUNDHAL began the administrative BOP process to later file a claim.

208.  LUNDAHL was assigned to  psychiatrist Camille Kempke, MD for her 4 month mental evaluation.   In the coarse of her meetings with Dr. Kempke,    Dr. Kempke chronicled patient notes that raised serious concerns with LUNDAHL's incarceration.  For example:   Dr. Kempke opined that the prison system was being abused against LUNDAHL in apparent retaliation to LUNDAHL's litigation history with LILLY.       KEMPKE further reported that LUNDAHL's counsel was not assisting  LUNDAHL whatsoever; hence LUNDAHL spent all of her free time at the law library to prosecute her own cases via habeas corpus.     In addition, KEMPKE wrote that the Utah jails were locking LUNDAHL down under supermax classifications when LUNDAHL had no criminal record,   had no violent tendencies,  and had not committed any disciplinary infractions.   KEMPKE found this very abusive.   Finally,  Kempke wrote that

LUNDAHL's medications and health care treatment in the jails in Utah was being mismanaged, if not deliberately so, that LUNDAHL had a reason to be concerned about her incarceration in the utah jails.   See ADD. "40" for two patient treatment notes by Dr. Kempke setting forth some of the foregoing professional opinions.

209.   Dr. POWERS asked LUNDAHL to retake the MMPI test.   LUNDAHL indicated she would but that she would only do so if she could photocopy her test responses and keep a copy for her records to make sure her responses were not changed.      Dr. POWERS subsequently informed LUNDAHL that she did not need LUNDAHL to take another MMPI test.   LUNDAHL would later find out that the original test LUNDAHL took - but did not photocopy, was significantly altered by FMC officials and GREGORY in order to support GREGORY's fabricated and false report diagnosing LUNDAHL with various (non-existent) psychosis'.

210.   Four months later, Dr. Kempke discharged LUNDAHL.   Dr. Kempke reported that LUNDAHL suffered from NO PSYCHOTIC disorders, mental diseases or mental defects and that LUNDAHL was very capable to stand trial.      Dr. Kempke also reported that LUNDAHL's health had been stablized as favorable as possible given the strenuous condition of defending against such serious charges.   See ADD. "41".

211.   LUNDAHL completed her habeas corpus petitions and submitted them for mailing to the FMC's mail department.   The FMC held onto LUNDAHL's Habeas petitions until after LUNDAHL left the FMC.   The Northern District filed LUNDAHL's habeas petitions only to subsequently adjudicate them moot in light of LUNDAHL's departure from the FMC at the time the petitions were filed.      LUNDAHL also sued her attorneys and FMC officials POWERS, GREGG, and EDWARDS for malpractice, a RICO conspiracy to obstruct justice and Federal Civil Rights Violations in the Northern District of Texas as the initial complaint filed herein.   104

212.   A competency hearing was scheduled upon LUNDAHL's return back to Utah. LUNDAHL contacted several friends and asked these friends to appear in the marshals office

_____

104.   US v. Morris, 259 F.3d 894, 899 (7th Cir. 2001)(6th amendment violation when counsel did not withdraw from representing the defendant when defendant had sued counsel for malpractice or attorney knew that defendant would do so.).

just before LUNDAHL's hearing and listen to LUNDAHL's conversation with her attorney CORPORON,  whom LUNDAHL had maintained from the beginning was attempting to fix a conviction against LUNDAHL.   Several friends did appear in the US Marshals office after they observed CORPORON go into the attorney booth to speak to LUNDAHL.   As always,  there was yelling from both parties.   CORPORON informed LUNDAHL that she had received a lettered offer from the prosecutor to reduce the 7 felony counts down to 1 felony count if LUNDAHL would plead guilty.   LUNDAHL told CORPORON  "to go to hell",  that LUNDAHL was innocent and that LUNDAHL had sued CORPORON in Texas for blatant malpractice and conspiracy to violated LUNDAHL's civil rights.   CORPORON called LUNDAHL a bitch and told LUNDAHL that LUNDAHL would never see the light of day to prosecute her action against CORPORON because CORPORON  was going to see to it that LUNDAHL spend the full 80 year prison term in a mental institution for the criminally insane.

212.    When LUNDAHL returned back to Utah,  a competency hearing was conducted.   Dr. Kempke,  psychologist POWERS and another psychologist were flown in for the hearing and testified.   Dr. KEMPKE gave straight forward testimony attesting that LUNDAHL did not suffer from any mental defect whatsoever and that LUNDAHL should be entitled to try her case on the merits.   Dr. KEMPKE noted that LUNDAHL was prepared to do so by way of habeas corpus petitions.

213.    Dr. Powers presented  altered MMPI test results from LUNDAHL's first visit to the FMC and testified that LUNDAHL's  test results showed the borderline psychosis' raised by GREGORY,   but not actual psychosis.    LUNDAHL saw the test results for the first time at this hearing.  While LUNDAHL told her counsel during the hearing  that the test results had been altered and therefore the entire test should be thrown out as fruit from a poison tree,   LUNDAHL's counsel ignored LUNDAHL and proceeded to facially take over the prosecutions case against LUNDAHL as their lead counsel.

214.    Before Dr. Powers left the stand,  Dr. Powers was asked by CORPORON if POWERS  thought LUNDAHL was dangerous.    Dr. Powers testified that LUNDAHL was not physically dangerous but that LUNDAHL knew enough about the law to be very dangerous to

any adversary.

214.    Once again, the court refused to let LUNDAHL testify in her own behalf.

215.    At the conclusion of the hearing the court expressed anger at FMC psychiatrist KEMPKE's determination that LUNDAHL was competent and suffered from no mental defects.    The Judge wanted to sustain GREGORY's report irrespective that he knew GREGORY's report,   the FMC test results and other testimony attacking LUNDAHL's competency were  perjured and false.    The Judge off the record instructed  POWERS to inform Dr. KEMPKE that the judge was going to send LUNDHAL back to the FMC one more time and that he was ordering Dr. Kempke to  report LUNDAHL incompetent.

216.    LUNDAHL remained locked up in supermax confinement in Utah for another 4 months before LUNDAHL was shipped back to Texas.   Upon her arrival in Texas,  the charges were dismissed without prejudice and LUNDAHL was ordered released.    Apparently, sometime before the transfer,   the judge had corruptly entered a written report supporting the false and fabricated report of GREGORY which held that LUNDAHL was mentally incompetent.

### CAUSES OF ACTION ARE DIRECTED AT THE FOREGOING PARTIES:

1.  FTCA Claim against the United States only;

2.  Defendant DOWNES is sued for declaratory and injunctive relief only to decree the mental incompetency order entered by him void and unenforceable;

3.  Defendant CASTLE is sued in his personal and  official capacity for all matters in which he investigated before the 10/4/2005  grand jury convened and for his part in interfering with LUNDAHL's dental  and health care;

4.  Defendant Holder is sued for declaratory and injunctive relief only in his official supervisory and administrative capacity;

5.  Judges Benson, Seymour, Tallman and Durham are sued in their official and personal capacities for declaratory and injunctive on the void abusive litigant orders and for acting as complaining witnesses for the criminal

proceedings in knowingly  advancing their void orders to wrongfully

prosecute LUNDAHL for crimes LUNDAHL did not commit; and

6.   And all other defendants for all causes of action except LUNDAHL's FTCA

claim and LUNDAHL's declaratory relief claims against the judges.


WHEREFORE LUNDAHL PRAYS AS FOLLOWS:

1.   For Compensatory, special, general and punitive damages as allowed by law;

2.   For treble damages as allowed under LUNDAHL's RICO claims;

3.   For Equitable, Declaratory and Injunctive Relief as allowed by law ;

4.   For Jury Trial on her  Bivens claim first before submission to the Court

of her FTCA claim;

5.   For Trial by Jury on all of her legal claims;

6.   For attorneys fees and court costs;

7.   For pre and post judgment interest;

8 .  For all other relief not herein included but permitted under FRCP rule 54 to

meet the ends of justice; and

9.   For  backwards access claims on all claims this court deems not part of a single

ongoing conspiracy.



Dated February 1, 2010                    electronically signed

_____

Holli   Lundahl

Holloway v. Arkansas,  435 U.S. 475 (1978)  (the trial judge **must  conduct a hearing** where defendant challenges appointed counsel.).


Supervisory officials may be held liable only if they (i) affirmatively participate in acts that cause a constitutional deprivation or (ii) implement unconstitutional policies that causally result in the plaintiff's injuries. *See Baker,* 75 F.3d at 199 (citing *Mouille v. City of Live Oak,* **977 F.2d 924, 929 (5th Cir.1992)**, *cert. denied,* 508 U.S. 951, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993)); *Brenoettsy,* 158 F.3d at 911. "    In sum,  the [supervisor's] conduct must be measured against the standard of deliberate indifference."   *Alton,* 168 F.3d at 200. Page 661    "For an official to act with deliberate indifference,    `the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Brenoettsy,* 158 F.3d at 911; *see Farmer,* 511 U.S. at 837, 114 S.Ct. 1970; *Alton,* 168 F.3d at 200.    "The standard of deliberate indifference is high." *Id.* (citing *Doe v. Dallas Indep. Sch. Dist.,* **153 F.3d 211, 218 (5th Cir.1998)**).